# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DAVID GANEK,

        Plaintiff,

v.

DAVID LEIBOWITZ; REED BRODSKY;
DAVID MAKOL; MATT KOMAR; JAMES
HINKLE; HOLLY J. TRASK; DAVID CHAVES;
PATRICK CARROLL; RACHEL ROJAS; DIEGO
RODRIGUEZ; MARC P. BERGER;
CHRISTOPHER L. GARCIA; RICHARD B.
ZABEL; BOYD M. JOHNSON, III; and
PREETINDER S. BHARARA,

        Defendants.

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**



## COMPLAINT AND JURY DEMAND

Plaintiff David Ganek, by and through his attorneys, Neufeld Scheck & Brustin, LLP, hereby alleges as follows:

### INTRODUCTION

1.  This is a case about the government fabricating evidence and, as a result, destroying a business. Knowing the "catastrophic risk" that a business organization would foreseeably suffer from publicity relating to a criminal investigation, in November 2010, Defendants from the FBI and the U.S. Attorney's Office for the Southern District of New York authorized a high-profile raid against Plaintiff David Ganek at the offices of his hedge fund, Level Global Investors.

2.  Defendants had no probable cause to believe Mr. Ganek had engaged in any wrongdoing. He was never charged by the Department of Justice or even by the Securities and Exchange Commission. The alleged evidence used to justify the raid against Mr. Ganek was

1

fabricated. Specifically, a number of FBI agents and individual AUSAs met with a witness who told them he did *not* have knowledge that Mr. Ganek had been involved in insider trading; the investigators then falsely represented that the witness had said just the opposite—that he *did* have such knowledge. This fabrication was the basis for the raid on Mr. Ganek's office.

3.   The wrongful search was also widely and recklessly publicized. Due to a tip to the *Wall Street Journal*, the raid was front page news. Coverage included photographs of agents carrying boxes of files from the Level Global offices. Because of the raid, Mr. Ganek faced the foreseeable consequence that his investors—themselves highly sophisticated financial professionals—would withdraw their investments from his fund, which would cause it to fold.

4.   Mr. Ganek knew he was innocent of any insider trading. But he did not know what statements the government had made to implicate him, since the affidavit in support of the search warrant was sealed. Immediately following the raid, he took steps to try to reassure his investors and save his business. Prior to the raid, as a matter of quality control and internal compliance, Mr. Ganek had commissioned an external review of Level Global that found no wrongdoing on his part. Following the raid, Mr. Ganek commissioned a second, multi-million dollar review of Level Global by highly respected, top-tier law firms, led by former high-ranking members of the U.S. Attorney's office, and gave them unfettered access to his files. The review concluded that Mr. Ganek had not engaged in any insider trading.

5.    Mr. Ganek attempted to use this external review to reassure his investors. But the investors
      continued to ask whether Mr. Ganek was a focus of the search and investigation. Because
      he had been named in the warrant, Mr. Ganek was unable to satisfy those concerns.

6.    On December 20, 2010, Level Global representatives met with attorneys from the U.S.
      Attorney's Office who were responsible for the investigation, led by Richard Zabel and
      including David Leibowitz. The Level Global representatives expressed concerns about the
      damage the raid and investigation were doing to Level Global. In response, the U.S.
      Attorney's Office representatives assured the Level Global representatives that the raid had
      been carefully considered at the highest levels, with full appreciation for the likely
      commercial consequences, and that that all necessary precautions had been taken. In
      essence, the U.S. Attorney's Office representatives communicated that they had dotted
      their "I"s and crossed their "T"s on all issues surrounding the raid.

7.    Mr. Ganek made one last-ditch effort to save his business and protect his hard-earned
      reputation, investors, and approximately 60 employees. In early February 2011, a highly
      respected former federal prosecutor in the same office as U.S. Attorney Preet Bharara (the
      "Level Global Attorney") reached out to Mr. Bharara to ask him to intervene. The Level
      Global Attorney told Mr. Bharara, in substance, that the fact of the search had unnerved
      investors and that unless the government would clarify that Mr. Ganek was not the focal
      point of the investigation and that it did not allege that there was probable cause to charge
      Mr. Ganek with insider trading, the hedge fund would have to fold and dozens of people
      would lose their jobs. In sum, the Level Global Attorney asked Mr. Bharara to make sure
      that his office was not unnecessarily causing the entire company to shut down based on the
      actions of one former employee. He thus asked Mr. Bharara to give some indication that

Mr. Ganek was not a target of the investigation so that Level Global could reassure its investors.

8.  Mr. Bharara said he would follow up. Within days, Mr. Bharara spoke to the Level Global Attorney again. Mr. Bharara stated in substance that he had consulted with his team. Mr. Bharara told the Level Global Attorney that they had not authorized the raid of Level Global without considering the consequences, including the potential for closing the Fund, and that they stood by their actions. The Level Global Attorney asked whether the U.S. Attorney's Office could make any clarifying statement regarding Mr. Ganek; Mr. Bharara said he was not able to help. A few days later, Mr. Ganek sent a letter to investors announcing that Level Global would close.

9.  During the time that Mr. Bharara had promised to follow up on the basis for the raid against Mr. Ganek, no one from the U.S. Attorney's Office or the FBI spoke to the one witness who Defendants had alleged—falsely—had implicated Mr. Ganek. However, the same day that Level Global's closing was announced and widely publicized, members of the U.S. Attorney's Office brought the witness in for an interview. During that interview, the witness made crystal clear, again, that he had no evidence implicating Mr. Ganek.

10. Given the high-profile nature of this raid and investigation, the anomalous use of such a raid in an investigation of financial crimes, the customs and practices of the FBI and U.S. Attorney's Office, and the subsequent statements about this investigation by supervisors up to and including United States Attorney Preet Bharara himself, it is clear that supervisors up the chain of command must have been involved from the outset, including in the decision to conduct the raid, to leak it to the press, and to implicate Mr. Ganek as a target of the search despite the lack of evidence against him.

11.   Mr. Ganek was never charged by the Department of Justice or the Securities and Exchange Commission. In March 2012, in connection with the prosecution of another defendant suspected of insider trading, but still pursuant to a confidentiality order, Mr. Ganek's attorneys were able to review the sealed search warrant affidavit. They learned that the only asserted basis for naming Mr. Ganek in the search warrant was the representation that a government cooperator had told the FBI agents and AUSAs that he had provided Mr. Ganek with inside information *and* had told him the improper source of that information. Both allegations were necessary to provide probable cause.

12.   But in November and December 2012, at the subsequent criminal trial for that separate defendant, both the cooperator and one of the FBI agents present at that initial meeting made clear that the cooperator had *never* made the statement attributed to him in support of the warrant. In other words, both the cooperator and one of the FBI Defendants made clear, under oath, that the sole basis given for naming Mr. Ganek as a target of the raid—the same raid that Mr. Bharara had allegedly investigated and stood by—was completely false.

## SUBJECT MATTER JURISDICTION

13.   In this complaint, Plaintiff David Ganek asserts claims against certain members and former members of the FBI and the U.S. Attorney's Office for violating Mr. Ganek's constitutional rights. This action is brought pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

14.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## VENUE

15. Venue is proper in the Southern District of New York because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district. *See* 28 U.S.C. § 1391(b).

16. In particular, the investigation into Plaintiff, the fabrication of evidence against Plaintiff, and the resulting unconstitutional search of Plaintiff occurred within this judicial district.

## JURY DEMAND

17. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims in this Complaint.

## PLAINTIFF

18. Plaintiff David Ganek is a resident of New York, New York. He was the founder and principal behind Level Global Investors from 2003 until it closed in 2011.

## DEFENDANTS

19. **Defendant David Leibowitz** was at all relevant times an Assistant United States Attorney and member of the Securities and Commodities Fraud Task Force of the U.S. Attorney's Office. At all relevant times, Defendant Leibowitz was acting under color of federal law and as an employee of the U.S. government. Defendant Leibowitz is named in his individual capacity.

20. **Defendant Reed Brodsky** was at all relevant times an Assistant United States Attorney and member of the Securities and Commodities Fraud Task Force of the U.S. Attorney's Office. At all relevant times, Defendant Brodsky was acting under color of federal law and as an employee of the U.S. government. Defendant Brodsky is named in his individual capacity.

