# EXHIBIT  A

AO 93 (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE PREMISES KNOWN AND DESCRIBED AS<br>LEVEL GLOBAL INVESTORS, 888 SEVENTH AVENUE,<br>27TH FLOOR, NEW YORK, NY (AS ATTACHED) | ) <br> ) <br> ) <br> )    Case No. **10 MAG 2587** <br> ) <br> ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____SOUTHERN_____ District of _____NEW YORK_____
*(identify the person or describe the property to be searched and give its location)*:
THE PREMISES KNOWN AND DESCRIBED AS LEVEL GLOBAL INVESTORS, 888 SEVENTH AVENUE, 27TH FLOOR, NEW YORK, NY (AS ATTACHED) (AND ANY LOCKED OR CLOSED CLOSETS, SAFES, CABINETS AND CONTAINERS THEREIN)
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

SEE ATTACHED AFFIDAVIT, INCLUDING ALL ATTACHMENTS

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     *November 28, 2010*
                                                                                              *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court.     *TK*
                                                                                                                              *USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30).*
                              ☐until, the facts justifying, the later specific date of _____

Date and time issued:     *11:09 p[m]*
                                              *November 1, 2010*          *S/ Theodore H. Katz*
                                                                                      *Judge's signature*

City and state:     NEW YORK, NEW YORK          HONORABLE THEODORE H. KATZ, U.S.M.J.
                                                                              *Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

### Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS (A) THE OFFICES OF DAVID
GANEK, ANTHONY CHIASSON, AND ████████████, INCLUDING ALL
COMPUTERS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES, (B) THE
DESKTOP AND LAPTOP COMPUTERS OF SAM ADONDAKIS, AND (C) A MIRROR
IMAGE OF LEVEL GLOBAL INVESTORS' SERVERS WHICH WILL THEN BE
SEARCHED USING SPECIFIC SEARCH TERMS AND PROCEDURE SET FORTH IN
ATTACHMENT B, ALL LOCATED AT LEVEL GLOBAL INVESTORS,
888 7TH AVENUE, 27TH FLOOR, NEW YORK, NEW YORK

(A) THE OFFICES OF DAVID GANEK, ANTHONY CHIASSON, AND

████████████, INCLUDING ALL COMPUTERS, HAND-HELD DEVICES, AND

CELLULAR TELEPHONES: All financial records, handwritten documents

and/or notebooks, letters and correspondence, photographs,

telephone and address books, identification documents, travel

documents, telephone records, computers and other electronic

devices, cellular telephones, and other records and documents

that constitute evidence of the commission of securities fraud,

wire fraud, money laundering, commercial bribery, conspiracy to

commit and aiding and abetting the commission of such crimes, or

are contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds. These items will

be searched pursuant to the procedure set forth in Attachment B.

ATTACHMENT A
(page 2 of 2)

(B)  THE DESKTOP AND LAPTOP COMPUTERS OF SAM ADONDAKIS,

AND

(C)  A MIRROR IMAGE OF LEVEL GLOBAL INVESTORS' SERVERS

WHICH WILL THEN BE SEARCHED USING SPECIFIC SEARCH TERMS AND

PROCEDURE SET FORTH IN ATTACHMENT B.

**ATTACHMENT B**
(page 1 of 2)

  1.   The Federal Bureau of Investigation ("FBI") will follow the following procedure with respect to the search of the servers listed in Attachment A at Level Global Investors.

  First, personnel at the FBI will make a mirror image of all, or as much as feasible and necessary, of the servers at Level Global Investors.  In the event that the FBI cannot make a mirror image of a server or servers on site, the FBI will remove the servers and mirror the servers off site as soon as reasonably possible.  In that event, once the servers have been imaged, they will be returned.

  Second, if Level Global Investors volunteers to make a mirror image of the servers and (if and only if) the FBI determines that their assistance is necessary and proper, the FBI will supervise the process by which all, or as much as feasible and necessary, of the servers at Level Global Investors will be imaged.

  Third, following completion of the imaging process, the FBI will designate one or more personnel who will be walled off from the investigation to conduct the following searches of the imaged material from the servers:

  (1)  Search for all emails and documents authored by, sent to, and/or received from David Ganek, Anthony Chiasson, ██████████████, and Sam Adondakis.

  (2)  Search for all emails and documents containing the following search terms in the file name or anywhere in the electronic data of the file(s):

  (a)  ██████████████████
  (b)  ██████
  (c)  "my check"
  (d)  consultant
  (e)  ██████████
  (f)  ████
  (g)  Kinnucan
  (h)  "Broadband Research"
  (i)  Dell
  (j)  ████████████
  (k)  ████████████████████

**ATTACHMENT B**
(page 2 of 2)

2. For all other items listed in Attachment A (other than the servers which is covered by procedure #1 above), the FBI will search the content in Attachment A for the following information:

1. Any and all communications between and among David Ganek, Anthony Chiasson, ▓▓▓▓▓▓, Sam Adondakis, ▓▓▓▓▓ consultants, ▓▓▓, ▓▓▓▓▓▓▓▓▓▓, ▓▓▓, John Kinnucan, Broadband Research, and any third-party consultant.

2. Any and all documents relating to, reflecting, and/or concerning information about public companies.

3. Any and all evidence reflecting communications about trading based on information about public companies.

4. Any and all other evidence that will assist the FBI in identifying and/or determining whether other individuals were involved in providing material, nonpublic information in violation of fiduciary and other duties of confidentiality and/or involved in trading based on material, nonpublic information.

5. Any and all other information reflecting and/or showing and/or leading to evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United States Code, Sections 78j(b) and 78ff, and Title 18, United States Code, Section 2 in connection with those offenses.

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

LEVEL GLOBAL INVESTORS, 888 SEVENTH
AVENUE, 27TH FLOOR, NEW YORK, NEW YORK

)
)
)
)
)

Case No.     **10 MAG 2587**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

THE PREMISES KNOWN AND DESCRIBED AS 888 SEVENTH AVENUE, 27TH FLOOR, NEW YORK, NEW YORK (AS ATTACHED)

located in the _____SOUTHERN_____ District of _____NEW YORK_____ , there is now concealed *(identify the person or describe the property to be seized):*

PLEASE SEE ATTACHED AFFIDAVIT AND ALL ATTACHMENTS.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2, 371, 1343, 1348, 1349; 15 U.S.C. §§ 78j (b), 78ff | Including but not limited to wire fraud , fraud in connection with securities, and money laundering, and conspiracy to commit the same. |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HOLLY J. TRASK, SPECIAL AGENT, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____11/21/2010_____

