# EXHIBIT B

# In The Matter Of:

*UNITED STATES OF AMERICA, v*
*TODD NEWMAN,*

*November 27, 2012*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File CBRFNEWF.txt
**Min-U-Script® with Word Index**

| CBRMNEW6 | Adondakis - direct | Page 1876 |
|---|---|---|

1 A. It is.
2 Q. What do you understand Mr. Kuo to be saying when he says, I
3 get a non-GAAP GM of 37.8 percent?
4 A. He had taken out that inventory charge and this is the
5 number that he got for non-GAAP.
6 Q. Let's go to the top of the e-mail.
7 Who does Mr. Tortora forward that to?
8 A. To Todd Newman.
9 THE COURT: Why don't we take a break here. Let's
10 stop here for an afternoon break. I'll see you in about ten
11 minutes. Don't discuss the case, of course. But you can use
12 the restroom, stretch your legs, get a cookie or something.
13 Thanks.
14 All rise for the jury.
15 (Jury not present)
16 THE COURT: Anything we need to discuss?
17 You have ten minutes. See you in a bit.
18 (Recess)
19 THE COURT: Let's bring in the jury.
20 MR. NATHANSON: Your Honor, one brief matter.
21 The last exhibit that the government went over is
22 Exhibit 805, and I believe the last question that was just
23 asked was whether or not at the top of that e-mail that
24 Mr. Tortora forwarded it to Mr. Newman. I don't think that's
25 an appropriate question. Mr. Adondakis isn't on that portion

| CBRMNEW6 | Adondakis - direct | Page 1877 |
|---|---|---|

1 of the e-mail. It's really just a point for summation.
2 Mr. Adondakis just said yes, it is and he sees that it is.
3 I mention it now because there are at least two other
4 exhibits, 810 and 820, that have similar strings that at the
5 top they get forwarded to Mr. Newman. This witness can't
6 possibly add anything to those. He is not on those top
7 communications.
8 I just ask that there be no questions about whether or
9 not Mr. Tortora, after it was forwarded to Mr. Adondakis, then
10 forwarded it to Mr. Newman.
11 THE COURT: But the exhibit is in evidence, so the
12 jury can infer that it was forwarded.
13 MR. NATHANSON: Sure. There is no reason to ask this
14 witness to show him that part of the e-mail and say, was this
15 forwarded on to Mr. Newman? It's not something within the
16 purview of his knowledge other than the fact that he is seeing
17 an e-mail, which I understand is in evidence. It doesn't seem
18 like an appropriate question to ask.
19 MR. ZACH: Your Honor, the documents are in evidence.
20 The jury is having a lot of documents thrown at them. I am
21 asking the question to point out that it was to Mr. Newman.
22 There is so many documents coming in, there is nothing wrong
23 with the witness reading from it. I don't intend to do it that
24 much more.
25 THE COURT: It's in evidence. I think you can ask a

| CBRMNEW6 | Adondakis - direct | Page 1878 |
|---|---|---|

1 witness to read in from it. If you want to go into on cross if
2 he knows nothing about what was actually done, I think you can.
3 I don't think it's an improper thing with an exhibit that's in
4 evidence.
5 Let's bring in the jury.
6 (Jury present)
7 THE COURT: We are going to resume the examination of
8 Mr. Adondakis by Mr. Zach.
9 Go ahead, Mr. Zach.
10 MR. ZACH: Thank you, your Honor.
11 Q. Before we broke Mr. Adondakis, we had been looking at
12 Government Exhibit 805 which had information from an accounting
13 manager at Nvidia being passed along to a variety of people.
14 Do you recall that?
15 A. Yes.
16 Q. Now, what did you tell Mr. Chiasson about this inside
17 information that you were getting from Nvidia?
18 A. I explained to him that a friend of Jesse Tortora would be
19 getting information from Nvidia through a friend of his who he
20 went to church with and that the contact was -- it would have
21 an Nvidia contact, essentially.
22 Q. When you say Nvidia contact, did you express where that
23 Nvidia contact worked?
24 A. I didn't specifically say at Nvidia, but based on contacts
25 that we had at other companies, I assumed --

| CBRMNEW6 | Adondakis - direct | Page 1879 |
|---|---|---|

1 MR. WEINGARTEN: Respectfully object.
2 THE COURT: Hold on.
3 Did you express where that Nvidia contact worked, yes
4 or no?
5 THE WITNESS: No.
6 THE COURT: Next question.
7 Q. Had you had a course of dealing in talking about sources of
8 information with Mr. Chiasson that you referred to in a
9 specific way?
10 A. Yes.
11 Q. What was the way that you referred to him?
12 A. When I would refer to contacts I would refer to them as
13 those that worked at companies.
14 Q. When you said that a contact at a company, did that mean
15 that that contact worked at the company?
16 A. That's correct.
17 Q. Now, turning to Government Exhibit 810, it's already in
18 evidence, have you seen this document?
19 A. Yes.
20 Q. Let's look at the lower e-mail.
21 THE COURT: Hold on one second. Just take that down.
22 I don't have that in. Maybe I just missed it. Does anybody
23 else who is keeping score have it in? There has been a lot of
24 documents. I don't suggest that I am infallible on this point.
25 MR. TARLOWE: Our records suggest that it was admitted

| CBRMNEW6 | Adondakis - direct | Page 1880 |
|---|---|---|

1  on November 15 through Mr. Tortora.
2       THE COURT: My problem is my Live Note doesn't go back
3  that far.
4       November what day?
5       MR. TARLOWE: November 15.
6       THE COURT: Sorry, folks.
7       MR. NATHANSON: Your Honor, our record also shows that
8  it's in evidence.
9       THE COURT: Go ahead.
10      MR. ZACH: Put it up on the screen. Can we look at
11 the bottom e-mail.
12 Q. Who is this e-mail from?
13 A. The bottom e-mail is from Danny Kuo.
14 Q. Who is it to?
15 A. To Victor Dosti.
16 Q. Was it later forwarded to you?
17 A. Yes.
18 Q. What does it say?
19 A. Nvidia checks.
20 Q. And what did you understand this information to be coming
21  from --
22 A. This was coming through Danny's contact through his friend
23  at Nvidia.
24 Q. And looking at the date of April 3, where is that in
25  relation to the close of Nvidia's quarter?