6

21. **Defendant David Makol** was and, upon information and belief, continues to be, an FBI Special Agent working out of the New York field office. At all relevant times, Defendant Makol was acting under color of federal law and as an employee of the U.S. government. Defendant Makol is named in his individual capacity.

22. **Defendant Matt Komar** was and, upon information and belief, continues to be, an FBI special agent working out of the New York field office. At all relevant times, Defendant Komar was acting under color of federal law and as an employee of the U.S. government. Defendant Komar is named in his individual capacity.

23. **Defendant James Hinkle** was and, upon information and belief, continues to be, an FBI Special Agent working out of the New York field office. At all relevant times, Defendant Hinkle was acting under color of federal law and as an employee of the U.S. government. Defendant Hinkle is named in his individual capacity.

24. **Defendant Holly J. Trask** was and, upon information and belief, continues to be, an FBI Special Agent working out of the New York field office. At all relevant times, Defendant Trask was acting under color of federal law and as an employee of the U.S. government. Defendant Trask is named in her individual capacity.

25. **Defendant David Chaves** was one of the two heads of securities and commodities fraud units at the New York field office of the FBI. At all relevant times, Defendant Chaves was acting under color of federal law and as an employee of the U.S. government. Defendant Chaves is named in his individual capacity.

26. **Defendant Patrick Carroll** was one of the two heads of securities and commodities fraud units at the New York field office of the FBI. At all relevant times, Defendant Carroll was

acting under color of federal law and as an employee of the U.S. government. Defendant Carroll is named in his individual capacity.

27. **Defendant Rachel Rojas** was the Assistant Special Agent in Charge for the White Collar Branch of the FBI's New York field office. At all relevant times, Defendant Rojas was acting under color of federal law and as an employee of the U.S. government. Defendant Rojas is named in her individual capacity.

28. **Defendant Diego Rodriguez** is currently the head of the FBI's New York field office, but at times relevant to this complaint was the head of the Criminal Division of the FBI's New York field office. At all relevant times, Defendant Rodriguez was acting under color of federal law and as an employee of the U.S. government. Defendant Rodriguez is named in his individual capacity.

29. **Defendant Marc P. Berger**, at times relevant to this complaint, was the Deputy Chief of the Securities and Commodities Fraud Task Force of the U.S. Attorney's Office. He was promoted to Chief of the Securities and Commodities Fraud Task Force in 2012. At all relevant times, Defendant Berger was acting under color of federal law and as an employee of the U.S. government. Defendant Berger is named in his individual capacity.

30. **Defendant Christopher L. Garcia**, at times relevant to this complaint, was the Chief of the Securities and Commodities Fraud Task Force of the U.S. Attorney's Office. At all relevant times, Defendant Garcia was acting under color of federal law and as an employee of the U.S. government. Defendant Garcia is sued in his individual capacity.

31. **Defendant Richard B. Zabel**, at times relevant to this complaint, was the Chief of the Criminal Division at the U.S. Attorney's Office. He was subsequently promoted to the position of Deputy U.S. Attorney of that office. At all relevant times, Defendant Zabel was

acting under color of federal law and as an employee of the U.S. government. Defendant Zabel is named in his individual capacity.

32. **Defendant Boyd M. Johnson, III**, at all relevant times, was the Deputy U.S. Attorney in the SDNY. At all relevant times, Defendant Johnson was acting under color of federal law and as an employee of the U.S. government. Defendant Johnson is named in his individual capacity.

33. **Defendant Preetinder ("Preet") S. Bharara** was sworn in as the United States Attorney for the Southern District of New York on August 13, 2009, and, at all times relevant to this complaint, was the U.S. Attorney for the SDNY. At all relevant times, Defendant Bharara was acting under color of federal law and as an employee of the U.S. government. Defendant Bharara is named in his individual capacity.

## BACKGROUND FACTS

### Mr. Ganek and Level Global

34. In 2003, Mr. Ganek founded his own investment fund, Level Global. Level Global was an investment advisor which managed hedge funds.

35. Investment funds like Level Global operate by doing extensive market research, and using that research to develop a trading thesis that they hope will permit them to outperform the market.

36. Level Global's particular investment strategy was relatively unique and conservative. Its goal was to earn high-quality, risk-adjusted returns regardless of market direction. In other words, and unlike many long-short hedge funds operating at the time, Level Global sought to provide a true "hedge" against market risk. And it had been successful. The fund had

averaged roughly a nine percent return per year since 2003, including only modest losses during the financial crisis.

37.  As a result of its long tenure, history of success, and profile as a true "hedge" against market risk, Level Global was a popular investment choice for institutional investors like government retirement funds and endowments for non-profits. In particular, Level Global's clients included six distinct state pension funds, as well as the endowments or foundations of multiple private and public universities, a theological seminary, and a hospital. These investors were particularly conservative, and did substantial due diligence on Level Global before investing with the Fund.

38.  As of 2010, Level Global had approximately $4 billion in assets under management. At the end of the first quarter in 2010, a major, sophisticated investor bought a minority stake in Level Global's management company, establishing an equity value of the company at over $400 million for a passive minority stake. Level Global's good performance in 2010, and the addition of their strategic partner, was paying dividends. They had a robust pipeline of potential future investors, including one investor preparing to invest approximately $500 million.

39.  Although Mr. Ganek co-founded Level Global with Anthony Chiasson, Mr. Ganek was the principal partner, with a large majority interest in the business. Mr. Ganek was also the more prominent of the partners and the public face of Level Global, known broadly in New York and national financial circles as a successful asset manager, as well as for his philanthropy, service on boards of trustees, and as a sophisticated collector of modern art.

40.  Mr. Ganek's involvement in Level Global was so uniquely important that he was identified as a "key" person at the firm; the fund guaranteed to promptly notify all investors should

10

Mr. Ganek's role in the fund cease and also promised in that case clients could redeem their investments without any fees.

41. Level Global had approximately 60 employees, including a number of research analysts, traders, and support staff. The research analysts were divided into various sectors by subject matter, under the supervision of sector heads. Each research analyst was assigned a particular set of companies within a sector, such as technology or consumer products. The analyst then had responsibility for thoroughly investigating his assigned companies to permit Level Global to develop intelligent trading theses for these companies. Analysts use a variety of tools to develop this information, including sophisticated modeling, conversations with authorized company representatives, analysis of macroeconomic factors, and sell-side research reports. The information the analyst developed would be passed up, through the sector heads, to the senior management. The trading decisions made based on this information would then be implemented by the separate traders.

42. From 2006 until 2010, one research analyst employed by Level Global was Spyridon ("Sam") Adondakis. Mr. Adondakis was charged with performing market research on a number of technology companies, including Dell and Nvidia, and reporting the results of that research up the chain so that Level Global could make trades on this information.

43. There is nothing unlawful about trading based on nonpublic information developed through lawful research tools. However, financial professionals are not permitted to trade based on information that they know was obtained in breach of a fiduciary duty.

44. In an effort to ensure that its analysts did not engage in insider trading, Level Global created a compliance regimen. Level Global maintained a legal and compliance group, which produced a comprehensive Compliance Manual and Code of Ethics and required

each employee to read and commit to complying with firm policies and procedures. In order to keep Level Global's compliance program up to date, the legal and compliance group kept abreast of industry trends though organizations such as the Managed Funds Association, review of industry periodicals, reports from the SEC and Presidents Working Group, and communications with outside counsel. The legal and compliance group updated Level Global as necessary on legal, regulatory, and compliance issues. Each year there would be several offsite seminars for the employees on compliance.

45.    The Director of Compliance also maintained a list of restricted stocks containing the names of securities that Compliance had determined could not be traded. Research analysts were told that if they received information that they believed could be improper inside information, they were obligated to inform the compliance officer. The compliance officer would then evaluate that information to determine whether it would be permissible to trade on this information; if it was not, the security would be added to the list of restricted stocks. The list was updated and distributed weekly or more often if required. In addition, the specific stocks on the Restricted List were uploaded into a computer program, which was designed to block restricted securities trades from being executed. The Director of Compliance reviewed the Firm's portfolios along with employee's personal accounts in an effort to detect if there had been inappropriate trading.