City and state: _____Scarsdale, N.Y._____

_____
*Judge's signature*

THEODORE H. KATZ
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
                                        :
IN THE MATTER OF THE APPLICATION OF     :    <u>FILED UNDER SEAL</u>
THE UNITED STATES OF AMERICA            :
FOR A SEARCH WARRANT FOR THE PREMISES   :
KNOWN AND DESCRIBED AS (A) THE OFFICES  :    AFFIDAVIT IN
OF DAVID GANEK, ANTHONY CHIASSON, AND   :    SUPPORT OF A
▨▨▨▨▨▨▨▨, INCLUDING ALL COMPUTERS,      :    SEARCH WARRANT
HAND-HELD DEVICES, AND CELLULAR         :
TELEPHONES, (B) THE DESKTOP AND LAPTOP  :
COMPUTERS OF SAM ADONDAKIS, AND (C) A   :
MIRROR IMAGE OF LEVEL GLOBAL INVESTORS' :
SERVERS WHICH WILL THEN BE SEARCHED     :
USING A SPECIFIC PROCEDURE, ALL LOCATED :
AT LEVEL GLOBAL INVESTORS, 888 7TH      :
AVENUE, 27TH FLOOR, NEW YORK, NEW YORK  :
- - - - - - - - - - - - - - - - - - - x

        HOLLY J. TRASK, being duly sworn, deposes and says:

        1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI").  I make this Affidavit pursuant to Rule 41
of the Federal Rules of Criminal Procedure for the issuance of a
warrant to search THE PREMISES KNOWN AND DESCRIBED AS (A) THE
OFFICES OF DAVID GANEK, ANTHONY CHIASSON, AND ▨▨▨▨▨▨▨,
INCLUDING ALL COMPUTERS, HAND-HELD DEVICES, AND CELLULAR
TELEPHONES, (B) THE DESKTOP AND LAPTOP COMPUTERS OF SAM
ADONDAKIS, AND (C) A MIRROR IMAGE OF LEVEL GLOBAL INVESTORS'
SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE,
(as set forth in this affidavit and its attachments), ALL LOCATED
AT LEVEL GLOBAL INVESTORS, 888 7TH AVENUE, 27TH FLOOR, NEW YORK,
NEW YORK (the "PREMISES").  The grounds for my belief are as
follows.

2.     I have been a Special Agent with the FBI for over 7 years.  I have participated in numerous investigations of fraudulent schemes, including wire fraud, mail fraud, money laundering, and securities fraud.  Among other things, during these investigations, I have participated in the execution of search warrants.  Through my training, education, and experience, I have become familiar with the manner in which fraudulent schemes, including illegal insider trading and wire fraud schemes, are operated, and the types of electronic records kept in and maintained in connection with these fraudulent schemes.

3.     This application is submitted in connection with an investigation of wire fraud and illegal insider trading schemes in which individuals have been receiving and then transmitting to others material, nonpublic information regarding certain public companies' quarterly earnings releases and other market moving events (the "Inside Information") for the purpose of executing profitable securities transactions, and in which the Inside Information has been misappropriated by individuals in violation of their fiduciary and other duties of trust and confidence to their employers.  For the reasons detailed below, there is probable cause to believe that, in the PREMISES, there exists evidence, fruits, and instrumentalities of violations of the following statutes: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; (b) money laundering, in

2

violation of Title 18, United States Code, 1956; (c) travel act, commercial bribery, in violation of Title 18, United States Code, Section 1952; (d) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 371; (e) conspiracy to commit commercial bribery, in violation of Title 18, United States Code, Section 371; (f) conspiracy to commit money laundering, in violation of Title 18, United States Code, 371; (g) securities fraud, in violation of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; (h) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and Title 18, United States Code, Section 1349; and (i) aiding and abetting the substantive offenses of wire fraud, money laundering, travel act/commercial bribery, and securities fraud, in violation of Title 18, United States Code, Section 2 (hereinafter collectively referred to as "TARGET OFFENSES"), as described below and in Attachments A and B to this Affidavit.

4. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a warrant to search the PREMISES, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. The information contained in this Affidavit is based upon

3

conversations with other law enforcement officers, cooperating witnesses (as reflected below), my review of various documents and records, my review of interceptions of wire communications as a result of court-authorized wiretaps pursuant to Title 18, United States Code, Section 2518 and, where specified, my personal observations and knowledge. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part only.

<u>THE INVESTIGATION</u>

5. Since at least in or about 2009, I and other FBI agents have been investigating the TARGET OFFENSES in connection with the use of third-party consultants hired by money managers, including hedge funds, to provide Inside Information relating to public companies. In certain circumstances, the investigation has focused on third-party consultants like JOHN KINNUCAN who operated his own firm called Broadband Research. Consultants like KINNUCAN received money from money managers, including hedge funds, for information that they obtained from, among other sources, insiders at public companies. In other circumstances, the investigation has focused on third-party consultant firms like ███████████████████ who pay, among other people, insiders at public companies to speak with and provide information to their clients, including hedge funds.

4

6.    Since at least in or about 2009, I and other FBI agents have determined that there is probable cause to believe that certain third-party consultants, certain third-party consultant firms, certain insiders at public companies, and certain money managers, among others, have violated the TARGET OFFENSES.  During the course of the investigation, I and other FBI agents have obtained the cooperation of multiple participants in these TARGET OFFENSES.  In addition, under the direction of the FBI, several of these cooperating witnesses have recorded conversations with participants in these TARGET OFFENSES.  Moreover, I and other FBI agents have obtained court authorization to intercept wire communications over the telephones used by multiple individuals.

7.    From on or about October 7, 2009 through on or about May 27, 2010, I and other FBI agents obtained court authorization to intercept wire communications over two conference lines used by ▒▒▒▒ to connect, among other things, ▒▒▒▒ consultants who included insiders at public companies with ▒▒▒▒ clients who included hedge funds.  (In this affidavit I refer to these telephone lines as "▒▒▒▒ Conference Line 1," "▒▒▒▒ Conference Line 2," and collectively, the "▒▒▒▒ Conference Lines").  Based on these wire interceptions, I and other FBI agents learned that numerous insiders at public companies were violating their

fiduciary and other duties of trust and confidence to their
employers by disclosing Inside Information to ████'s clients.

8.    Based on my review of summary line sheets and my
conversations with other FBI agents, I have learned that certain
wire interceptions over the ████ conference lines included
conversations between SAM ADONDAKIS, an employee at the time with
a hedge fund called LEVEL GLOBAL INVESTORS, and ████consultants
who were insiders at public companies.  I have further learned
that, during these conversations, ADONDAKIS knowingly received
Inside Information from these ████ consultants who were violating
their fiduciary and other duties of trust and confidence to their
employers.  The following are some examples of those
interceptions:[1]

a.    On or about November 6, 2009, at approximately
11:32 a.m., an incoming call was intercepted over the ████
Conference Lines, between SAM ADONDAKIS and ████████████
████████.[2]  During the conversation, ADONDAKIS stated that he

--------------------------------

[1]    In certain instances throughout this affidavit, I have
included in parentheses my interpretation of certain
abbreviations, words, and phrases used in the recorded
communications quoted herein, and I have used ellipses (". . .")
to denote where I have omitted other recorded words, phrases, or
other statements made within the passages quoted herein.  These
interpretations are based on my training, experience, my
conversations with cooperating witnesses, my review of
intercepted conversations, and my review of publicly available
information.