| CBRMNEW6 | Adondakis - direct | Page 1881 |
|---|---|---|

1  A. Shortly before the close of the quarter.
2  Q. And what sort of information is set out in there?
3  A. This is consistent with the format of other e-mails
4   received from Danny which talks about a revenue estimate for
5   the April quarter, a revenue range, should give a read on gross
6   margin over the weekend, which I assumed meant that the gross
7   margin numbers weren't finalized but he would be getting more
8   information from a sales standpoint. March was flattish month
9   over month and a slight disappointment versus a strong
10  inventory replenishment in February. There is a still color on
11  how the revenues were coming in in the quarter. Still looking
12  for a back end loaded quarter with April up strongly month over
13  month versus March/February levels. Back end loaded meaning
14  that he expected more revenues to occur in the last part of the
15  month as opposed to the first part of the month. Also begin to
16  push out some delivery into next quarter. If that were true,
17  that would be positive for the company's revenues in the next
18  quarter. And that's consistent with the last line, which says,
19  July quarter, 750 million, initial read. If you compare that
20  to the April quarter, which is in the first line, it's higher.
21 Q. And this is a check relating to the quarter of Nvidia
22  that's about to close at the end of April?
23 A. Correct.
24 Q. Let's look now at Government Exhibit 812.
25      THE COURT: That one is in. I have that.

| CBRMNEW6 | Adondakis - direct | Page 1882 |
|---|---|---|

1  Q. Looking at 812, and going up the lower e-mail.
2  A. Yup.
3       MR. ZACH: Can we blow up the top half.
4  Q. Looking at this top e-mail, who wrote this?
5  A. Danny Kuo.
6  Q. Who is he sending it to?
7  A. He is sending it to Jesse Tortora, John Horvath, Fayad
8   Abbasi, and myself.
9  Q. When is this document dated?
10 A. This is April 22, 2009.
11 Q. How many days before the close of Nvidia's quarter is this?
12 A. Four days before the close of the quarter.
13 Q. And in fact what's the subject of this e-mail?
14 A. Talks about -- the subject is Nvidia.
15 Q. Now, would you read what Mr. Kuo wrote?
16 A. My last check two weeks ago indicated that April quarter
17  gross margin at 25 percent, after taking another inventory
18  reserve charge. Excluding this charge, April quarter gross
19  margin would have been 35 percent. July quarter gross margin
20  will be guided to mid 30 percent. I will check again today.
21 Q. Where did you understand that information to be coming
22  from?
23 A. From the same contact who was an Nvidia insider.
24 Q. What sorts of numbers are these -- what sorts of numbers
25  are being provided to you here?

| CBRMNEW6 | Adondakis - direct | Page 1883 |
|---|---|---|

1  A. This particular e-mail talks about gross margins.
2  Q. And when you get updates like this from Mr. Kuo, what would
3   you do with that information?
4  A. I would pass it along to Mr. Chiasson.
5  Q. For what reason were you passing it along to Mr. Chiasson?
6  A. For the purpose of potentially investing in Nvidia.
7  Q. Now, turning to Government 813, do you recognize this
8   document?
9  A. Yes.
10      MR. ZACH: The government offers 813 into evidence.
11      THE COURT: Any objection?
12      MR. WEINGARTEN: No, your Honor.
13      THE COURT: Government 813 is received.
14      (Government's Exhibit 813 received in evidence)
15 Q. Now, let's start by quickly looking at the top.
16      Who is that from?
17 A. Danny Kuo.
18 Q. And who is he e-mailing it to?
19 A. He is forwarding it to Jesse Tortora, Jon Horvath, Fayad
20  Abbasi, and me.
21 Q. On what day is he forwarding it?
22 A. April 27, 2009.
23 Q. And how does that relate to the end of the quarter?
24 A. It's one day after the close of the quarter.
25 Q. Let's look at the e-mail that Mr. Kuo was forwarding.

# In The Matter Of:

*UNITED STATES OF AMERICA, v*
*TODD NEWMAN,*

*November 28, 2012*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File CBSMNEWF.txt
**Min-U-Script® with Word Index**

| CBSFNEW2 | Adondakis - cross | Page 2015 |
|---|---|---|

1  Q. 3502-7 in your narrower binder with your statements. See
2  if that refreshes your recollection.
3  A. 3502, which one?
4  Q. 3502-7, page 3. The third full paragraph.
5     (Pause)
6  A. I don't recall saying that specifically. It looks like
7  these might be notes that were taken, is that right?
8     THE COURT: Well, let's not get into that. Just
9  answer the question. Does that refresh your recollection?
10 A. No, I don't recall saying that specifically, I'm sorry.
11 Q. Let's start from the beginning. Did you implicate Mr.
12 Chiasson in insider trading?
13 A. I told the truth about what happened and I guess does that,
14 I guess that implicates him.
15 Q. And what about Mr. Brenner?
16 A. Yes.
17 Q. And what about Mr. Ganek?
18 A. I don't know about Mr. Ganek.
19 Q. Well, if the FBI -- excuse me. Isn't it true that you said
20 to the FBI that Chiasson and Ganek were both interested in the
21 Dell information when you told them because the information
22 came directly from contacts at Dell and isn't it also true that
23 you --
24    THE COURT: Wait, let's not do compound. Let's just
25 leave it there.