46.    Level Global's computer programs were also designed to provide real-time monitoring of trading from compliance with investments guidelines, allocations, and required regulatory filings. The programs generated warnings that were sent to the fund's Director of Compliance and other executives in order to determine if further action was needed.

47.   In May 2010, Level Global determined that Mr. Adondakis had violated the compliance regimen, and he was asked to leave the company.

**Insider-Trading Investigations**

48.   Beginning in 2007 or 2008, federal authorities including officials at the FBI and the U.S. Attorney's Office began devoting significant resources to the investigation of insider trading among financial professionals. The investigations were conducted jointly between teams of individuals and supervisors from the FBI and U.S. Attorney's Office and required a substantial sharing of information and resources.

49.   On August 13, 2009, Mr. Bharara was sworn in as U.S. Attorney for the Southern District of New York. At that time Mr. Bharara was briefed regarding significant investigations occurring within the office, including a number in the financial fraud area. Given the high-profile nature of the targets of the ongoing insider-trading investigations, and according to the customs and practices of the FBI and U.S. Attorney's Office, Mr. Bharara would have been briefed on this investigation at that time; he and other supervisors in the FBI and U.S. Attorney's Office would have been kept apprised of developments in the investigation.

50.   The investigations into financial professionals led to a number of high-profile insider-trading prosecutions in 2009. Mr. Bharara held a number of press conferences heralding these prosecutions, and made repeated appearances on stations covering financial news such as CNBC to discuss the prosecutions.

51.   As a matter of investigative strategy, the U.S. Attorney's Office has for many years conducted investigations of alleged wrongful activity at legitimate business by using overt investigative means, such as grand jury subpoenas. There are many reasons for using overt investigative techniques. Financial crimes are complex. Frequently investigations take

many months and even years and there is substantial uncertainty as to whether such investigations will lead to criminal charges. And, critically, covert investigative methods such as the execution of search warrants can destroy legitimate businesses many months before a decision has been made to bring charges.

52. In a much publicized change from these prior practices, the U.S. Attorney's Office under Mr. Bharara's leadership adopted investigative techniques typically associated with the investigation of organized crime and other violent criminal organizations, including the use of informants and wiretaps. These were among the first investigations to use these techniques to target financial professionals. Mr. Bharara himself drew this parallel, he described the Office's "aggressive use of wiretaps [a]s important: It shows that we are targeting white-collar insider-trading rings with the same powerful investigative tools that have worked so successfully against the mob and drug cartels."

53. Wiretaps, in particular, require the use of significant man-power and financial resources— both to monitor the active wires and to evaluate the resulting information. In late 2009, Mr. Bharara and his team obtained authorization for taps covering 104 separate employees and clients of a third-party firm that dealt with hedge funds and other financial professionals.

**Defendants' Roles in this Case**

54. After the initial spate of financial crimes prosecutions in late 2009, the FBI and U.S. Attorney's office continued to use resource-intensive wiretaps to target financial professionals in 2010. As Mr. Bharara told the press in June 2010: "We have never been working harder, have never put so many resources into investigating and prosecuting corporate fraud in this office." That same article also referred to sources who said Mr. Bharara himself was "overseeing some of the highest-priority investigations." The

14

expenditure of significant manpower and resources on the wiretap and other aspects of this investigation created incentives to produce commensurately significant prosecutions.

55. One of the financial firms the FBI and U.S. Attorney's Office was investigating in 2010 was Level Global. Mr. Ganek was the most high-profile person at Level Global.

56. The FBI team responsible for this investigation included members of the FBI's Squad C-35, including Defendants Trask, Komar, Makol, and Hinkle.

57. The individual members of Squad C-35 were supervised by Defendants Chaves and Carroll, co-chiefs of the Squad. The Squad fell under the purview of Defendants Rodriguez and Rojas.

58. The FBI's Squad C-35 worked closely with Mr. Bharara's U.S. Attorney's Office, including AUSAs from the Securities and Commodities Fraud Task Force, whose responsibility it was to investigate a range of fraud, including insider trading.

59. At times relevant to this complaint, Defendants Brodsky and Leibowitz were Assistant U.S. Attorneys assigned to the Securities and Commodities Fraud Task Force and involved in the Level Global investigation. Defendants Brodsky and Leibowitz reported to Defendants Garcia and Berger, the Chief and Deputy Chief of the Securities and Commodities Fraud Task Force.

60. The Task Force fell under the supervision of Defendant Zabel, the Chief of the Criminal Division, who in turn reported to Defendants Bharara and Johnson.

61. In January 2012, Defendant Bharara and Janice Fedarcyk, the Assistant Director in Charge of the New York Division of the FBI, publicly recognized FBI Defendants Rodriguez, Rojas, Chaves, Hinkle, and Makol, and U.S. Attorney Defendants Garcia, Berger, Leibowitz, and Brodsky for their contributions to the investigation of Level Global.

15

**Defendants' Initial Investigation Reveals No Evidence Implicating Mr. Ganek**

62. In an October 2010 speech, Mr. Bharara explained that investigation of insider trading was a "top criminal priority" for his office. At that time, there was pressure to bring more insider-trading prosecutions, especially of top-level executives like Mr. Ganek. As a Time cover story on Mr. Bharara, titled "This Man is Busting Wall Street," described it: "In post meltdown America, Main Street has been baying for some high-paid Wall Street heads to roll, and . . . Bharara is supplying them." The article continued that "Bharara is aiming high, making arrests so far up Wall Street's food chain that hedge-fund bosses may be wondering about picking up the phone."

63. On October 14, 2010, FBI Defendants Hinkle and Makol, with Defendant Chaves' knowledge and approval, approached former Level Global mid-level research analyst Sam Adondakis in Central Park.

64. Unbeknownst to Adondakis, the FBI and U.S. Attorney's Office had developed wiretap evidence involving Adondakis from his time at Level Global.

65. While the FBI and the U.S. Attorney's Office evidently believed that the wiretap records indicated that Mr. Adondakis had been involved in insider trading, the wiretaps did not provide evidence that Mr. Ganek had been engaged in insider trading.

66. Defendants Hinkle and Makol informed Adondakis of the nature of the evidence already gathered against Adondakis in an attempt to obtain his cooperation and assistance with the FBI and the U.S. Attorney's Office's investigation into Mr. Ganek and Level Global.

67. Following this initial meeting, Adondakis agreed to cooperate. Makol informed Adondakis of the general conditions of this cooperation, including that Mr. Adondakis was required to

provide truthful information to the government agents. Any material falsehoods would be a basis for rescinding the cooperation agreement.

68. On November 2, 2010, Adondakis had a second investigative meeting with Defendants. Adondakis met with AUSA Defendants Brodsky and Leibowitz and FBI Defendants Makol, Hinkle, and Komar. At this meeting, these Defendants sought information from Adondakis about insider trading while Adondakis was at Level Global, including, most importantly, information regarding Mr. Ganek.

69. At the November 2 meeting, Adondakis admitted to Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar that he had received sensitive, non-public information regarding Dell, a publicly traded company.

70. At that meeting, Adondakis also implicated two other Level Global employees. Adondakis did *not*, however, implicate Mr. Ganek, either to Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar, or to anyone else. In particular, Adondakis made clear to Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar that Adondakis had *never* told Mr. Ganek that information he had obtained regarding Dell had come from contacts inside Dell, and that he had *never* told Mr. Ganek that the information had been obtained in breach of anyone's fiduciary duties.

71. Mr. Adondakis's job at Level Global was to use market research and other lawful tools to develop information about particular companies, including Dell, and pass that information on so that it could be used in making trading decisions. In other words, what Mr. Adondakis described about his interactions with Mr. Ganek—that he had passed on information about Dell that Mr. Ganek could use in making trading decisions—was *completely consistent* with the lawful job Mr. Ganek had hired Mr. Adondakis to do.

72.   Given Mr. Ganek's primary role at Level Global, the priority placed on prosecutions of high-level executives like Mr. Ganek, and the level of experience of the AUSAs and FBI agents present at the interview of Mr. Adondakis, the subject of Mr. Ganek's involvement must have been fully discussed and vetted during and after that interview.