[2]    Based on my conversations with other FBI agents, I have
learned that ████████ has been identified as ████████████

6

worked for Level Global Investors, that Level Global Investors has $4 billion in assets and is based in New York, and that ADONDAKIS covers computer hardware and semiconductors. During the conversation, ▓▓▓▓ stated that he worked for ▓▓▓▓, which is a business unit within ▓▓▓▓▓▓▓, and that his group was involved with all of ▓▓▓▓▓▓. (Based on my review of the wiretap application submitted by the FBI to intercept wire communications over the ▓▓ Conference Lines (hereinafter "▓▓▓ Wiretap Application"), I have learned that ▓▓▓▓▓▓▓ is a public company whose shares are traded on NASDAQ.) ▓▓▓▓▓ further stated that he has "good visibility" into the semiconductor side of ▓▓▓▓▓▓. (Based on my review of the ▓▓ Wiretap Application, I have learned that the semiconductor side of ▓▓▓▓▓▓ accounts for approximately 50% of the company's overall revenue.) ▓▓▓▓ stated that "from the semiconductor side, I think I have a pretty good idea of what is going on in terms of capital expenditure from the outside world as we see it." ADONDAKIS responded: "Great." ▓▓▓▓ further stated that "... technically my role here is, I am a materials project manager, but in order to do what we do for projects that are wide (in) scope across the company, it requires us to have that vision of what is happening in a more global sense." ADONDAKIS responded: "Sure, ok, perfect." ADONDAKIS later stated that he thought that most

companies who had reported (earnings) recently think things are
going well and that the order guidance was strong for the fourth
quarter.  ADONDAKIS stated that recently there had been a couple
of reports that there was a chance that things could slow and he
would be curious to get ████'s take "if momentum has
continued," and how ████ "sees the slope of the next few
quarters." ████ responded: "Yeah, so hopefully you are hearing
that news from our competitors, because I am not seeing it the
same way.  You know really what I am look at the fourth quarter,
of course, our earnings call will be next week, but, um, the
fourth quarter from my viewpoint finished up what was a pretty
dismal year at least on a positive note, you know.  I am looking
at about a 75% uptick from the previous quarter, although it was
down from the previous year, it was single digits down, right, so
7% below the previous year . . . and let me preface what I am
about to say with, um, the information, what I look (at)
basically are, is, in a sense, kind of a build plan, so it gives
me a tick on what we are seeing coming in from our customer base.
Um, typically, because it is more manufacturing oriented, the
future outlook is somewhat sketchy, I guess would be the best way
to put it.  Um, so it is not a real, there is not a real
scientific forecast that we have.  Um, so really what we see
comes down to the nuts and bolts of hard orders, um, as we get
into real time.  So you know, a month away, two months way,

8

pretty good information, pretty much speculative as we go further than that." A short time later, ████████ added that "I am expecting a first quarter uptick of at least 50% on top of the fourth quarter, and then right now the second quarter and the third quarter are somewhat leveling out, and the reason I think that is good news is because, right now, if we can say in the first quarter, in early first quarter, that the second quarter and the third quarter are leveling out, more than likely, what we have seen is a lot of that drop in demand come in closer to the time, and we see the numbers increase." ADONDAKIS responded: "I see." ████████ then stated: "So do I think we are leveling out? I don't think so. I think the numbers right now mathematically would say that it is leveling, but I believe the way the momentum is going right now is that we will see a continual rise, at least probably through the mid-part of 2010." (Based on my training, experience, and conversations with other agents, I believe that the information that ████████ provided to ADONDAKIS would be important to an investor in determining whether to buy and/or sell ████████████ securities, and that the information regarding the growth of the semiconductor part of the business in the fourth quarter of this year and the first, second, and third quarters of next year, was nonpublic at the time.) Later in the conversation, ADONDAKIS asked: "When do you start to get, um, you know, very good confidence in the next quarter? At what point?"

9

[REDACTED] responded: "Oh, I would say, you know, I mean obviously the closer the better, but as we get within a month or so, I think we have a pretty good idea.  We will see some ebbing and flowing going on for a little while yet, but, like I say, because we are where we are at, and the numbers that I am seeing for the second quarter, even the third quarter, is what really makes me feel a little bit more comfortable in saying that those are going to be some pretty solid quarters for us.  No obviously not going to be at levels we were used to a couple of years ago, but certainly, you know, reaching levels we were at in mid-2006. Hold on a sec, I will tell you exactly where that falls in, yeah, so 2005, mid-to-late 2005, was a bit of a lull, but we are approaching those levels right now."  ADONDAKIS asked: "OK, so you are approaching levels of 2006 or 2005?"  [REDACTED] responded: "2005, yeah, 2006 really started to shoot up in the second quarter, um, you know, way up there.  We are not there yet." (Based on my training, experience, and conversations with other agents, I believe that the information that [REDACTED] provided to ADONDAKIS about how the "numbers" looked in the fourth quarter as compared with the numbers in 2005 and 2006 would be important to an investor in determining whether to buy and/or sell [REDACTED] [REDACTED] securities.)  Toward the end of the conversation, [REDACTED] stated: "As we near the end of the quarter is probably a good time to get a little bit firmer numbers and see where things

10

are going, but you know, I leave that up to you, what makes sense

to you, so you just let me know and I can make it happen."