| CBSFNEW2 | Adondakis - cross | Page 2016 |
|---|---|---|

1  A. I honestly don't recall saying that.
2  Q. Well, forget what you said to them. Is that true or not
3  true?
4  A. I'm sorry, is what true or not true?
5  Q. Chiasson and Ganek -- let me start again. You don't
6  remember whether or not you said that first statement to the
7  FBI?
8  A. I don't.
9  Q. Now, do you remember saying that Chiasson and Ganek were
10 the, quote, "opposite of discouraging," end of quote, and
11 wanted to have an edge in regards to Dell's quarterly results
12 versus expectations. Do you recall saying that to the FBI?
13 A. I'm sorry, I don't recall saying that specifically.
14 Q. Do you remember saying to the FBI the Level Global fund and
15 Radar funds were both trading low and Chiasson and Ganek
16 decided to make trades based on the information obtained from
17 Goyal?
18 A. I don't remember saying that either.
19 Q. Well, if you did say that, were they truthful statements or
20 not?
21 A. I don't think they're a hundred percent true, no.
22 Q. So if those statements were made to the FBI they wouldn't
23 be a hundred percent true, is that right?
24    MR. TARLOWE: Objection. One, 403, it's confusing,
25 based on the documents being used and, two, he's asking him to

| CBSFNEW2 | Adondakis - cross | Page 2017 |
|---|---|---|

1  hypothesize.
2     THE COURT: Overruled. If those statements that you
3  read were made, they wouldn't be true.
4     MR. TARLOWE: Could we say which statements?
5     THE COURT: I think that's fair. What statements were
6  you referring to, Mr. Weingarten? The one you just read?
7     MR. WEINGARTEN: Yes.
8     THE COURT: Read it again.
9  Q. Let's refer to Mr. Ganek specifically. I'd like to read
10 two, if I may. "Chiasson and Ganek were both interested in the
11 Dell information when Adondakis told them because the
12 information came directly from contacts at Dell." Is that true
13 as to Mr. Ganek or not true?
14 A. No, it's not true.
15 Q. All right, so --
16 A. There's a part of that statement that's not true.
17 Q. And it's the one that pertains to Mr. Ganek.
18 A. That's right.
19 Q. And how about, "The Level Global fund and Radar fund were
20 both performing low when Chiasson and Ganek decided to make
21 trades based on the information obtained from Goyal." Is that
22 true as to Mr. Ganek or not true as to Mr. Ganek?
23 A. True. He made the trades, and the information was from
24 Goyal.
25 Q. And Ganek decided to make trades based on the information

| CBSFNEW2 | Adondakis - cross | Page 2018 |
|---|---|---|

1  obtained from Goyal?
2     MR. TARLOWE: Objection.
3     THE COURT: Overruled. Overruled.
4  A. He did decide to make the trades and the information was
5  from Goyal, so that's true.
6  Q. So your testimony today is that Ganek is as innocent as the
7  driven snow --
8     MR. TARLOWE: Objection.
9     THE COURT: Sustained. Sustained.
10 Q. I believe you testified and your information and plea
11 agreement reflect that you pled guilty to wrongdoing through
12 the middle of 2010, is that correct?
13 A. That's correct.
14 Q. What crimes did you commit in 2010?
15 A. 2010.
16 Q. Yes.
17 A. I was still receiving information from contacts during that
18 time, so I would assume it was insider trading.
19 Q. And were you sharing that information with anyone at Level
20 Global?
21 A. Yes.
22 Q. In 2010?
23 A. Yes.
24 Q. What information in 2010?
25 A. You know, I honestly don't remember specifically which -- I

| CBSFNEW2 | Adondakis - cross | Page 2019 |
|---|---|---|

1  was still speaking with all the contacts in 2010.
2  Q. All right, so there's no doubt that you continued with your
3  contacts with your friends on the board past Level Global,
4  correct?
5  A. Past Level Global?
6  Q. Yes.
7  A. I did continue speaking with, receiving e-mails from those
8  that were still in the industry after I left, that's right.
9  Q. So you were receiving checks from them in 2010 and beyond,
10  correct?
11  A. That's right.
12  Q. Okay. Now, let's talk about your preparation with the
13  government in connection with this case. So, you began
14  cooperating at the end of 2010, correct?
15  A. Yes.
16  Q. How frequently have you met with them?
17  A. I may have met with them 20 times during that entire
18  period, maybe 25. I'm not a hundred percent sure how many
19  times.
20  Q. And you spent a lot of time preparing for trial, correct?
21  A. I have.
22  Q. And you've endeavored to review all your e-mails, correct?
23  A. The ones that I've been shown, yes.
24  Q. Were you given access to e-mails that you could take home
25  or only look at them at the FBI office or prosecutor's office?