73.   By the close of the meeting, Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar understood that Mr. Adondakis did not tell Mr. Ganek anything about the source of the information and did not tell Mr. Ganek that the information came from someone breaching his fiduciary duty.

74.   Futhermore, Defendants had no information from any other source indicating that Mr. Ganek had traded based on information he knew came from someone who was breaching a fiduciary duty. None of the wiretaps implicated Mr. Ganek in any impropriety. No other confidential informant implicated Mr. Ganek in any impropriety. No document implicated Mr. Ganek in any impropriety.

75.   As well-trained and experienced Special Agents and Assistant U.S. Attorneys, Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar understood at this point that there was insufficient evidence that Mr. Ganek was involved in insider trading, and thus insufficient basis to make him the target of a search.

76.   After this November 2 meeting, Defendants Brodsky, Leibowitz, Makol, Hinkle and Komar fabricated evidence against Mr. Ganek. Specifically, knowing it was not true, these Defendants fabricated that Mr. Adondakis had told Mr. Ganek that he had received insider information from an inside source at Dell and that he had told Mr. Ganek that the information came from someone breaching his fiduciary duty.

18

77. Upon information and belief, and consistent with both the high-profile nature of this investigation, the priority the U.S. Attorney's Office was giving to insider-trading prosecutions, the customs and practices of the U.S. Attorney's Office and the FBI with regard to the involvement of supervisors, and the reports in the press about supervisory involvement in high-priority insider-trading cases, Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar made the results of their interview with Adondakis known to their fellow Special Agent Defendant Trask, as well as to their supervisors: U.S. Attorney's Office Defendants Berger, Garcia, Zabel, Johnson, and/or Bharara, and FBI Defendants Chaves, Carroll, Rojas, and/or Rodriguez.

78. In the weeks following the raid, Adondakis had multiple meetings with FBI and AUSA Defendants, including Defendants Hinkle, Makol, Harris, Trask, and Brodsky. Consistent with the November 2 meeting, Adondakis never said that Mr. Ganek had engaged in illegal insider trading.

79. Nevertheless, Defendants subsequently misrepresented that, after their conversations with Mr. Adondakis, they now had sufficient evidence implicating Mr. Ganek to make him a focus of their investigation.

### The Fabricated Evidence is Used to Justify a Raid of Mr. Ganek

80. On Friday, November 19, 2010, the *Wall Street Journal* broke a story that federal authorities, capping a three-year investigation, were preparing insider-trading charges that could result in criminal charges against financial professionals. The *Journal* article reported that the investigation had been conducted by the U.S. Attorney's Office and the FBI.

81. Representatives of the U.S. Attorney's Office, the FBI, and the SEC declined to comment, but were made aware of the *Journal*'s plan to publish the article.

82. Although still lacking truthful evidence implicating Mr. Ganek in insider trading, Defendants made the decision to conduct a high-profile raid of targets including Mr. Ganek. The sole basis for probable cause to make Mr. Ganek a target of the raid was the evidence Defendants had fabricated.

83. Defendant Trask signed an Affidavit in support of the warrant, outlining the evidence that Defendants had uncovered during their investigation. Consistent with the customs and practices of the U.S. Attorney's Office and the FBI, the Affidavit would have been reviewed by the Defendants present at the November 2 meeting, including AUSA Defendants Brodsky and Leibowitz and FBI Defendants Makol, Hinkle, and Komar. Consistent with those practices, supervisors including AUSA Defendants Berger, Garcia, Zabel, Johnson, and/or Bharara, and FBI Defendants Chaves, Carroll, Rojas, and/or Rodriguez would have approved the raids.

84. Although the FBI and U.S. Attorney's Office had conducted extensive wiretapping related to third-party consultants as part of this investigation, no recorded conversations implicated Mr. Ganek. Thus, the allegations with respect to Mr. Ganek are not supported by any recorded conversations. Nor are they supported by any documentary evidence. Rather, the vague and conclusory allegations against Mr. Ganek all stem from a single conversation between Defendants and Mr. Adondakis—the November 2, 2010 meeting. Although Defendant Trask was not present at that meeting, she stated she obtained the information in the warrant from her conversations with other law enforcement agents.

85. In particular, the only allegations in the Affidavit implicating Mr. Ganek in insider trading were Defendants' fabrications. That is, the Affidavit falsely alleges that on or about November 2, 2010, Mr. Adondakis informed Defendants that Mr. Adondakis provided

20

inside information to Mr. Ganek *and informed Mr. Ganek of the sources of the inside information.*[1] Strikingly, the Affidavit's only allegations about Mr. Ganek are conclusory and lack any and all specificity.

86. As Defendants knew, Adondakis never said that he had informed Mr. Ganek that he was providing him inside information and never said that he had informed Mr. Ganek about the source of the information he was providing. In fact, Mr. Adondakis had told Defendants the opposite: that he had *never* told Mr. Ganek the source of the information he provided.

87. Defendants had no other source of information implicating Mr. Ganek. At the time of the fabrication of the allegations against Mr. Ganek, Defendants did not even have the relevant trading records for the allegedly illegal transactions.

---

[1] The only allegations purporting to establish probable cause with respect to Mr. Ganek are as follows:

- "Based on my conversations with other FBI agents, I have learned the following regarding SAM ADONDAKIS: . . . . By on or about November 2, 2010, ADONDAKIS agreed to cooperate with law enforcement in this investigation. Among other things, ADONDAKIS has admitted his participaration in obtaining Inside Information knowing that the Inside Information came directly and/or indirectly from public employees who were violating a duty of confidentiality that prohibited them from disclosing the information, *providing the Inside Information to DAVID GANEK, [other names omitted], among others, at Level Global Investors who then executed and caused others to execute securities transactions based in part on the Inside Information,* and exchanging that Inside Information with other individuals."

  (Aff. ¶ 11 (emphasis added)).

- "Based on my conversations with other FBI agents who have spoken with SAM ADONDAKIS, I have learned, among other things, the following:

  . . . .

     c. During his work as an analyst at Level Global Investors, ADONDAKIS obtained Inside Information from insiders at public companies through third-party consultants, including PGR consultants, and from colleagues at other money managers, including hedge funds. *On certain occasions, ADONDAKIS provided this Inside Information to DAVID GANEK, [other names omitted], and GANEK, [other names omitted] executed and caused others to execute certain securities transactions based, in part, on the Inside Information, and that ADONDAKIS informed GANEK, [other named omitted] of the sources of the Inside Information.* . . .

     . . . .

     e. During his work as an analyst at Level Global Investors, *ADONDAKIS spoke with and provided Inside Information to GANEK, [other names omitted] and informed GANEK [other names omitted] regarding the sources of the Inside Information.*

  (Aff. ¶ 13 (emphasis added)).

21

88.     The fabricated inculpatory statements against Mr. Ganek were the only basis for Defendants to include Mr. Ganek as a target of the raid.

89.     On Sunday, November 21, 2010, FBI Defendant Trask filed an Application for a Search Warrant, the Affidavit in Support, and a Request for Sealing. Each of these documents was signed by Defendant Trask and presented to a magistrate judge in the Southern District of New York.

90.     Without knowing that the evidence attributed to Mr. Adondakis was false and fabricated by Defendants, the magistrate judge authorized the warrant in full, including with respect to Mr. Ganek.

91.     As an explicit target of the warrant, Mr. Ganek's personal office, financial records, letters, correspondence, photographs, address book, telephone records, and cellular telephone were all subject to search.

**The Raid on Mr. Ganek's Offices**

92.     On November 22, 2010, as part of coordinated raids in New York, Connecticut, and Massachusetts, individuals from the FBI and/or U.S. Attorney's Office executed a search on the Midtown Manhattan offices of Level Global. While such synchronized raids are typically used when arresting the most violent of criminals—mafia bosses or drug kingpins—the FBI and U.S. Attorney's Office very rarely conducts a physical raid on the offices of a legitimate business, particularly where the raid occurs before decisions have been made to charge individuals.

93.     Upon information and belief, the November 22, 2010 raids are the only instances of the FBI and U.S. Attorney's Office conducting a physical raid of a hedge fund's office when there was no simultaneous arrest made or charges filed. Indeed, it would be another 14

months before any charges were brought or arrests made against the targets of the raid of Level Global. And, of course, Mr. Ganek himself was never arrested or charged in any way.