ADONDAKIS responded: "OK, perfect.  Well, you know what, maybe I

will check in with you following, well I guess the earnings call

is next week, so maybe it makes sense for us to talk, uh, kind of

late November, later in the month, like uh, the last week of

November, the first week of December timeframe."  ▓▓▓▓▓▓▓▓▓

responded: "Sure."

      b.    On or about December 1, 2009, at approximately

12:04 p.m., an incoming call was intercepted over the ▓▓▓▓▓

Conference Lines during which BOB NGUYEN, a ▓▓▓▓ employee, spoke

with ▓▓▓▓▓▓ who stated that he previously worked at ▓▓▓▓▓

▓▓▓▓▓▓ and now worked at ▓▓▓▓ .  (Based on my review of the

▓▓▓ Wiretap Application, I have learned that ▓▓▓▓▓▓▓▓▓▓▓▓ is

a public company whose shares trade on the New York Stock

Exchange, and that ▓▓▓▓▓ is a private company that ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ .)  During the conversation, NGUYEN stated that he was

instructed to speak with ▓▓▓ by "JESSE" [LNU] (who appears to be

a ▓▓▓ client named JESSE TORTORA) and that he was interested in

learning about ▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓ NGUYEN mentioned

that he knew that ▓▓▓ had spoken with JESSE TORTORA and "SAM"

(whom I believe to be SAM ADONDAKIS) in the past, and that NGUYEN

was directed to speak with ▓▓▓ .  NGUYEN stated that JESSE

11

TORTORA was at a firm whose compliance has grown stronger, so there might have been recent hesitation with JESSE TORTORA reaching out to ███████ (Based on my training, experience, and conversations with other agents, I believe that NGUYEN was stating that JESSE TORTORA's compliance department did not want JESSE TORTORA speaking directly with employees at public companies and, as a result, JESSE TORTORA directed NGUYEN to speak with ██████ and then provide the information to JESSE TORTORA, as a means by which JESSE TORTORA would be able to get around the compliance department's policies.) ███████ stated that the information he had provided was his read on the industry but nothing confidential and now that ██████ was working at a private company, there should be no conflict of interest.  NGUYEN stated that JESSE TORTORA told NGUYEN that ███████ information in the past was a good market indicator even if ██████ was not working at the executive level. ███████ stated that he left ████████████ because it was a massive company, but ███████ was growing and focusing on cellular wireless technology solutions.  NGUYEN asked about ███████ interaction with ██████████████ and whether ████████████ was trying to sell its baseband group. ███████ said yes, that ████████████████ was trying to sell it, but that no one was willing to pay for it right now so that they pulled it back in-house. ███████ further stated that ████████████████ and ████████ had a supply agreement for the next ten years. ███████ said

12

that ███████████ was not buying any big companies. NGUYEN

asked ████ if ████ still followed what was going on at ████████

██████████ and ████ said that ██████ interacts with some of

███████████████ executives and that he hoped to continue that

relationship. ███████ also stated that his wife worked for ████████

██████████ as well. (Based on my training, experience, and

conversations with other agents, I believe that NGUYEN was asking

whether ████ had access to Inside Information at ████████

██████████ even though ████ no longer worked for that company,

and that ████ stated in his response that he had access to

information as a result of his company's business relationship

with ██████████████████, his continued access to executives at

██████████████ and his wife's employment at ████████

██████████████ NGUYEN asked about the next couple of months and

quarters in the semiconductor industry, and ████ responded that,

among other things, it would be until February before ████████████

could improve its lead times and that there were supply system

issues within ████████████████ that demand was still strong

into the end of the first quarter but who knew afterwards and

that, as far as double-booking, it was not a large concern right

now. (Based on my training, experience, and conversations with

other agents, I believe that the information that ██████ provided

NGUYEN relating to ████████████████ would be important to an

investor in determining whether to buy and/or sell ██████████

13

███████████ securities, and that the information was not public.)
NGUYEN wondered whether ████████████ was on a two-to-three
year downturn, and ██████ stated that inside management at ██████
████████ was short-sighted, that there was a lot of in-house
arguing, and that ██████████ had lost share over the last
few quarters (according to an individual named ██████████ whom I
believe to be ██████████████████████████████ based on my review of publicly available
information). NGUYEN asked if ████████████ will have
oversupply in the next year, and ██████ stated that he thought
██████████s was still conservative at least for the next
few quarters. NGUYEN stated that he wanted to speak with ██████ in
another month or two, and will ask about whether or not
"double-booking" will become an issue. NGUYEN asked ██████ if ████████
needed help with anything, and ██████ stated that he was interested
in certain areas and if NGUYEN heard about any upcoming mergers
and acquisitions. (Based on my training, experience, and
conversations with other agents, I believe that NGUYEN was
offering to provide information to ██████ about other companies as
a way to obtain further information from ██████ about ████████
██████████ in the future.) ██████ stated that some "M&A"
(referring to mergers and acquisitions) should happen but he did
not know of any right now. NGUYEN stated that he will send any
interesting notes that he has from a contact at AT&T and email

them to ▨ NGUYEN stated that he will let JESSE TORTORA know that ▨ was at a private company now.

      c.   On or about December 2, 2009, at approximately 3:05 p.m., an incoming call was intercepted over the ▨ Conference Lines in which SAM ADONDAKIS spoke with ▨ of ▨ During the conversation, ▨ stated that they talked in late October and that bookings was making a decent first quarter. ADONDAKIS asked whether bookings were going to go up in the first quarter, and ▨ stated that ▨ executives were expecting things to slow down but it had not, and that this was overall, not just analog or wireless. ADONDAKIS asked if ▨ knew what the bookings were in the fourth quarter as compared to the third quarter, and ▨ responded "the bookings in Q4 (fourth quarter) were, let's see, versus Q3 (third quarter) slightly up, just slightly greater than one book-to-bill, but not drastically better." ADONDAKIS asked about double-ordering, and ▨ stated that there was not much of a concern, just a week and a half ago when he talked to the guys, over double-ordering, and that it looked like the first quarter was going to come in flat. ADONDAKIS asked if there was anything else important, and ▨ stated that lead times at ▨ had been pretty consistent across the industry. (Based on my training, experience, and conversations with other agents, I believe that the information that ▨ provided to ADONDAKIS relating to

15

bookings and double-ordering would be important to an investor in
determining whether to buy and/or sell Texas Instruments
securities and that this information was not public at the time.)
ADONDAKIS thanked ▨ for the rundown, and stated that he will
check in with him on the December timeframe. ▨ stated that he
"will check in with some of the guys and try to get a read on how
things are, um, looking, rolling up, coming into mid-December,
they should have a good feel for how December is going to roll,
um, I'll see if I can get another datapoint for you." ADONDAKIS
responded: "Sounds good." They agreed to speak again in a couple
of weeks.

     d.   On or about January 15, 2010, at approximately
11:36 a.m., an incoming call was intercepted on the ▨
Conference Lines, during which SAM ADONDAKIS spoke with ▨
▨ (Based on my conversations with other FBI agents, I have
learned that ▨ was one of several global supply managers for
Dell, Inc., during the relevant period.) During the
conversation, ADONDAKIS stated that he had spoken with "some
folks at distributors" who told him that they just had a really
hard time getting parts, that "they couldn't get anything and
they are all freaked out about it," and that in the last two
weeks there was a sudden magical supply. ADONDAKIS asked whether
▨ "heard anything like this or does this make sense on what
you are seeing?" ▨ responded: "It does make sense because

16

my supply position right now and outlook is much better than it was two months ago. Where I have been living on 1 to 3 days of inventory to my to my forecast, I am now probably sitting on almost 5 to 6 days, so things have drastically improved. I think a lot of it is due to that both WD (Western Digital) and Seagate added some capacity and we are starting to see the fruitions of that. Now on the demand side, demand continues to be relatively healthy and strong. My forecast for December was what I think I told you like maybe 2.2 or 2.3 (million notebooks) and I finished at 2.1 (million), so you know we take that as a positive."