| CBSFNEW2 | Adondakis - cross | Page 2020 |
|---|---|---|

1  A. I don't recall ever being given something to take home.
2  Q. So all your review of the e-mails were in the government
3  offices, correct?
4  A. I believe so, yes.
5  Q. And you looked at your phone records, correct?
6  A. I don't believe I was ever shown the phone records.
7  Q. Any handwritten notes that you wrote?
8  A. I was shown handwritten notes, yes.
9  Q. But it's mostly been e-mails, correct?
10  A. Mostly e-mails, that's right.
11  Q. And you made best efforts to review all the e-mails that
12  could be conceivably relevant to this case, correct?
13  A. I have no idea.
14  Q. You looked at as many e-mails as you could in response to
15  the government's request. That was part of your cooperation,
16  correct?
17  A. I looked at all the e-mails they showed me.
18  Q. Let's just talk about e-mail traffic for a minute. So is
19  it fair to say that if we see an e-mail to hardware that you
20  submitted -- with me so far? That you made best efforts to
21  keep out any kind of incriminating information?
22  A. I think that's generally fair.
23  Q. So if it goes to hardware, you don't think -- you didn't
24  think there was anything wrong with it, correct?
25  A. I tried to keep incriminating information out of hardware

| CBSFNEW2 | Adondakis - cross | Page 2021 |
|---|---|---|

1  e-mails.
2  Q. Okay. And that's because it went to a wide variety,
3  including compliance, right?
4  A. No.
5  Q. That's not correct?
6  A. That is not correct.
7  Q. You wanted compliance to see incriminating e-mails?
8  A. No, I didn't, but that wasn't the reason why I kept it out.
9  Q. Well, is it because -- well, what is the reason?
10  A. It's because I didn't want to create a paper trail within
11  the firm.
12  Q. All right, you didn't want to create a paper trail within
13  the firm of incriminating evidence, is that your statement?
14  A. Yes.
15  Q. Now, when you received all your e-mails from your friends,
16  they came in on the level server, correct?
17  A. That's right.
18  Q. So the Danny Kuo e-mails that we spoke about before came to
19  you on the Level Global server, correct?
20  A. That's correct.
21  Q. And the Tortora e-mails from Sandy Goyal, they came to you
22  on the Level Global server, correct?
23  A. That's right.
24  Q. And it's your testimony that you were concerned about a
25  paper trail and that's why you didn't put things on hardware,

| CBSFNEW2 | Adondakis - cross | Page 2022 |
|---|---|---|

1  is that right?
2  A. That's right.
3  Q. And you were perfectly satisfied receiving these e-mails on
4  your Level Global server, correct?
5  A. No, I was not satisfied, I had many conversations with them
6  not to send them.
7  Q. But you couldn't stop your friends from doing so?
8  A. I could have, but --
9  Q. You chose not to?
10  A. That's right.
11  Q. And you continued to receive Kuo e-mails on the Level
12  Global server, is that correct?
13  A. That's right.
14  Q. Did I understand you to testify that Mr. Chiasson wanted
15  things on a high level?
16  A. Yes.
17  Q. So does that include e-mails?
18  A. It does.
19  Q. So if you sent e-mails to Mr. Chiasson, they would be like
20  the e-mails you sent to compliance?
21  A. I didn't send e-mails to compliance, so I don't have a
22  basis to answer that question.
23  Q. I'm sorry, I misspoke. I meant hardware.
24  A. Are you asking if the e-mails I sent to Mr. Chiasson were
25  the same as those sent to hardware?