94. Given the high-profile nature of the U.S. Attorney's Office's insider-trading investigation, the break with past practice in executing search warrants against legitimate businesses, the customs and practices of the FBI and U.S. Attorney's Office, and the subsequent statements about this investigation by supervisors up to and including United States Attorney Preet Bharara himself, supervisors up the chain of command were involved in the decision to conduct the raid and to implicate Mr. Ganek as a focus of the investigation despite the lack of evidence against him.

95. Upon information and belief, one or more of Defendants tipped the *Wall Street Journal* about the impending raids in order to ensure press attention. As a result of the tip, the *Journal* posted immediate and prominent coverage of the raid, including an online article titled "It's On: The Insider Trading Raids Have Started" and photographs of FBI agents carrying boxes of files from Level Global's office. Within 45 minutes of that initial article, the *Journal* had a second piece titled "November Raid: After WSJ Story, Feds Step Into High Gear." And the following day, the *Journal* had a third article, "Hedge Funds Raided in Probe; FBI Agents Seize Documents in 3 Cities as Insider-Trading Investigation Widens" on the front page. The raid was also covered globally, including on the front page of the *New York Times* business section, and in papers from London to New Zealand.

96. The press also immediately recognized the devastating effect these public raids could have on the funds. For example, a *New York Post* article titled "Targeted Hedge Funds are Toast" summarized:

23

Federal agents came armed with search warrants, but the documents may as well have been death warrants for the hedge funds raided in a widening insider-trading probe. In a move lifted from an action thriller, the FBI raided three firms—taking documents and confiscating BlackBerries—on Monday as part of a probe led by Manhattan US Attorney Preet Bharara. While the funds—Diamondback in Stamford, Conn., Level Global in New York, and Loch Capital in Boston—have not been charged with any wrongdoing, legal experts said the raids could mean the kiss of death. "This is very close to being accused of committing a crime without actually being accused," said Thomas Gorman, a white-collar litigation expert.

97. According to the policies and procedures of the U.S. Department of Justice and the Federal Bureau of Investigation, involvement of the press in investigations that may result in an indictment must be approved by the U.S. Attorney or FBI supervisors involved in the case.

98. Upon information and belief, and pursuant to the customs and practices of the U.S. Attorney's office, the approval necessary to authorize tipping the *Wall Street Journal* to the plan to conduct the raid came from supervisory U.S. Attorney's Office Defendants Berger, Garcia, Zabel, Johnson, and/or Bharara, as well as supervisory FBI Defendants Chaves, Carroll, Rojas, and/or Rodriguez.

99. The tip to the *Wall Street Journal* was contrary to established policies and procedures of the Department of Justice.

100. The apparent purpose of Defendants' decision to raid Mr. Ganek's offices, rather than rely on the traditional method of obtaining financial documents—the subpoena—was to unnecessarily publicize their investigation, thereby ensuring maximum harm to targets.

101. The decision to use this public method of conducting the search exacerbated the harms caused by the fabricated evidence against Mr. Ganek.

102. A publicized raid was not necessary to the purposes of the search. There were no exigent circumstances that justified this public search method rather than a subpoena. For example,

there was no sufficient factual basis to assume that information would be destroyed or otherwise not properly disclosed in response to the subpoena filed that same day. The result was an improper exacerbation of the deleterious effects of the search without reasonable justification.

103. Upon information and belief, this publicity and leak was part of an office-wide public relations strategy. In subsequent news articles about Mr. Bharara, unnamed "critics in the law enforcement community" were reported to complain that Mr. Bharara's "office is hyping his role in the insider-trading probe with a massive public relations campaign that includes selective leaks about upcoming arrests."

104. In an interview on CNBC, Mr. Bharara later described the awareness in his office of the possible consequences of public investigations into business organizations, comparing it to the collateral damage caused by firefighters.

> [W]hen smoke is generated, as happens in real life, firefighters show up. And firefighters, just like prosecutors in my office and other regulators, they are conditioned and they're trained to make sure that you don't do undue damage. But you've got to figure out whether or not there's a fire. And firefighters sometimes will go into a building to make sure they're saving lives and putting out the fire, and it turns out it was just smoke, but damage occurs to the building. And damage occurs, as I understand it, and as people in my office are sensitized to understanding it, to business organizations, even from the mere opening of an investigation. And we know that.

105. The raids involved roughly two dozen agents. Agents searched Mr. Ganek's office, files, and electronic devices, including making an electronic copy of his personal cell phone.

106. Mr. Ganek's attorney was provided with a copy of the warrant indicating what documents and files were sought, which demonstrated that Mr. Ganek himself was a target of the

search. Neither Mr. Ganek nor his attorney was permitted to see the supporting affidavit, however, which remained sealed.

## Defendants Refuse to Correct their Misconduct

107. Knowing he was innocent of any insider trading, but not knowing what allegations were in the search warrant, Mr. Ganek took immediate action to attempt to save his business and reputation.

108. Immediately following the raid of his offices, Mr. Ganek hired a well-respected top-tier law firm, headed by former high-ranking members of the U.S. Attorney's Office, to conduct a multi-million dollar, thorough external investigation in order to evaluate whether any misconduct had occurred at Level Global. This was in addition to an earlier external investigation Mr. Ganek had commissioned, before the raid, as part of his own internal compliance efforts.

109. External legal counsel was afforded unfettered access to Level Global records, and Mr. Ganek placed no limitations on the scope or depth of their inquiry.

110. On December 20, 2010, Level Global representatives met with attorneys from the U.S. Attorney's Office who were responsible for the investigation, led by Richard Zabel and including David Leibowitz. The Level Global representatives expressed concerns about the damage the raid and investigation were doing to Level Global. In response, the U.S. Attorney's Office representatives assured the Level Global representatives that the raid had been carefully considered at the highest levels, with full appreciation for the likely commercial consequences, and that that all necessary precautions had been taken. In essence, the U.S. Attorney's Office representatives communicated that they had dotted their "I"s and crossed their "T"s on all issues surrounding the raid.

111. On February 3, 2011, one or more of the FBI Defendants drafted a report of the November 2, 2010 meeting with Mr. Adondakis. Like the Affidavit, this subsequently created report also contained fabricated evidence. Specifically, the report falsely states that at the November 2 meeting, Mr. Adondakis informed Defendants that Mr. Ganek was "interested in the Dell information when Adondakis told them because the information came directly from contacts at Dell." Mr. Adondakis never made such a statement with respect to Mr. Ganek. In fact, Mr. Adondakis was clear that he had *not* provided Mr. Ganek with information regarding the source of this information.

112. In January 2011, following a thorough and unencumbered review of Level Global's files, the external investigation ordered by Mr. Ganek determined that he had not engaged in any insider trading.

113. Soon after the raid on Mr. Ganek's offices, Mr. Ganek's investors and clients became aware of the raid. Mr. Ganek and his representatives spoke to them about their concerns including, among other things, the public nature of the raid and whether Mr. Ganek was a target of a federal insider-trading investigation.

114. Large hedge fund investors and their advisors have a sophisticated understanding of the potential impact of federal investigations. They knew that while a hedge fund could survive the investigation and prosecution of lower-level employees, or even a minor partner, the risk to their own investments was too great if the principal of the hedge fund was the target or focus of a much-publicized raid.

115. Because the Affidavit in support of the Warrant remained sealed at this time, and no charges were publicly filed against any Level Global employees, Mr. Ganek did not know and therefore could not discuss the specific allegations against him.

116. The most that Mr. Ganek could do, given the sealing order, was reassure his investors and clients that he had done nothing wrong, and that the extensive investigation he had ordered confirmed that he had not engaged in any insider trading. But the investors continued to have questions Mr. Ganek could not answer including whether Mr. Ganek himself, as the face and principal of the Fund, was a focus of the investigation.

117. Given that Mr. Ganek was a target of the raid and had been named on the warrant, he could not give his investors the assurances they sought.

118. Although Mr. Ganek was not aware of the fabricated evidence against him, he and his representatives realized that he would be forced to close Level Global unless they were able to obtain some information or public statement from federal authorities that would reassure investors.