ADONDAKIS replied: "OK." ▓▓▓▓ continued: "Now January, my forecast is sitting, I wanted to tell you, I probably told you, like another 2.3 (million). And I am going to land anywhere between 1.9 (million) and 2 (million), that might be down a little bit but week one of January got off to a slow start. But at the same time, there is a lot of people off during that time period. So we are starting to see the hockey stick effect, as far as we get towards our end of the quarter in January that we are starting to see a good pickup. So we will probably land in the 1.9 (million) to 2.0 (million) range. That is off a little bit of the forecast of 2.3 (million), but we always put in a little bit of hedge in there to kind of drive more supply."

Toward the end of the conversation, ▓▓▓▓ stated: "Going forward for notebooks, February is at 1.93 (million); March is at 1.97

17

(million); April is at 2.19 (million); and May is at 1.65
(million)." ADONDAKIS replied: "OK." ▓▓▓▓ then stated: "With
my 2.1 (million) that I did in December, my Q4 ended at 6.1
(million). And if you were to compare that to what Q3 was, my Q3
was at 5.4 (million). And so you know there was some growth
there but at the same time, my company continues to lose market
share. And I think the IDC, or the data just came out, I guess,
yesterday that we showed that we lost market share. Of course,
we have always been margin focused over the last nine months and
I think that is going to change a little bit, and I think we are
going to be going more for revenue and trying to get back some of
this market share. So I think that is the strategy from our
executives coming out here relatively soon." ADONDAKIS asked:
"OK. Do you think that that means, you know, taking action on
pricing?" ▓▓▓▓ responded: "I would say yes." ▓▓▓▓ later
explained that companies like Dell, HP, Acer, and especially
Apple are moving away from using the "5400" RPM (revolutions per
minute) and move toward the "7200" RPM, and that "it's higher
margin for us of sales and then also for the hard drive suppliers
themselves." ADONDAKIS replied: "Gotcha. Yeah. That definitely
is something that should benefit them. I would that both
companies will report earnings next week, and I would think that
these will be kind of blowout numbers." ▓▓▓▓ stated, "right,
yeah, and it will be interesting to see what they say is their

18

outlook." (Based on my training, experience, and conversations with other agents, I believe that the information that ▓▓▓▓▓ provided to ADONDAKIS relating to actual and projected Dell notebook sales would be important to an investor in determining whether to buy and/or sell Dell, Western Digital, and Seagate securities, and that the information was not public at the time.)

9.    From on or about May 5, 2010, through on or about August 10, 2010, I and other FBI agents obtained court authorization to intercept wire communications over the cellular telephone of JOHN KINNUCAN, an independent third-party consultant who operated his own firm called Broadband Research. Based on these wire interceptions, I and other FBI agents learned that KINNUCAN obtained Inside Information from numerous insiders at public companies who were violating their fiduciary and other duties of trust and confidence to their employers by disclosing Inside Information to KINNUCAN. I and other FBI agents further learned that KINNUCAN then provided the Inside Information that he obtained from insiders at public companies to his hedge fund clients.

10.    Based on my review of summary line sheets and my conversations with other FBI agents, I have learned that certain wire interceptions over the cellular telephone of JOHN KINNUCAN were between KINNUCAN and both ANTHONY CHIASSON and ▓▓▓▓▓▓▓ of Level Global Investors. Based on my conversations with other

19

FBI agents, I know that CHIASSON is a co-founding partner and the
director of research for Level Global Investors and that ░░░░░░░
is an employee of Level Global Investors.  Based on my
conversations with other FBI agents, I have further learned that,
during the conversations intercepted between KINNUCAN and
CHIASSON and ░░░░░░░   KINNUCAN provided Inside Information to
CHIASSON and ░░░░░░░   and that KINNUCAN's sources of Inside
Information violated their fiduciary and other duties of trust
and confidence to their employers by providing that information
to KINNUCAN.  The following are some examples of those
interceptions:

     a.   On or about July 26, 2010, at approximately 10:29
a.m., an outgoing call was intercepted from the cellular
telephone of JOHN KINNUCAN to ANTHONY CHIASSON and ░░░░░░░░░░░░
of Level Global Investors.  At some point during the
conversation, KINNUCAN stated that Apple was lining up Sony as a
second source on the camera sensor due to execution miscues by
Omnivision, and that Apple was getting pretty frustrated with
Omnivision's execution.  CHIASSON then asked whether KINNUCAN did
"primary research" or whether the information was from a "rumor"
that KINNUCAN was picking up.  KINNUCAN told CHIASSON and ░░░░░░░
that he wanted to be very clear that he did not traffic in
"second hand and rumors," that he does not repeat stuff that he
heard, and that he only traffics in stuff that he has heard from

"my primary contacts." CHIASSON then said okay, and asked
whether this would be somebody in Taiwan or someone speaking to
somebody over there. KINNUCAN then stated that, "frankly, his
source was the chief contract manufacturer building the stuff for
Apple." (Based on my conversations with other FBI agents, I have
learned that KINNUCAN's source of information about Apple was
███████████ who was working for the chief contract
manufacturer at a public company called ██████████ and in charge
of putting cameras into certain Apple products. I have further
learned that ████████ was violating his fiduciary and other duties
of trust and confidence to ████████ and, in turn, Apple by
disclosing Inside Information to KINNUCAN, among others, in
exchange for money.) CHIASSON then asked KINNUCAN about the
impact on the near term and whether this was something to worry
about simply because it was going to be something that was a
product cycle down in the future. KINNUCAN responded that that
was absolutely true and that they were talking six months. Later
in the conversation, KINNUCAN provided information about
Broadcom. KINNUCAN stated that Broadcom was seeing very nice
upside over the course of the enterprise networking business
which had been a major source of concern. KINNUCAN further
stated that they may temper their guidance, and that all the high
profile names like Broadcom, Netlogic, Cavium, and Acme Packet
will all be quite positive. KINNUCAN also stated that he will

21

get some more updates on Netlogic later that day and that
Netlogic is a favorite short of some funds.  CHIASSON asked about
Sandisk, and KINNUCAN stated that he thought the market would
tighten in the next few weeks and that he is happy with his call
on Sandisk.

      b.   On or about July 27, 2010, at approximately 11:33
a.m., an outgoing call from JOHN KINNUCAN's cellular telephone to
ANTHONY CHIASSON was intercepted.  During the conversation,
KINNUCAN said that he was calling on Sandisk.  CHIASSON said that
he had just stepped into a meeting.  KINNUCAN then stated that
the long awaited tightening in the market finally appeared to be
happening.

      c.   On or about July 27, 2010, at approximately 2:13
p.m., an outgoing call from JOHN KINNUCAN to ANTHONY CHIASSON was
intercepted.  During the conversation, KINNUCAN stated that flash
market was starting to tighten up, that Apple was back in the
market asking for parts again after about a month off, and that
Cisco was cutting orders, the vast majority of which were never
being filled.