# In The Matter Of:

*UNITED STATES OF AMERICA, v*

*TODD NEWMAN,*

*December 6, 2012*

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File CC6HNEWF.txt

**Min-U-Script® with Word Index**

**CC6HNEW1**                      Page 3250

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4          v.                        12 Cr. 121 (RJS)
 5   TODD NEWMAN,
     ANTHONY CHIASSON,
 6
                  Defendants.
 7
     ------------------------------x
 8
                                      New York, N.Y.
 9                                    December 6, 2012
                                      2:05 p.m.
10
     Before:
11
                  HON. RICHARD J. SULLIVAN,
12
                                      District Judge
13
14                        APPEARANCES
15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ANTONIA APPS
17   JOHN ZACH
     RICHARD TARLOWE
18        Assistant United States Attorneys
19   SHEARMAN & STERLING
          Attorneys for Defendant Newman
20   BY:  STEPHEN R. FISHBEIN
          JOHN A. NATHANSON
21
     STEPTOE & JOHNSON
22        Attorneys for Defendant Chiasson
     BY:  REID WEINGARTEN
23        ERIK KITCHEN
          MICHELLE LEVIN
24        -and-
     MORVILLO LLP
25   BY:  GREGORY R. MORVILLO
```

**CC6HNEW1**                      Page 3251

1     (Trial resumed; jury not present)
2     THE COURT: All right. Let's I guess chat about the
3 issues that we have got on the table. The first is with
4 respect to whether David Ganek and Michael Steinberg are
5 unindicted coconspirators, namely, whether the government has
6 established by a preponderance that they were involved in the
7 same conspiracy as the defendants.
8     So I have what the government and Mr. Morvillo have
9 given me for Steinberg. We have just really been relying on
10 talk, correct? Nobody submitted anything. Let's then start
11 with Ganek. Anything else anybody wants to say beyond what has
12 been introduced or submitted?
13     MS. APPS: Your Honor, the only point that I would
14 make, and I went and looked back, the testimony on the call on
15 August 27 is there is actually more of it in the record after
16 looking at it further. It is not just the parts that I
17 referred the court to in the letter brief that we submitted,
18 but there is additional testimony where Mr. Adondakis says what
19 he talked about on the phone was that the information was
20 directionally consistent -- and I am quoting from page 1807 --
21 with what they heard before and that the gross margins were
22 just a little below the number he had gotten before, and the
23 reason that he remembered -- then he goes on to explain the
24 reason he remembered that.
25     So they are talking specific numbers that

**CC6HNEW1**                      Page 3252

1 Mr. Adondakis got compared to a number he got before. You see
2 in a lot of the e-mails that are set forth in the letter brief
3 we put forward, there is a lot of reference to checks and
4 contacts. Now Mr. Chiasson made the argument in his brief that
5 use of the word checks alone is not meaningful because it can
6 mean many different things, and the testimony has certainly
7 been that the word checks can mean many different things, but
8 it depends on context.
9     When you look at the context here, which is the timing
10 of the updates or the checks -- and it is clear from the
11 e-mails and the instant messages with Mr. Ganek that there is
12 some source outside the firm that Mr. Adondakis is getting
13 information from. When you look at the nature of that
14 information, the specific numbers, and you combine it with the
15 timing, I think we meet our burden of the preponderance.
16     THE COURT: All right. Mr. Morvillo.
17     MR. MORVILLO: Well, just to respond to that. What I
18 am hearing Ms. Apps say, at this point the word got, the fact
19 that he got a number means that they meet their burden on
20 conspiracy, on being a coconspirator, and that is preposterous.
21     There are numbers that fly all over this business, in
22 every sell side research report, which there were 30 or 40 per
23 quarter or more. I'm sorry. 30 people that covered Dell per
24 quarter that come out with numbers. Every single one of them
25 has a gross margin and EPS. They all have numbers in them.

**CC6HNEW1**                      Page 3253

1 They are all decimal points, they are all percentages. They
2 are all getting their information from someplace. Now whether
3 it is from each other or from the company or from channel
4 checks, there is a plethora of information in this record that
5 suggests that the word checks is not bad, that the word
6 contacts is not bad. All of these things do not bleed to the
7 notion that someone was a coconspirator, particularly in light
8 of the three or four times Mr. Adondakis said, I never told
9 Mr. Ganek the source.
10     It is like they start 50 points down in a football
11 game and they have to come way back. They can't overcome that
12 problem, and that is a massive problem for them. They can't
13 overcome Mr. Adondakis' testimony with the rest of this
14 circumstantial evidence that is as consistent, if not more
15 consistent, with innocent behavior and industry standards and
16 industry practices than it is with something that some person
17 is thinking might have happened because they used the word
18 "got." It just doesn't meet the standard.
19     Even if the standard is a minimal standard, it doesn't
20 meet it. Because their own witness goes against their own
21 theory of this, which is that it didn't happen. He didn't
22 know. He is thinking, well, maybe Mr. Chiasson told him, but
23 there is nothing in the record that suggests that Mr. Chiasson
24 told Mr. Ganek.
25     The only evidence that we have that he knew Mr. Ganek

CC6HNEW1                                                              Page 3254

knew or didn't know comes from Mr. Adondakis, and he said three or four times, including on his direct testimony, that he never told him. And on Nvidia it is even worse. There is nothing in the record that suggests Mr. Ganek knew about the Nvidia source, and the only evidence about whether Mr. Chiasson knew of the Nvidia source is the negative. You yourself asked the witness: Did you tell him the source, and he said no. So I don't see how they can get past that to a preponderance based on industry practices, industry standards. It just doesn't meet the burden that they need to meet.

I am happy to take their arguments one by one, but if your Honor is satisfied, I will sit down.

Checks and timing, those things don't suggest that someone is in a conspiracy without much, much more. It doesn't even come close.

THE COURT: All right. I disagree with that, I have to say. Having reviewed the record, exhibits and testimony, it seems to me that the evidence related to Ganek is largely circumstantial. Adondakis certainly did not say that he expressly told Ganek. That point has been made by Mr. Morvillo and it is accurate.