119. Following the results of the internal investigation, in an effort to save Level Global from going under, Mr. Ganek and his representatives decided to reach out to Mr. Bharara through the Level Global Attorney, who was a highly respected former federal prosecutor in the same office as U.S. Attorney Preet Bharara.

120. The Level Global Attorney reached out to Mr. Bharara directly to give him an opportunity to intervene before Level Global was forced to close.

121. The Level Global Attorney made this phone call to Mr. Bharara on or around February 4, 2011. On the call, the Level Global Attorney informed Mr. Bharara, in substance, that the search had put Level Global in jeopardy. The Level Global Attorney noted the urgency of the matter and explained that Mr. Ganek would be forced to close Level Global within days, leading to the loss of dozens of jobs, unless the FBI or U.S. Attorney would clarify

that Mr. Ganek was not a target of the investigation or that the search warrant did not allege probable cause that Mr. Ganek had engaged in insider trading (if that were so).

122. Mr. Bharara agreed to look into the matter.

123. On or about February 7, 2011, Mr. Bharara and the Level Global Attorney spoke again. Mr. Bharara informed the Level Global Attorney, in substance, that he had spoken to his team and that the U.S. Attorney's Office had not conducted the raid without thinking through the consequences of doing so, including that the search might force Level Global to close its doors. He further stated that he was unable to say anything about the search or Mr. Ganek that would help Level Global.

124. Based on his representations to the Attorney for Level Global and his communications with his subordinates, either Mr. Bharara knew that the sole representations allegedly implicating Mr. Ganek were fabrications, or he was recklessly indifferent to the fact that they were fabrications.

125. During this period—between when the Level Global attorney first contacted Mr. Bharara and when Mr. Bharara informed him the office stood by the fabricated allegations against Mr. Ganek—none of the Defendants, including none of the AUSA Defendants or the FBI Defendants, had contacted Mr. Adondakis.

126. Upon information and belief, none of Defendants reached out to Mr. Adondakis because they understood that he had already been clear that he did not tell Mr. Ganek anything about the source of the information, and that he certainly had not told Mr. Ganek that the source was an insider or someone breaching a fiduciary duty.

127. As a direct result of Mr. Bharara's confirmation that federal authorities would not provide any statement or assurance that might prevent the firm from going under, Mr. Ganek was forced to close the firm.

128. On February 11, 2011, Mr. Ganek was forced to shut down Level Global, resulting in the loss of employment for dozens of employees and also resulting in substantial losses for the investors. In a letter to investors and employees, Mr. Ganek announced that the fund expected to fully liquidate its portfolios by March 31 and would waive any early redemption fees and penalties.

129. Later on February 11, 2011, following press reports publicizing the closing of Level Global, AUSA Defendant Leibowitz and other federal agents arranged for another investigatory meeting with Mr. Adondakis.

130. At this meeting, despite repeated questioning by the AUSAs and federal agents regarding the same subjects discussed at the November 2 meeting, Mr. Adondakis refused to change his statement.  Mr. Adondakis reiterated that he had never told Mr. Ganek anything about the source of his information. In other words, contrary to the fabrications used to support the raid and stated in the Affidavit and the subsequently created report of the November 2 meeting, Mr. Adondakis told the government agents that he had never told Mr. Ganek that any of Mr. Adondakis' information came from an inside source or a source breaching a fiduciary duty. In simple terms, Mr. Adondakis confirmed that, to his knowledge, Mr. Ganek had never engaged in insider trading.

131. This meeting confirmed what Defendants already knew based on the November 2, 2010 meeting—that the sole allegations allegedly implicating Mr. Ganek were false and fabricated.

132. Upon information and belief, these facts, including that Mr. Adondakis' statements were in direct contradiction to the allegations used to support the raid and memorialized in the Affidavit and the subsequently created report, were relayed to the relevant supervisors, including U.S. Attorney Defendants Berger, Garcia, Zabel, Johnson, and/or Bharara, as well as FBI Defendants Chaves, Carroll, Rojas, and/or Rodriguez.

133. Subsequent investigatory meetings between Mr. Adondakis and Defendant Leibowitz and other agents, again confirmed these facts.

134. Despite knowing that the Affidavit contained false and fabricated statements with respect to Mr. Ganek, without which there was no probable cause to include Mr. Ganek on the warrant, none of the Defendants took any actions to correct these violations or mitigate the resulting harms.

135. Throughout the times relevant to this complaint, there were no prosecutions pending related to the Level Global investigation. Mr. Ganek issued the letter to investors indicating that Level Global would close on February 11, 2011. Mr. Adondakis was not indicted until April 25, 2011; his indictment was filed under seal and not unsealed until January 18, 2012. Other defendants from Level Global were not indicted until 2012. Mr. Ganek was never indicted.

### Defendants' Misconduct Comes to Light

136. Although Mr. Ganek understood that he had not committed insider trading, the Affidavit detailing the "evidence" against him remained sealed.

137. At a January 18, 2012 press conference, Defendant Bharara publicly announced that a day earlier, the U.S. Attorney's Office had filed charges against seven individuals in connection with the events described in this complaint. Those individuals included one former

employee of Level Global. Mr. Ganek was not charged, and his name was not mentioned in connection with these alleged crimes.

138. On the same day, Mr. Bharara's office unsealed an Information against Adondakis that had been filed months earlier. Unbeknownst to Mr. Ganek, Adondakis had already pled guilty to securities fraud and conspiracy to commit securities fraud.

139. Pursuant to a judge's order and Defendants' continued request, the Affidavit in support of the search warrant remained sealed and was not disclosed, even at the time that these charges were announced.

140. On March 1, 2012, the district judge presiding over the criminal prosecutions of other defendants signed a consent protective order agreed to by the criminal defendants and the AUSAs, permitting disclosure of confidential documents, including the Affidavit, to the criminal defendants, their counsel, and individuals necessary for preparation of the defense. Under this agreement, Mr. Ganek's lawyers finally obtained access to the search warrant to view the allegations against him.

141. On November 7, 2012, two of the defendants proceeded to trial. The trial lasted six weeks. During the trial, both Mr. Adondakis and Defendant Makol confirmed that at the November 2, 2010 meeting, Mr. Adondakis made clear that he never told Mr. Ganek anything about the source of the information Mr. Adondakis provided about Dell, and certainly never told Mr. Ganek that the information was obtained in breach of anyone's fiduciary duties. Mr. Adondakis testified on November 28, 2012; Defendant Makol testified on December 10, 2012.

142. At trial, Mr. Adondakis testified as follows on *direct* examination by the government:

> Q. What, if anything, did you tell Mr. Ganek about Sandy Goyal's source within Dell?

      A. *I never told him about it.*

**143.** Mr. Adondakis reiterated this fact—that he never told Mr. Ganek about the source of any

inside information—on cross examination:

> Q. Well, you made assertions to the FBI that all three [*i.e.*, Ganek, Chiasson, and
> Brenner] knew about the information from Sandy Goyal that you had received
> from Tortora correct?
> A. I don't know if those included Mr. Ganek.
> . . . .
>
> Q. Let's start from the beginning. Did you implicate Mr. Chiasson in insider
> trading?
> A. I told him the truth about what happened and I guess does that, I guess that
> implicates him.
>
> Q. And what about Mr. Brenner?
> A. Yes.
>
> Q. And what about Mr. Ganek?
> A. I don't know about Mr. Ganek.
> . . . .
>
> Q. Let's refer to Mr. Ganek specifically. I'd like to read [from the subsequently
> created report of the November 2, 2010 meeting], if I may. "Chiasson and
> Ganek were both interested in the Dell information when Adondakis told them
> because the information came directly from contacts at Dell." Is that true as to
> Mr. Ganek or not true?
> A. *No, it's not true.*

**144.** Defendant FBI Agent Makol confirmed Adondakis's testimony a few days later, first upon

examination by the defendants on trial, and then again on examination by the government:

> Q [by Mr. Weingarten, defense counsel]. And if you could turn to page 3 of [the
> subsequently created report], we will get right to it. Is it not true that Mr.
> Adondakis said to you and to the government that Chiasson and Ganek were
> both interested in the Dell information when Adondakis told them because the
> information came directly from contacts at Dell?
> A. Yes. Both Chiasson and Ganek were both interested in the Dell
> information. . . . When Mr. Adondakis told them about the Dell information,
> they were interested. The information was coming from someone inside Dell.
>
> Q. When you said to the government, both Chiasson and Ganek?