      11.   Based on my conversations with other FBI agents, I
have learned the following regarding SAM ADONDAKIS: During the
course of this investigation, in October 2010, two FBI agents
approached SAM ADONDAKIS regarding his involvement in
participating in trades based on material nonpublic information

at Level Global Investors, and asked for his cooperation. By on

or about November 2, 2010, ADONDAKIS agreed to cooperate with law

enforcement in this investigation. Among other things, ADONDAKIS

has admitted his participation in obtaining Inside Information,

knowing that the Inside Information came directly and/or

indirectly from public employees who were violating a duty of

confidentiality that prohibited them from disclosing the

information, providing the Inside Information to DAVID GANEK,

ANTHONY CHIASSON, ███████████ among others, at Level Global

Investors who then executed and caused others to execute

securities transactions based in part on the Inside Information,

and exchanging that Inside Information with other individuals. I

know from my conversations with other FBI agents that GANEK is

███████████████████████ of Level Global Investors.

     12. SAM ADONDAKIS, who has not yet been charged with

any crimes, is cooperating with the Government in the hope that

he will be able to provide substantial assistance to the

Government, enter into a cooperation agreement with the

Government, and receive a reduced sentence for his crimes.

Certain information provided by ADONDAKIS has proven to be

reliable and accurate through telephone records, recorded

conversations, and other information.

13. Based on my conversations with other FBI agents who have spoken with SAM ADONDAKIS, I have learned, among other things, the following:

a. ADONDAKIS was an analyst at Level Global Investors and was asked to leave the hedge fund in or about March 2010.

b. ADONDAKIS worked analyzing and researching public companies in the technology sector.

c. During his work as an analyst at Level Global Investors, ADONDAKIS obtained Inside Information from insiders at public companies through third-party consultants, including ██████████ ██████████ and from colleagues at other money managers, including hedge funds. On certain occasions, ADONDAKIS provided this Inside Information to DAVID GANEK, ANTHONY CHIASSON, and ██████████, and GANEK, CHIASSON, and ██████████ executed and caused others to execute certain securities transactions based, in part, on the Inside Information, and that ADONDAKIS informed GANEK, CHIASSON, and ██████████ of the sources of the Inside Information. Among other things, ADONDAKIS typed notes of his conversations with insiders at public companies regarding the Inside Information that he received from them. ADONDAKIS saved these notes to the shared network drive at Level Global Investors. These notes on the shared network drive would and should be maintained and kept on the servers of Level Global Investors.

24

      d.    During his work as an analyst at Level Global Investors, ADONDAKIS exchanged Inside Information with several colleagues at other money managers, including hedge funds. ADONDAKIS exchanged the Inside Information with these colleagues by and through, among other means, email communications. Prior to the arrests of Raj Rajaratnam, the founder of Galleon Group hedge fund, and other individuals on insider trading charges on or about October 16, 2009, ADONDAKIS used his email address at Level Global Investors to exchange Inside Information with these colleagues. At times, ADONDAKIS also forwarded certain emails that he received from colleagues at other money managers containing Inside Information to, among other people, CHIASSON. These email communications would and should be maintained and kept on the servers at Level Global Investors. Following the arrests on or about October 16, 2009, ADONDAKIS and certain colleagues with whom he exchanged Inside Information at other money managers stopped using their work email addresses and started to use personal email addresses to communicate with each other.

      e.    During his work as an analyst at Level Global Investors, ADONDAKIS spoke with and provided Inside Information to GANEK, CHIASSON, and █████, and informed GANEK, CHIASSON, and ████ regarding the sources of the Inside Information.

These conversations would take place in, among other locations, the offices of GANEK, CHIASSON, and ██████████.

      f.   Level Global Investors is currently located on the 27th floor of the building at 888 7th Avenue in New York, New York. Level Global Investors occupies the entire 27th floor of the building. On the 27th floor, one enters Level Global Investors by walking through big wooden double doors. Upon walking through those doors, the receptionist desk is on the right.

      g.   GANEK has an office on the 27th floor at 888 7th Avenue in New York, New York. GANEK's office can be located by passing the receptionist desk, making a right turn, and then making an immediate left turn to GANEK's office. The door to GANEK's office is a frosted glass door. GANEK has multiple computer screens in his office connected to a computer tower. GANEK also has a laptop computer.

      h.   CHIASSON has an office on the 27th floor at 888 7th Avenue in New York, New York. CHIASSON's office can be located by passing the receptionist desk, making a right turn, then making another right turn, and then walking down to the end of the hallway to CHIASSON's office. The door to CHIASSON's office is a clear sliding glass door. CHIASSON has multiple computer screens in his office connected to a computer tower. CHIASSON also has a laptop computer.

26

i.  has an office on the ▇ floor at 888 7th Avenue in New York, New York.

also has a laptop computer.

j.   ADONDAKIS still has possession, custody, and control over his laptop computer from Level Global Investors. While working at Level Global Investors on the 27th floor at 888 7th Avenue in New York, New York, ADONDAKIS also used a desktop computer.

k.   Level Global Investors maintains servers on the 27th floor at 888 7th Avenue in New York, New York. ADONDAKIS does not know where the servers are located on the 27th floor. All of the notes that ADONDAKIS took during his conversations with third-party consultants, including those conversations with insiders at public companies who provided ADONDAKIS with Inside Information, would and should be stored on the servers of Level Global Investors. Moreover, all of ADONDAKIS's emails from and to his address at Level Global Investors, and his emails from and

to GANEK, CHIASSON, and ▮▮▮▮▮▮ would and should be maintained and kept on the servers of Level Global Investors. Following the arrests of Raj Rajaratnam several individuals on October 16, 2009, ADONDAKIS was asked about several of these emails.