But I do think that the rest of the fact would support an inference by a preponderance that Mr. Ganek was aware of the source and the nature of this information. I mean just by way of example, Government Exhibit 438, leading up to July 2008,

CC6HNEW1                                                              Page 3255

Dell quarterly earnings report, Ganek is expressing awareness of and interest in Adondakis' Dell contact. After that there is additional instances in which Ganek is aware that Adondakis has a connection to folks at Dell. This is Government Exhibit 515. Ganek was aware that the Dell contact was providing Adondakis with a series of incremental checks that are spaced out over several weeks, which is consistent with financial results being firmed up as the roll up process is taking place, as the reporting date approaches. An example of that is Government Exhibit 438.

With respect to Nvidia, Ganek was aware that Adondakis' reads would get, quote, firmer as the earnings report approached, a trend that also the evidence introduced at trial suggests is consistent with the roll up process. That is Government Exhibit 907.

At one point Adondakis was providing Dell checks to Ganek during a black-out period for Dell. Ganek received again precise information concerning Nvidia gross margins. That is GX907. The large trading positions that Ganek is authorizing shortly after the information on Dell and Nvidia is received, I think also is circumstantial evidence of his knowledge. And then there is the suggestion from statements made by Ganek, although they don't talk about the source, but I think his conversations with Adondakis during this period and on the few occasions when they talk do suggest that he understands that

CC6HNEW1                                                              Page 3256

Adondakis is not just any analyst who is crunching numbers; that he's got a particular source.

Then there is the conversation that takes place with Adondakis, Alessi and Chiasson in which they discuss the source and then immediately afterwards Adondakis is dispatched but there is a meeting, a closed door meeting with Ganek, Alessi, and Chiasson. I think that does support --

MR. MORVILLO: Your Honor, if I might interrupt. I think your Honor has that wrong. I think you are conflating two different circumstances. There is an August 27th phone call with Mr. Ganek, Mr. Chiasson, Mr. Brenner and Mr. Adondakis on the phone. He puts in Mr. Alessi at some point. He says he is not even really sure. That is a phone call on August 27th. And on that phone call he does not disclose the source of this information specifically.

Then there is an August 11th meeting between Brenner, Chiasson and Adondakis where they hand over -- he hands over the expected value, and the expected value is where the number, 17.5, is in. It is listed as 45 percent chance of it happening. The other number, the upside number is 18.5, listed at 45 percent chance of happening. Both numbers on that. Then Mr. Adondakis leaves and he says he sees Chiasson and Brenner go into Ganek's office and talk. He doesn't know what is going on in there.

THE COURT: Yes, there is no dispute about that, but I

CC6HNEW1                                                              Page 3257

think the inference can be drawn, based on the totality of the facts, that there is the discussion then about Adondakis' source which is consistent with him being in the conspiracy.

MR. MORVILLO: I don't think it can, your Honor, because Mr. Ganek isn't in the office that day.

THE COURT: I have no doubt you are going to make a lot of arguments to the jury, and they might be very good ones to make, but I think the issue for now is whether the preponderance standard has been met with respect to 801(d)(2)(E), and I find that it does.

MR. MORVILLO: I'm sorry, your Honor. How can the standard be met specifically on the August 11th conversation if Mr. Ganek isn't there.

So the notion is that Mr. Chiasson and Mr. Brenner walked into Mr. Ganek's office and he wasn't there and then he is supposed to know what the source of the information is. Being a coconspirator is not like having chicken pox. You can't just be a coconspirator by being in the same room with someone who has it.

THE COURT: Mr. Morvillo, these are not advisory decisions and it is not an advisory ruling.

MR. MORVILLO: Then, look, I would move to preclude this under 403.

THE COURT: Overruled.

So I am going to allow the Ganek exhibits in. That

| CC6HNEW1 | Page 3258 |
|---|---|

1  is, the IMs and a couple of other exhibits that I reserved on.
2      MR. MORVILLO: Your Honor, under 403, this is late and
3  it is confusing. Particularly the IM is very confusing because
4  it is not talking about Dell. It is talking about Nvidia. If
5  I can find it, I will tell you exactly what I mean, if I have
6  it here.
7      I don't have it with me, but it is the IM that they
8  are talking about where he says, Mr. Alessi uses the word
9  silver bullet. That language is going to be used by this jury,
10 they are going to be invited to speculate they are talking
11 about a Dell source when it follows directly an Nvidia
12 conversation. They are talking about Nvidia. We don't have
13 information on Nvidia to up size the Nvidia position because we
14 don't have a silver bullet. In other words, we don't know what
15 we are doing in Nvidia. We don't have any -- we don't have the
16 best read on Nvidia. And read means research, it means thesis.
17     THE COURT: You can argue that certainly, but I think
18 a fair reading is he can update you on Nvidia as well.
19     MR. MORVILLO: That is right, and then the next line
20 is we don't have a silver bullet there, meaning at Nvidia, not
21 at Dell.
22     THE COURT: It doesn't say "there." I understand the
23 arguments. I think there are arguments to be made and that is
24 what lawyers should do. But with respect to the admissibility
25 of the evidence, I am going to allow it in.

| CC6HNEW1 | Page 3259 |
|---|---|

1      So now let's move to the Steinberg exhibits. There
2  are only three, correct?
3      MR. FISHBEIN: Correct, your Honor. Just to give some
4  context, I agree with your Honor the issue is whether Michael
5  Steinberg is a knowing participant in the conspiracy. As I
6  said, we do not dispute that Horvath is part of the group that
7  shares information and that Horvath gave information to
8  Steinberg. The issue is whether Steinberg knew this was
9  improper in any way. There has been no testimony on that
10 because the government did not call Jon Horvath as a witness.
11 He is a cooperating witness. They can call him.
12     THE COURT: No question.
13     MR. FISHBEIN: We certainly can't presume that Horvath
14 would have testified that he told Steinberg. So I submit, your