A. I recall from that meeting specifically at that meeting that there was confusion about this paragraph [of the report] because I know coming away from that meeting that I didn't write the report. *I was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell*, so it was confusing.

. . . .

Q [by Ms. Apps, Assistant U.S. Attorney]. Separate and apart from what's written in the report about what Mr. Adondakis said he told Mr. Ganek, do you have a recollection of what Mr. Adondakis said he told Mr. Ganek about the source of the inside information?

A. Sorry. You are referencing the date of contact on the first initial proffer on 11/2?

Q. Yes, . . .

A. Okay, yes.

Q. You were asked by Mr. Weingarten about a passage that appears on page 3 [of the report]?

A. Yes.

Q. It's the second full paragraph on that page?

A. Yes.

Q. Separate and apart from that, what's written there, do you have a recollection of what Mr. Adondakis said during that initial proffer about what he told Mr. Ganek about the source of the inside information?

A. Yes.

Q. And what is that recollection?

A. *Mr. Adondakis did not say that he told Mr. Ganek that the Dell information was coming from a source inside Dell.*

Ms. Apps: Nothing further.

145. With respect to Mr. Ganek, the evidence presented at trial regarding what happened at the November 2, 2010 meeting directly contradicted the evidence contained in the Affidavit and in the report of the November 2 meeting, proving both had been fabricated.

146. What's more, this was not a case in which a witness said one thing, on which the government relied, and then recanted. The witnesses at trial were clear that Mr. Adondakis had *never* made the statements attributed to him by Defendants. These fabrications had

34

been the sole evidence offered implicating Mr. Ganek at the time of the raid and the time

Mr. Ganek was forced to close his business, Level Global.

## **DAMAGES**

147.   As a direct and proximate result of the unlawful actions of Defendants Bharara, Johnson,

Zabel, Garcia, Berger, Brodsky, Leibowitz, Rodriguez, Rojas, Chaves, Carroll, Trask,

Makol, Komar, and Hinkle, Mr. Ganek suffered and continues to suffer substantial injuries

and damages, including but not limited to:

a.   loss of his business, which, in an equity transaction only eight months before the

raid, was valued at $400,000,000;

b.   costs associated with the shutting down of his business;

c.   loss of income, including both Mr. Ganek's majority share of net profits as well as

additional investment income;

d.   loss of future income and opportunities;

e.   loss of business reputation and associated opportunities;

f.   fines; and

g.   legal fees.

148.   These injuries and damages were a directly foreseeable result of Defendants' intentional,

bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions.

## PLAINTIFF'S CLAIMS

### COUNT I

**Fifth Amendment Claim for Violation of Mr. Ganek's Due Process Rights**

*Against Defendants Trask, Makol, Hinkle, Komar, Brodsky, and Leibowitz*

149.  Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further
alleges as follows:

150.  AUSA and FBI Defendants Brodsky, Leibowitz, Trask, Makol, Hinkle, and Komar, acting
individually and in concert, and in their investigative capacities, deliberately fabricated
inculpatory evidence against Mr. Ganek: that Adondakis had told them he had provided
Mr. Ganek with inside information *and* informed Mr. Ganek of the improper sources of this
information. Defendants Brodsky, Leibowitz, Makol, Hinkle and Komar, who were present
at the November 2, 2010 meeting with Adondakis, all understood that Adondakis had never
made any such statement implicating Mr. Ganek. These Defendants informed their fellow
investigator, Defendant Trask, what had occurred at the November 2, 2010 meeting.

151.  This fabricated evidence was foreseeably used against Mr. Ganek, causing Mr. Ganek to be
a focus of a federal investigation. As a direct, proximate and foreseeable result of
Defendants' fabrication, the court authorized the search of Mr. Ganek's offices, files,
records, and electronic devices, which Defendants effected through a public raid of Level
Global's offices. This false evidence was the only basis upon which Mr. Ganek could have
been deemed a focus of the investigation or a target of the raid, and the only basis upon
which he could have been named a subject of the warrant.

152. Defendant Trask signed an affidavit in support of the search warrant including this fabricated evidence. Without this fabricated evidence, there was no basis to make Mr. Ganek a target of the search warrant.

153. Defendants' misconduct deprived Mr. Ganek of his clearly established constitutional rights under the Fifth Amendment of the United States Constitution not to be deprived of liberty or property as a result of the fabrication of evidence by government officials acting under color of federal law. Defendants performed the above-described acts under color of federal law, in their capacities as FBI Special Agents and AUSAs. No reasonable investigator in 2010 or 2011 would have believed that this conduct was lawful.

154. At the time of the fabrications, all Defendants, including the FBI and U.S. Attorney's Office supervisory Defendants, understood the detrimental impact that even the appearance of impropriety or the mere suggestion of a federal investigation would have on a financial business like Level Global.

155. Defendants further understood that by implicating Mr. Ganek as a focus of the investigation, he would personally suffer substantial harm to his business reputation, which would impact both his present and future business. This harm was known to be particularly significant for a financial professional like Mr. Ganek, who worked in an industry predicated upon good reputation.

156. As a direct and proximate result of being publicly considered a focus of the investigation and the resulting harm to his business reputation, Mr. Ganek was forced to close Level Global. The fact that Mr. Ganek was a focus of the investigation left him unable to reassure investors, and left him unable to operate Level Global in a manner consistent with his fiduciary duties.

157. Moreover, in addition to the harm to his business reputation and stigmatization that resulted from being implicated as a focus of the investigation and from the public raid, Mr. Ganek also suffered a number of discrete, material government-imposed burdens that went beyond the typical consequences of being named on a warrant.

158. For example, the known risk of harm to Mr. Ganek's business reputation was deliberately increased by the decision to conduct a physical raid and to tip off the press as to the planned raid. These decisions served no legitimate law enforcement purpose, but served to increase Mr. Ganek's reputational injuries. The story was immediately carried by professional media outlets, including the *Wall Street Journal*, and therefore widely distributed among Mr. Ganek's colleagues, investors, and potential investors. These decisions amounted to a direct, intentional interference with Mr. Ganek's business, rather than the execution of legitimate law enforcement needs.

159. Moreover, the government's fabrication of evidence in the affidavit permitted Defendants to conduct an unlawful search, to deprive Mr. Ganek of his property (including personal files and records), and to interfere with his property (including by copying his personal cellular phone).

160. In both the initial decision to authorize a high-profile raid against Mr. Ganek based on fabricated statements, and the subsequent decision to stand by those false allegations, thereby causing Mr. Ganek's company to fold, Defendants Brodsky, Leibowitz, Makol, Hinkle, Komar, and Trask deliberately engaged in arbitrary and conscious-shocking conduct.

161. As a direct and proximate result of Defendants' actions, Mr. Ganek was wrongfully searched, his property was taken, his business closed, and he suffered other substantial and continuing injuries and damages as set forth above.

## COUNT II

### Fourth Amendment Claim for Violating Mr. Ganek's Right to be Free from an Unreasonable Search

### *Against Defendants Trask, Makol, Hinkle, Komar, Brodsky, and Leibowitz*

162. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

163. Defendants Trask, Brodsky, Leibowitz, Makol, Hinkle, and Komar, acting individually and in concert, caused a search of Mr. Ganek's offices, files, records, and electronic devices without probable cause, thereby violating Mr. Ganek's clearly established constitutional rights under the Fourth Amendment of the United States Constitution to be free from unreasonable searches by government officials acting under color of federal law.

164. Although Defendants' search of Mr. Ganek's effects was conducted pursuant to a warrant, that authorization was issued based on fabrications, material misrepresentations, and material omissions. Defendants, as discussed in detail above, knowingly or deliberately, or with reckless disregard of the truth, made the fabrications, false statements, and material omissions in the warrant Affidavit.