14. Based on my conversations with other FBI agents, I have learned the following:

a. In or about October 2010, the FBI approached BOB NGUYEN and asked him to cooperate with law enforcement in this investigation. NGUYEN agreed to cooperate with law enforcement. Among other things, NGUYEN admitted that he participated with others at ▮▮ in obtaining Inside Information from ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ including insiders at public companies, and that NGUYEN participated in helping ▮▮▮ clients obtain Inside Information from ▮▮▮▮▮▮▮▮▮▮. NGUYEN, who has not yet been charged with any crimes yet, is cooperating with the Government in the hope that he will be able to provide substantial assistance to the Government, enter into a cooperation agreement with the Government, and receive a reduced sentence for his crimes. Certain information provided by NGUYEN has proven to be reliable and accurate through telephone records, recorded conversations, and other information.

b. In or about October 2010 and November 2010, the FBI has approached certain ▮▮▮▮▮▮▮▮▮▮ (and others) who worked as insiders at public companies. Certain ▮▮▮▮▮▮▮▮▮▮▮

28

admitted that they had violated their fiduciary and other duties
of trust and confidence to their employers by providing Inside
Information to [REDACTED] clients, including hedge funds, in exchange
for money.  For example, [REDACTED] admitted that he had violated
his fiduciary and other duties of trust and confidence to his
employer Dell by providing Inside Information to [REDACTED] clients,
including Level Global Investors, in exchange for money.  [REDACTED]
who has not yet been charged with any crimes yet, is cooperating
with the Government in the hope that he will be able to provide
substantial assistance to the Government, enter into a
cooperation agreement with the Government, and receive a reduced
sentence for his crimes.  Certain information provided by [REDACTED]
to has proven to be reliable and accurate through telephone
records, recorded conversations, and other information.

    15.  Based on my review of the Wall Street Journal
("WSJ"), and other media, I have learned that, during the evening
hours of November 19, 2010, the WSJ published online an article
which appeared the next day on the front page of the print
edition, entitled "U.S. in Vast Insider Trading Probe."  Among
other things, the article stated: "Federal authorities, capping a
three-year investigation, are preparing insider-trading charges
that could ensnare consultants, investment bankers, hedge-fund
and mutual-fund traders and analysts across the nation, according
to people familiar with the matter."  The article further stated:

29

"One focus of the criminal investigation is examining whether
nonpublic information was passed along by independent analysts
and consultants who work for companies that provide 'expert
network' services to hedge funds and mutual funds.  These
companies set up meetings and calls with current and former
managers from hundreds of companies for traders seeking an
investing edge.  Among the expert networks whose consultants are
being examined, the people say, is Primary Global Research LLC, a
Mountain View, Calif., firm that connects experts with investors
seeking information in the technology, health-care and other
industries."

      16.  The November 20, 2010, WSJ article further
reported: "John Kinnucan, a principal at Broadband Research LLC
in Portland, Ore., sent an email on Oct. 26 to roughly 20
hedge-fund and mutual-fund clients telling of a visit by the
Federal Bureau of Investigation: 'Today two fresh faced eager
beavers from the FBI showed up unannounced (obviously) on my
doorstep thoroughly convinced that my clients have been trading
on copious inside information,' the email said.  '(They obviously
have been recording my cell phone conversations for quite some
time, with what motivation I have no idea.)  We obviously beg to
differ, so have therefore declined the young gentleman's gracious
offer to wear a wire and therefore ensnare you in their devious
web.'"

17. Based on my conversations with other FBI agents, I have learned that, following publication of the WSJ article on the evening of November 19, 2010, a confidential source ("CS-1"), who works at a hedge fund which used ▓▓ consultants, among other people, to obtain Inside Information, informed the FBI that CS-1's supervisor directed him to delete and discard evidence of their participation in illegal insider trading and wire fraud schemes.[3]

18. Based on my training, experience, conversations with other FBI agents, and knowledge of the actions taken by CW-1's supervisor to discard and destroy evidence for purposes of obstructing the Government's investigation, as well as the actions that appear to be taken by JOHN KINNUCAN to obstruct the Government's investigation through his email to his clients, there is probable cause to believe that because, among other things, GANEK, CHIASSON, and ▓▓▓▓▓ received and executed trades based in part on Inside Information provided by ADONDAKIS (who obtained the Inside Information from ▓▓ consultants and ADONDAKIS's colleagues at other funds), and CHIASSON and ▓▓▓▓▓▓ received Inside Information from KINNUCAN, this search warrant of

---

[3]     CS-1, who has not yet been charged with any crimes yet, is cooperating with the Government in the hope that CS-1 will be able to provide substantial assistance to the Government, enter into a cooperation agreement with the Government, and receive a reduced sentence for CS-1's crimes. Certain information provided by CS-1 has proven to be reliable and accurate through telephone records, recorded conversations, and other information.

31

the PREMISES is not only necessary to obtain evidence, fruits,
and instrumentalities of the TARGET OFFENSES, but to preserve
such evidence.

ITEMS LIKELY TO BE FOUND AT THE PREMISES

19.  Based upon my training, experience and
participation in investigations of fraudulent schemes,
particularly schemes relating to illegal insider trading and wire
fraud, as well as my conversations with other FBI agents, I know
the following:

a.  Participants in fraudulent schemes, including
insider trading and wire fraud schemes, frequently maintain
documents in paper and electronic form that reflect their
communications relating to Inside Information, their
communications relating to trades executed based in part on
Inside Information, notes reflecting the receipt of Inside
Information, the location of fraudulent proceeds, the transfers
of money and other proceeds of the schemes, and other evidence of
the fraudulent schemes.  In particular, based on the information
provided above, I believe that PREMISES will contain emails,
notes, and financial records that would constitute evidence,
fruits, and/or instrumentalities of the TARGET OFFENSES.

b.  Participants in fraudulent schemes, including
insider trading and wire fraud schemes, also commonly maintain
addresses and telephone numbers in books and papers in both
electronic and paper form which reflect names, addresses,
telephone numbers and/or paging numbers for their associates in
the schemes.  Based on the information provided above, I believe

33

that the PREMISES will contain telephone and address books and other documents reflecting names and numbers in both paper and electronic form and that such items would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

c.      Participants in fraudulent schemes, including insider trading and wire fraud schemes, often use computers and other electronic devices, including hand-held devices, for the storage of documents and to send and/or receive email communications.  Based on the information above, I believe that the computers and other electronic devices, including hand-held devices, on the PREMISES are items that would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.  I further believe that the servers on the PREMISES would contain evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

d.      Participants in fraudulent schemes, including insider trading and wire fraud schemes, often use cellular telephones to store contact information of other participants and to send and receive text messages in furtherance of the schemes. Based on the information above, I believe that cellular telephones on the PREMISES are items that would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

34

e.    Based on my training, experience and knowledge, as
well as conversations with other law enforcement agents and other
individuals, I have learned the following:  Email is a popular
form of transmitting messages and/or files in an electronic
environment between computer users.  When an individual computer
user sends email, it is initiated at the user's computer,
transmitted to the subscriber's mail server, then transmitted to
its final destination.  Typewritten documents on a computer can
be saved to the computer's hard drive and dedicated network which
is shared by many users.  A "server" is a computer that is
attached to a dedicated network and serves many users.  Emails
and other electronic data deleted on computers will often remain
stored on the server.  In other words, if individuals
intentionally deleted certain emails and electronic data from
their own computers, the emails and electronic data will likely
remain on the server unless and until further actions are taken
to destroy the emails and data on the server.