15 Honor, the only evidence the government is putting forward here
16 are the three e-mails themselves. If we can go through those,
17 I can articulate the grounds of our motion to preclude these.
18     We will go through them chronologically.
19     The first is Government Exhibit 605, Monday, August
20 18th. The only relevant part of this, and I assume the only
21 part the government really wants to put in, is the bottom
22 e-mail from Horvath to Steinberg because the ones above that
23 talk about other people and don't have any apparent connection
24 to the events charged in this case. But in any event, that
25 lower one, he says: Just mentioning that JT asked me

| CC6HNEW1 | Page 3260 |
|---|---|

1  specifically --
2      THE COURT: Well, the header. It is a continuation of
3  the subject.
4      MR. FISHBEIN: That's right. Dell stuff.
5      THE COURT: "Please keep the Dell stuff especially on
6  the down low, just mentioning that because JT asked me
7  specifically to be extra sensitive with the info."
8      MR. FISHBEIN: Right. Your Honor, to get to the
9  point, I think it is a fair inference to say JT is Jesse
10 Tortora and that there was some discussion of Dell. What I
11 would say to your Honor is there was testimony in this case
12 from Mr. Tortora that even with completely legitimate
13 information he sought to restrict the circulation because
14 getting it out broadly would hurt the trade. I will just give
15 you an example.
16     He testified that he did copious research on which
17 analysts were good at certain stocks and he put together an
18 e-mail showing that Bear Stearns, in the case of Altera, had
19 made a lot of correct predictions. He forwarded it to Horvath.
20 This is page 452 of the transcript. And on direct he says, I
21 have done this exhaustive analysis to figure out who was good
22 on what. I sent it to Horvath and he says don't forward it
23 around. I believe that is a quote from the e-mail.
24     He explained that, that he doesn't want this
25 information getting out broadly. If we look just at this

| CC6HNEW1 | Page 3261 |
|---|---|

1  e-mail, I submit to your Honor this is equally consistent with
2  legitimate information or not legitimate. This does not show
3  by a preponderance that it is illegitimate.
4      On the next one, which is 610, dated August 25th, and
5  for this one I think it is important to start at the beginning
6  of the chain, which is page 2. This starts with Horvath
7  describing a discussion with investor relations, Shep Dunlap.
8  We have heard a lot about him. And the subject line is Short
9  IR Conduct.
10     If you look at it -- I won't read the whole thing --
11 it is about discussions with investor relations that are
12 totally legitimate, and the last sentence of that first
13 paragraph: "JT also spoke with them again and his check was
14 unchanged," suggesting that JT is speaking with investor
15 relations.
16     If there is any doubt about who JT was talking to, you
17 turn to the next page, the e-mail at 1:38 p.m. It continues
18 the discussion of summarizing discussions with Dell IR, and the
19 last line: "JT is also hearing that IR doesn't sound good."
20 So this is a discussion about investor relations, which is
21 legitimate.
22     Then you get up to the e-mail at 2:21. The subject
23 line is Still Short IR conversation, and there is a discussion
24 of some checks that Jesse Tortora did. I submit to your Honor
25 that in the context of this e-mail chain, talking about

# In The Matter Of:

*UNITED STATES OF AMERICA, v*

*TODD NEWMAN,*

___

*December 10, 2012*

___

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File CCAHNEWF.txt

**Min-U-Script® with Word Index**

**CCAMNEW2**     Makol - redirect     Page 3501

1 Q. David Ganek was the principal owner of Level Global,
2    correct?
3 A. Yes.
4 Q. So he would be a big person in the investigation and object
5    of interest, fair?
6 A. He would have been an important person in the conversation,
7    yes.
8 Q. And it would be highly relevant information whether or not
9    the cooperator fingered Mr. Ganek as to knowing the source of
10    the information, fair?
11        MS. APPS: Objection.
12        THE COURT: Overruled. You can answer.
13 A. It would be important.
14 Q. That would be an important piece of information?
15 A. It would have been important that the cooperator told
16    Mr. Ganek that the Dell information was coming from someone
17    inside Dell.
18 Q. Now, it's your testimony here that Adondakis said just the
19    opposite, that he had not told Ganek that, correct?
20 A. Had not told him that the Dell information was coming from
21    someone inside Dell. He had no recollection of that.
22 Q. And it's your testimony he said that in this proffer at the
23    U.S. Attorney's Office on November 2, 2010, correct?
24 A. No. I recall -- I don't recall him saying that, so it
25    wasn't -- he wasn't saying that he gave the information to

**CCAMNEW2**     Makol - redirect     Page 3502

1    Mr. Chiasson and Mr. Ganek. It's a slight variation. It's not
2    the information from Chiasson -- giving the Dell information.
3    He gives the Dell information to Chiasson again, but he does
4    not disclose to Ganek that the information came from someone
5    inside Dell.
6 Q. Let's look at 3502-7, the 302, or your memo that we were
7    looking at before.
8        THE COURT: This is the 302?
9        MR. WEINGARTEN: Yes. 3502-7. That's a memo of
10    interview, your Honor.
11        THE COURT: This is by Agent Hinkle, right? You said
12    your memo.
13 Q. You signed off on this memo, correct?
14 A. I reviewed it, yes.
15 Q. Is it indicated anywhere in this entire memo that David
16    Ganek did not know the source of the information at Dell?
17 A. One more time?
18 Q. Is it indicated anywhere in this memo that Adondakis told
19    the government that Ganek did not know the source of the
20    information at Dell?
21        MS. APPS: Objection. Mischaracterizes earlier
22    testimony.
23        THE COURT: Sustained.
24 Q. In any memo of interview that you did or approved in this
25    investigation, is it ever reported that Mr. Adondakis never

**CCAMNEW2**     Makol - redirect     Page 3503

1    told Ganek the source of the Dell information?
2 A. I don't believe so.
3 Q. It's true, is it not, that notes were taken of the
4    interview at the government's offices on November 2, 2010?
5 A. Yes. Notes would have been taken, yes.
6 Q. And can you look at 3502-8.
7        Do you have that in front of you? Do you have the
8    notes? Let me give you a copy.
9 A. Thank you.
10 Q. Sure.
11        Is it fair to say those are handwritten notes taken of
12    the interview of Adondakis' proffer at the Federal Government?
13 A. Yes, sir.
14 Q. And are they your notes or Hinkle's notes?
15 A. I think -- they are not my notes and I believe there is a