165. These representations were necessary to the court's finding of probable cause. Defendants had no other evidence that Mr. Ganek knowingly traded based on inside information and presented no other evidence to the court. Without these fabrications, material

misrepresentations, and material omissions, there was no probable cause for the search, and the warrant would not have been issued.

166. Defendants knowingly or deliberately, or with reckless disregard of the truth, made the fabrications, false statements, and material omissions in the warrant Affidavit because they knew that otherwise, Defendants had nothing more than a generalized suspicion of misconduct that was insufficient to include Mr. Ganek as a target of the warrant.

167. In addition to violating Mr. Ganek's Fourth Amendment rights by engaging in a search absent probable cause, Defendants also violated Mr. Ganek's Fourth Amendment right to be free from an unreasonable search based on the *public manner* of the search on Mr. Ganek's office.

168. As explained above, the orthodox procedure for gathering evidence from a financial institution like Level Global was to seek records pursuant to a subpoena. Indeed, in this case, Defendants also requested documents from Level Global via subpoena, and ultimately exclusively relied on documents produced pursuant to the subpoena during the prosecution of other Level Global employees.

169. Although Defendants understood that a subpoena would have been sufficient to achieve the goals of the investigation, they nevertheless sought and received authorization to conduct a physical raid of Level Global offices. Defendants also went one step further, informing the *Wall Street Journal* of their plan to conduct the raid, thereby affording reporters and photographers time to be present for the raid, and maximizing publicity.

170. The decisions to conduct a raid and to inform the media of the raid served no legitimate law enforcement purpose. Instead, the purpose of these tactics was to sensationalize the federal investigation.

171. By securing judicial approval based on false statements, misrepresentations, and omissions; conducting a search without probable cause; departing from typical procedures by conducting a raid absent cause; and publicizing the search to members of the media without any legitimate law enforcement purpose, Defendants directly and proximately caused Mr. Ganek's injuries, including the loss of his business.

## COUNT III

### Claim for Failure to Intercede

### *Against all Defendants*

172. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

173. Defendants Trask, Brodsky, Leibowitz, Makol, Hinkle, and Komar and their supervisors, U.S. Attorney's Office Supervisor Defendants Bharara, Johnson, Zabel, Garcia, and Berger, and FBI Supervisor Defendants Rodriguez, Rojas, Chaves, and Carroll, each had a realistic opportunity to intervene on Mr. Ganek's behalf to prevent the violation of Mr. Ganek's constitutional rights not be deprived of property or reputation without due process of law and to be free from unreasonable searches, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

174. Defendants Brodsky, Leibowitz, Makol, Hinkle, and Komar were each present at the November 2, 2010 meeting with Adondakis and understood that he had not provided Mr. Ganek with any information about the source of any alleged insider information. These Defendants therefore understood that there was insufficient evidence to name Mr. Ganek as a target of the warrant or to search his office, files, and personal electronic devices. As part of the team responsible for investigating Mr. Ganek, responsible for the drafting of the

Affidavit, and responsible for the search, these Defendants also knew that the Affidavit contained false statements against Mr. Ganek. These Defendants did nothing to prevent the submission of false statements in support of the warrant and did nothing to prevent the ensuing unconstitutional search and injuries to Mr. Ganek.

175. Prior to the issuance of the warrant, consistent with the policies and practices of the FBI and the U.S. Attorney's Office and with the high-profile nature of this case, U.S. Attorney's Office Supervisor Defendants Bharara, Johnson, Zabel, Garcia, and Berger, and FBI Supervisor Defendants Rodriguez, Rojas, Chaves, and Carroll would also have been informed of the evidence against Mr. Ganek and of the decision to include Mr. Ganek as a target in the warrant. These supervisory defendants either knew that the Affidavit contained false statements, or operated with reckless disregard as to the truth of the statements, and in any event failed to take any action to ensure that Mr. Ganek's constitutional rights were not violated.

176. Defendants' failures to intervene were not limited to opportunities prior to the execution of the search.

177. As discussed in detail above, following his inclusion in the warrant and the raid, Mr. Ganek attempted to keep Level Global from closing, in part by commissioning an extensive external review of the company by major New York law firms. Despite the results of that review, Mr. Ganek's investors were unwilling to remain with Level Global so long as Mr. Ganek remained a target of the warrant. This information was conveyed directly to Defendant Bharara by one of Level Global's attorneys, who was also a former colleague of Defendant Bharara.

178. At this moment, Defendants again had an opportunity to intervene to prevent further harm to Mr. Ganek's reputation, business, and financial prospects. They again failed to do so.

179. Upon information and belief, Defendant Bharara spoke to Defendants Johnson, Zabel, Garcia, Berger, Leibowitz, and/or Brodsky regarding the information provided by the Attorney and regarding the allegations made against Mr. Ganek in the Affidavit. These Defendants were informed regarding what had occurred at the November 2 meeting and regarding the fabrications contained in the warrant. Defendants stood by the allegations against Mr. Ganek.

180. As a direct and proximate result of Defendants' failure to intervene and prevent the violation of Mr. Ganek's constitutional rights, Mr. Ganek suffered the substantial and continuing injuries and damages as set forth above.

## COUNT IV

**Claim for Supervisory Liability Regarding Each of the Above-Mentioned Violations of Mr. Ganek's Constitutional Rights**

*Against Defendants Bharara, Johnson, Zabel, Garcia, Berger, Rodriguez, Rojas, Chaves, and Carroll*

181. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

182. U.S. Attorney's Office Supervisor Defendants, Bharara, Johnson, Zabel, Garcia, and Berger, and FBI Supervisor Defendants Rodriguez, Rojas, Chaves, and Carroll, acting within the scope of their employment and under color of federal law, were personally involved in the unconstitutional misconduct against Mr. Ganek.

183. The Supervisor Defendants supervised the warrant application process, were involved in direct discussions with Mr. Ganek's counsel, and were in direct discussions with the FBI agents and AUSAs regarding the substance of the evidence against Mr. Ganek.

184. The Supervisor Defendants knew, or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate agents and AUSAs had deprived Mr. Ganek of his clearly established constitutional rights not to be deprived of property as a result of fabricated evidence, to be free from unreasonable searches absent probable cause, and not to have his reputation harmed absent due process.

185. Based on the policies and customs of the FBI and U.S. Attorney's Office involving high-profile cases like this, the Supervisor Defendants were involved in each of the critical decisions involving Mr. Ganek, including the decision to include Mr. Ganek on the warrant, the decision to conduct a raid rather than use a subpoena, the decision to tip the press about the raid, and the decision to stand by the allegations against Mr. Ganek despite the evidence presented by Mr. Ganek.

186. In making these decisions, the Supervisor Defendants were either directly informed of the fact that the allegations against Mr. Ganek were directly contradicted by Adondakis, and/or were deliberately indifferent to the truth of factual basis of the allegations, and/or recklessly failed to supervise their subordinate officers.

187. The Supervisor Defendants' knowledge of and direct involvement with the actions against Mr. Ganek are further exhibited by the direct involvement of Defendant Bharara, the head of the office, and Defendant Zabel, the chief of the criminal division.

188. By their active and direct participation in, and facilitation of their subordinates' misconduct, these Supervisor Defendants caused Mr. Ganek to be deprived of his clearly established rights under the Fourth and Fifth Amendments.

189. Moreover, the Supervisor Defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not adequately supervised or disciplined, and in which those subordinates knew that their violations of Mr. Ganek's constitutional rights would be facilitated, approved, and/or condoned by the Supervisor Defendants.

190. As a direct and proximate result of the Supervisor Defendants' misconduct Mr. Ganek suffered the substantial and continuing injuries and damages as set forth above.

**WHEREFORE,** David Ganek prays as follows:

    **a.** For a trial by jury;

    **b.** That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

    **c.** That the Court award punitive damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

    **d.** For pre-judgment and post-judgment interest and recovery of costs; and

    **e.** For any and all other relief to which he may be entitled.

Respectfully submitted,

February 26, 2015

Barry C. Scheck
Nick J. Brustin
Hon. Nancy Gertner (Ret.)*
    *(awaiting admission pro hac vice)*
Anna Benvenutti Hoffmann
Farhang Heydari

Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel: (212) 965-9081
Fax: (212) 965-9084

*Attorneys for Plaintiff*
*David Ganek*