20.  Based on my training, experience, conversations
with other FBI agents, review of wire interceptions, and
conversations with cooperating witnesses who have participated in
illegal insider trading and wire fraud schemes, I am familiar
with the practices and methods of persons committing the TARGET
OFFENSES, and the means by which such persons communicate with
each other and maintain documents and records in paper and

electronic form.   In addition, based on my conversations with
other FBI agents who have spoken to SAM ADONDAKIS, I know that
there is probable cause to believe that the PREMISES contains
certain electronic data relating to the TARGET OFFENSES.

      21.   Finally, based upon the facts set forth herein, I
request authorization to search and seize any of the above items
constituting the PROPERTY that are maintained within safes
(including but not limited to those referenced in this
affidavit), suitcases, containers, safe deposit boxes, and other
closed or locked containers, including those that may be further
secured by combination and/or key locks of various kinds.

      22.   Based on the foregoing, I believe that there is
probable cause to believe that the documents, records, computers,
hand-held devices, servers, and cellular telephones on the
PREMISES constitute evidence, fruits, and instrumentalities of
the commission of violations of federal laws, including the
TARGET OFFENSES.

<u>SEARCH PROCEDURE</u>

      23.   In order to ensure that agents search only the
PREMISES, the search warrant will direct Level Global Investors
to produce the items on the PREMISES as described in Attachment
A, and the FBI will conduct a search of the servers on the
PREMISES and the other items on the PREMISES in accordance with
the procedure and use of search terms set forth in Attachment B.

<u>CONCLUSION</u>

WHEREFORE, I respectfully request that a search warrant issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the PREMISES for the items and information set forth in Attachment A, and following the procedure described in Attachment B, all of which constitute evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES.

Dated:     November 21, 2010
           New York, New York

                                    _Holly J. Trask_
                              HOLLY J. TRASK
                              Special Agent
                              Federal Bureau of Investigation


SO ORDERED:

_s/ Theodore H. Katz_
HONORABLE THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

37

## Request for Sealing

Since this criminal investigation is non-public and ongoing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will seriously jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of application for the search warrant, the application for the search warrant, and any attachment thereto be filed under seal until further order of this Court.

Dated: November 21, 2010
New York, New York

_____
HOLLY J. TRASK
Special Agent
Federal Bureau of Investigation

SO ORDERED:

_____
HONORABLE THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

38

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS (A) THE OFFICES OF DAVID
GANEK, ANTHONY CHIASSON, AND ▮▮▮▮▮▮ INCLUDING ALL
COMPUTERS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES, (B) THE
DESKTOP AND LAPTOP COMPUTERS OF SAM ADONDAKIS, AND (C) A MIRROR
IMAGE OF LEVEL GLOBAL INVESTORS' SERVERS WHICH WILL THEN BE
SEARCHED USING SPECIFIC SEARCH TERMS AND PROCEDURE SET FORTH IN
ATTACHMENT B, ALL LOCATED AT LEVEL GLOBAL INVESTORS,
888 7TH AVENUE, 27TH FLOOR, NEW YORK, NEW YORK

    (A) THE OFFICES OF DAVID GANEK, ANTHONY CHIASSON, AND

▮▮▮▮▮▮ INCLUDING ALL COMPUTERS, HAND-HELD DEVICES, AND

CELLULAR TELEPHONES: All financial records, handwritten documents

and/or notebooks, letters and correspondence, photographs,

telephone and address books, identification documents, travel

documents, telephone records, computers and other electronic

devices, cellular telephones, and other records and documents

that constitute evidence of the commission of securities fraud,

wire fraud, money laundering, commercial bribery, conspiracy to

commit and aiding and abetting the commission of such crimes, or

are contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds.  These items will

be searched pursuant to the procedure set forth in Attachment B.

ATTACHMENT A
(page 2 of 2)


(B) THE DESKTOP AND LAPTOP COMPUTERS OF SAM ADONDAKIS,

AND

(C) A MIRROR IMAGE OF LEVEL GLOBAL INVESTORS' SERVERS

WHICH WILL THEN BE SEARCHED USING SPECIFIC SEARCH TERMS AND

PROCEDURE SET FORTH IN ATTACHMENT B.

<u>ATTACHMENT B</u>
(page 1 of 2)

1.    The Federal Bureau of Investigation ("FBI") will follow the following procedure with respect to the search of the servers listed in Attachment A at Level Global Investors.

First, personnel at the FBI will make a mirror image of all, or as much as feasible and necessary, of the servers at Level Global Investors.  In the event that the FBI cannot make a mirror image of a server or servers on site, the FBI will remove the servers and mirror the servers off site as soon as reasonably possible.  In that event, once the servers have been imaged, they will be returned.

Second, if Level Global Investors volunteers to make a mirror image of the servers and (if and only if) the FBI determines that their assistance is necessary and proper, the FBI will supervise the process by which all, or as much as feasible and necessary, of the servers at Level Global Investors will be imaged.

Third, following completion of the imaging process, the FBI will designate one or more personnel who will be walled off from the investigation to conduct the following searches of the imaged material from the servers:

(1) Search for all emails and documents authored by, sent to, and/or received from David Ganek, Anthony Chiasson, ▓▓▓▓▓▓▓▓▓▓ and Sam Adondakis.

(2) Search for all emails and documents containing the following search terms in the file name or anywhere in the electronic data of the file(s):



(a) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
(b) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
(c) "my check"
(d) consultant
(e) ▓▓▓▓▓▓▓▓▓▓
(f) ▓▓▓▓▓▓▓▓▓▓
(g) Kinnucan
(h) "Broadband Research"
(i) Dell
(j)
(k) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

ATTACHMENT B
(page 2 of 2)


        2.    For all other items listed in Attachment A (other than
the servers which is covered by procedure #1 above), the FBI will
search the content in Attachment A for the following information:

        1.    Any and all communications between and among David
Ganek, Anthony Chiasson, ▓▓▓▓▓▓▓▓ Sam Adondakis, ▓▓▓▓
consultants, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ John Kinnucan,
Broadband Research, and any third-party consultant.

        2.    Any and all documents relating to, reflecting,
and/or concerning information about public companies.

        3.    Any and all evidence reflecting communications
about trading based on information about public companies.

        4.    Any and all other evidence that will assist the
FBI in identifying and/or determining whether other individuals
were involved in providing material, nonpublic information in
violation of fiduciary and other duties of confidentiality and/or
involved in trading based on material, nonpublic information.

        5.    Any and all other information reflecting and/or
showing and/or leading to evidence, fruits, and/or
instrumentalities of violations of Title 18, United States Code,
Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 18, United
States Code, Section 2 in connection with those offenses.