16    third agent that's there at the time of the interview, an agent
17    by the name of Matthew Komar.
18 Q. And so it's normal practice for the FBI to take handwritten
19    notes at an interview, to make a record, and to assist in the
20    production of the memo interview, correct?
21 A. When covering a new topic, yes.
22        THE COURT: If you were covering a new topic?
23        THE WITNESS: Yes.
24 Q. What I would like you to do is take first 3502-7. That's
25    the memo of interview, correct?

**CCAMNEW2**     Makol - redirect     Page 3504

1 A. Yes.
2 Q. And let's just make sure that the notes of the interview
3    correspond to the memo of interview. It's the same briefing
4    that we are talking about, correct?
5 A. It is.
6 Q. Now, if you could turn to the seventh page of the
7    handwritten notes, can you see that that corresponds to the
8    paragraph that we were talking about in my first examination?
9 A. Yes.
10 Q. And the first sentence of the typewritten report reads:
11    Chiasson and Ganek were both interested in the Dell information
12    when Adondakis told them because the information came directly
13    from the contacts at Dell.
14        Do you see that?
15        MS. APPS: Objection.
16        THE COURT: Overruled.
17 Q. Let's look at the very top of the handwritten notes and
18    read what they say.
19 A. Yes, I've read it.
20 Q. Doesn't the notes also reflect that Adondakis said that
21    both Ganek and Anthony interested in Dell because of contacts.
22    And in the handwritten notes Ganek -- there is an arrow from
23    David to knew about contacts at Dell, right?
24 A. I see that, yes.
25 Q. That's what the notes reflect?

UNITED STATES OF AMERICA, v
TODD NEWMAN,
December 10, 2012

| CCAMNEW2 | Makol - redirect | Page 3505 |
|---|---|---|

1  A.  Knew about contacts about Dell.
2  Q.  They reflect an arrow from the word David to knew about
3  contacts at Dell?
4  A.  Correct.
5      MR. WEINGARTEN:  Thank you very much, sir.
6      THE COURT:  Any recross?
7      MS. APPS:  No.
8      THE COURT:  Why don't we take a short break and then
9  we will resume with the defense case.
10     All rise for the jury.
11     (Jury not present)
12     THE COURT:  Agent Makol, you can take your time.
13     (Witness excused)
14     THE COURT:  Then we are going to go to Professor
15 Jarrell.
16     MR. FISHBEIN:  Then we have a few more documents and
17 then we are not done.
18     THE COURT:  You are not going to call your expert?
19     MR. MORVILLO:  No.  We are going to put some documents
20 in, your Honor.
21     THE COURT:  You think we will finish before lunch, or
22 no.
23     MR. NATHANSON:  We may, your Honor.  I think the
24 direct is maybe an hour, hour and a half.  I am not sure.
25     THE COURT:  We have to figure out whether we are going

| CCAMNEW2 | | Page 3506 |
|---|---|---|

1  to send the jury home and, if so, what we are going to tell
2  them about tomorrow.
3      Why don't you guys take a break and we will talk about
4  timing.  We need to have a charge conference and I have to get
5  you -- this is sooner than I thought.  I thought I would be
6  able to get you the charge tonight and then we would have a
7  charge conference tomorrow at some point.
8      MR. MORVILLO:  Your Honor, that would be fine with us.
9  We were hoping we could have the charge conference tomorrow,
10 anyway, and have the evening to review the charge.
11     THE COURT:  If we wrap up at 1:00 I can get you the
12 charge in short order and then you could look at it for an hour
13 and a half.  It's not that different from what you already
14 propose.  It's just a handful of spots where there are
15 disagreements.
16     MR. MORVILLO:  There may be factual issues that we
17 need to discuss with Mr. Newman's counsel.  We may need to have
18 longer than just two hours or three hours to discuss this.  We
19 may need record cites to argue and we won't know that until we
20 read it.
21     THE COURT:  I think I would like to have a charge
22 conference today, if we can, just because I don't want -- if we
23 have a charge conference tomorrow, then the jury is not getting
24 here until when?  What would you be proposing?
25     MR. MORVILLO:  I would be proposing that we have the

| CCAMNEW2 | | Page 3507 |
|---|---|---|

1  charge conference at 9:00 and have the jury here at 10.  If
2  it's not going to be that long, we can start at 10:00 tomorrow
3  morning.
4      THE COURT:  Who is doing the main summation?
5      MS. APPS:  I am.
6      THE COURT:  How long do you think it is?
7      MS. APPS:  Maximum of three hours, your Honor.  If we
8  start tomorrow morning with my summation, we could fit one
9  defense counsel in the afternoon, we could put the next one the
10 next morning, charge them Wednesday afternoon.  That way they
11 can have the case by the end of the day Wednesday.
12     I think if your Honor is able to get us the charge,
13 and they have a couple of hours to review it, I would very much
14 like to have the charge conference today so we can proceed on
15 the schedule that I just outlined.
16     THE COURT:  It sounds like Mr. Morvillo is suggesting
17 10:00 for summations anyway.
18     MS. APPS:  I don't know that one hour is realistic,
19 number one, and, number two, I actually think that's a little
20 tough because I don't know where you are going to come out on
21 some of these issues.  It could change the way we do the
22 summations.  It's going to be sort of going on the fly.
23     I would respectfully submit that two hours is plenty
24 of time for the two of them to confer.  And if your Honor's
25 schedule permits, of course, we could fit in the charge

| CCAMNEW2 | | Page 3508 |
|---|---|---|

1  conference today.  That way I am not trying to adjust a
2  summation on the fly.
3      THE COURT:  You think you'll be three hours and, Mr.
4  Fishbein --
5      MR. FISHBEIN:  It's going to be Mr. Nathanson.
6      THE COURT:  Mr. Nathanson.  And how long do you think
7  it will be?
8      MR. FISHBEIN:  Three hours.
9      THE COURT:  And how long do you think, Mr. Weingarten?
10 You are doing yours?
11     MR. WEINGARTEN:  Yeah.  I don't think that long.
12 There is a lot to say.
13     THE COURT:  Then a rebuttal.  That's you, Mr. Zach.
14     MR. ZACH:  Maybe an hour, your Honor.
15     MR. FISHBEIN:  Your Honor, for what it's worth, on the
16 charge, there are some difficult issues, there is some
17 important legal issues.  And we, too, would like some time to
18 digest your proposed charge so we can be fully prepared as to
19 which sections we really have an issue with and which we don't.
20 We will come earlier than 9, too, if you want.
21     THE COURT:  Let me think about it.  I think we may try
22 to do something this afternoon.
23     Get a drink and I'll see you in a bit.
24     (Recess).
25     (Continued on next page)