# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DAVID GANEK,

       Plaintiff,

  v.

DAVID LEIBOWITZ; REED BRODSKY; DAVID MAKOL; MATT KOMAR; JAMES HINKLE; HOLLY J. TRASK; DAVID CHAVES; PATRICK CARROLL; RACHEL ROJAS; DIEGO RODRIGUEZ; MARC P. BERGER; CHRISTOPHER L. GARCIA; RICHARD B. ZABEL; BOYD M. JOHNSON, III; and PREETINDER S. BHARARA,

       Defendants.

**No. 15 Civ. 1446 (WHP)**

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Barry C. Scheck
Nick J. Brustin
Nancy Gertner
Anna Benvenutti Hoffmann
Farhang Heydari

Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel: (212) 965-9081
Fax: (212) 965-9084

*Counsel for Plaintiff*
*David Ganek*

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II. LEGAL STANDARDS ...................................................................................... 5

    A. Motion to dismiss standard ............................................................................5

    B. Qualified immunity may rarely be decided on a motion to dismiss ........................6

    C. Evidence outside the Complaint may not be considered for its truth ....................7

III. STATEMENT OF FACTS ............................................................................... 8

    A. The FBI and USAO's insider trading investigations ................................................8

    B. Defendants target Mr. Ganek, but fail to obtain evidence against him. ................9

    C. With no evidence, Defendants move forward with their search of Mr. Ganek.....10

    D. Based on Defendants' fabrications, Defendants raid Mr. Ganek's Level Global offices ...........................................................................................11

    E. Defendants repeatedly refuse to correct their misconduct. ....................................12

    F. Defendants' misconduct comes to light ...............................................................14

    G. Mr. Ganek's claims ..............................................................................................15

IV. ARGUMENT ................................................................................................. 16

    A. Mr. Ganek's claims are timely ...............................................................................16

    B. Mr. Ganek has more than adequately alleged a fabrication claim.........................18

        i.  *Defendants fail to address the core of Mr. Ganek's fabrication claim* .........18

        ii. *Mr. Ganek has plausibly alleged that Defendants deliberately fabricated evidence against him* ...............................................................................20

            1. Defendants fabricated that Mr. Adondakis implicated Mr. Ganek in insider trading..............................................................................21

            2. The fabrication is plausible. ........................................................22

    C. Mr. Ganek has adequately pled a violation of his Fourth Amendment rights......25

*i. The search lacked probable cause* ................................................................**26**

    **1. The Affidavit contained multiple false statements and omissions ..27**

    **2. A neutral magistrate would not have issued the search warrant based on the corrected Affidavit** ..........................................**29**

*ii. Defendants conducted their search in an unreasonable manner* ....................**34**

    **1. Defendants again misapply the law and improperly dispute the facts as alleged in Mr. Ganek's Complaint** ...............................**34**

    **2. The Complaint states a clearly-established Fourth Amendment claim** .............................................................................**35**

**D. Mr. Ganek has stated a stigma-plus claim.** ...............................................**38**

    *i. Defendants' stigmatizing statement regarding Mr. Ganek* ............................**39**

    *ii. Mr. Ganek's atypical injuries constitute a "plus"* ..........................................**40**

    *iii.Post-Deprivation Remedies are inadequate* ....................................................**41**

**E. Defendants violated Mr. Ganek's substantive due process rights** .........................**42**

**F. Defendants' violated Mr. Ganek's right by failing to intercede on his behalf** .......**43**

**G. The Supervisor Defendants were personally involved and thus liable for the violations of Mr. Ganek's constitutional rights** ...............................................................**44**

**V.  CONCLUSION** .........................................................................................................**45**

# TABLE OF AUTHORITIES

## Federal Cases

*Adrian v. Selbe*, 364 F. App'x 934 (5th Cir. 2010)....................................................18

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) .........................5, 6, 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .......................................5, 6, 35, 45

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................21, 43

*Ayeni v. Mottola*, 35 F.3d 680 (2d Cir. 1994) ....................................................34, 36

*A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011)......................................16

*Bailey v. City of New York*, 79 F. Supp. 3d 424 (E.D.N.Y. 2015)..............................................18

*Barbaro v. United States*, 521 F. Supp. 2d 276 (S.D.N.Y. 2007)...............................................17

*Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811 (2d Cir. 2013) ................................. 7

*Barrett v. United States*, 689 F.2d 324 (2d Cir. 1982)................................................16

*Beauvoir v. Israel*, 794 F.3d 244 (2d Cir. 2015).......................................................7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................5, 6, 21, 43

*Biswas v. City of New York*, 973 F. Supp. 2d 504 (S.D.N.Y. 2013) ....................................42–43

*Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010)......................................................42

*Boyd v. United States*, 116 U.S. 616 (1886) ........................................................26

*Brandt v. Bd. of Co-op. Educ. Servs.*, 820 F.2d 41 (2d Cir. 1987) ...........................................39

*Burns v. Reed*, 500 U.S. 478 (1991) ...............................................................5

*Caldarola v. Cnty. of Westchester*, 343 F.3d 570 (2d Cir. 2003) .............................................37

*Calderon v. City of New York*, No. 14 Civ. 1082, 2015 WL 2079405
(S.D.N.Y. May 4, 2015) .........................................................................28

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)...................................................7

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998).................................................42

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013) ...................................................23

*Conn v. Gabbert*, 526 U.S. 286 (1999) .................................................................................42

*Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380 (S.D.N.Y. 2008)..................................36

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) .............................................................41, 42

*Dirks v. S.E.C.*, 463 U.S. 646 (1983) ......................................................................................8

*Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001) *rev'd on other grounds sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003)....................38, 39

*Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623 (2d Cir. 1996) ....................39

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) ......... 6

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..............................................................................25

*Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006)........................................................................7

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167 (2d Cir. 2006).............................................6

*Franks v. Delaware*, 438 U.S. 154 (1978)........................................................................26, 27

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ..........................................................7

*Gobel v. Maricopa Cnty.*, 867 F.2d 1201 (9th Cir. 1989)......................................................41

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991) .....................................27, 29, 30, 33

*Gonzalez v. Hasty*, — F.3d —, 2015 WL 5155150 (2d Cir. Sept. 3, 2015) ............................16

*Grancio v. De Vecchio*, 572 F. Supp. 2d 299 (E.D.N.Y. 2008)..............................................17

*Greenwood v. New York, Office of Mental Health*, 163 F.3d 119 (2d Cir. 1998) ...............40, 41

*Hope v. Pelzer*, 536 U.S. 730 (2002) .................................................................................37

*Hudson v. New York City*, 271 F.3d 62 (2d Cir. 2001) ..........................................................25

*Hudson v. Palmer*, 468 U.S. 517 (1984)...............................................................................41

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .............................................................................6

*In re Dinova*, 212 B.R. 437 (B.A.P. 2d Cir. 1997) ................................................................44

*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001) ..................................43

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014)......................................................6

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998).....................................................16, 17

*Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000) ...................................................................34, 36

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) .......................................................................20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015).........23

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................................5

*McColley v. Cnty. of Rensselaer*, 740 F.3d 817 (2d Cir. 2014) ................................................31

*McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004) ..................................................................6, 7

*Mooney v. Holohan*, 294 U.S. 103 (1935) .................................................................................20

*Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001) ..................................................44

*Morse v. Fusto*, — F.3d —, 2015 WL 5294862 (2d Cir. Sept. 11, 2015) ...........................19, 20

*Napue v. Illinois*, 360 U.S. 264 (1959) ......................................................................................20

*Nat'l City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980) ...............................33

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014) ...........................................................................25

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009)....................38

*O'Ferrell v. United States*, 998 F. Supp. 1364 (M.D. Ala. 1998) .......................................17, 18

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) .....................................................................43

*Parratt v. Taylor*, 451 U.S. 527 (1981)......................................................................................41

*Patterson v. City of Utica*, 370 F.3d 322 (2d Cir. 2004)...........................................................40

*Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005) ..........................................................................42

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
    568 F.3d 374 (2d Cir. 2009)..................................................................................................6

*Pyle v. Kansas*, 317 U.S. 213 (1942) .........................................................................................20

vi

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)..........................................22

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)....................................................19

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991)............................................................28, 33

*Rodriguez v. Phillips*, 66 F.3d 470 (2d Cir. 1995)...................................................................43

*Rotella v. Wood*, 528 U.S. 549 (2000) ....................................................................................16

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ..............................................................2, 7, 12, 22

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007) .......................................................38

*Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) .........................................................38, 41

*Samson v. California*, 547 U.S. 843 (2006)...........................................................................25

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009)..................................................6, 22

*Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2012)................................................29

*Stanford v. State of Texas*, 379 U.S. 476 (1965)................................................................26, 32

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ..................................................................37

*Thomas v. McElroy*, 463 F. App'x 591 (7th Cir. 2012).........................................................17–18

*Triestman v. Probst*, 897 F. Supp. 48 (N.D.N.Y.1995) ...........................................................17

*Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015) ....................................................................21

*United States v. Bianco*, 998 F.2d 1112 (2d Cir. 1993) .........................................................31

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000)..........................................................29

*United States v. Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) .................................................30

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ......................................................26, 32, 33

*United States v. Feng Ling Liu*, No. 12 CR. 934, 2014 WL 101672
(S.D.N.Y. Jan. 10, 2014).......................................................................................................33

*United States v. Figueroa*, 750 F.2d 232 (2d Cir. 1984) ........................................................27

*United States v. Galpin,* 720 F.3d 436 (2d Cir. 2013) ............................................................30

*United States v. Kubrick*, 444 U.S. 111 (1979)..........................................................................16

*United States v. Martin*, 426 F.3d 68 (2d Cir. 2005) ...............................................................32

*United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) *cert. denied*, (U.S. Oct. 5, 2015).........15

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ..................................................25, 28

*United States v. Todd Newman, et. al*, No. 12 Cr. 121, Dkt. No. 26 (S.D.N.Y. Feb. 7, 2012) ..33

*United States v. Vilar*, No. 305-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) .30, 31, 33

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ..................................26, 32

*Valdez ex rel. Donely v. United States*, 518 F.3d 173 (2d Cir. 2008)..................................17, 18

*Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997)........................................................................16

*Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994) ....................................................................39, 40

*Vega v. Hempstead Union Free School District*, — F.3d —, 2015 WL 5127519
        (2d Cir. Sept. 2, 2015)..................................................................................................21

*Vega v. Lantz*, 596 F.3d 77 (2d Cir. 2010)...............................................................................38

*Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994)................................................................27, 29, 30

*Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005).............................................................................38, 42

*Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318 (2d Cir. 2004) ..................................18

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007)........................................................................32, 33

*Walker v. Mendoza*, No. 00-CV-93, 2000 WL 915070 (E.D.N.Y. June 27, 2000) ..................28

*White Plains Towing Corp. v. Patterson*, 991 F.2d 1049 (2d Cir. 1993) ..................................39

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) .........................................................20

*Wilson v. Layne*, 526 U.S. 603 (1999) ......................................................................................36

*WMX Techs., Inc. v. Miller*, 197 F.3d 367 (9th Cir. 1999) .......................................................41

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................................................42

*Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) .............................................44

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) ........................................................18, 19, 20, 24


**<u>Other</u>**

Dep't of Justice, *U.S. Attorney Manual* § 1-7.401(C) ................................................................38

Federal Rule of Criminal Procedure 41(g)................................................................................41

U.S. Const. amend. V................................................................................................................20

## I.    INTRODUCTION

In November 2010, FBI and AUSA Defendants conducted an unprecedented raid on the offices of Plaintiff David Ganek, after leaking their plans to the *Wall Street Journal*. Mr. Ganek is a well respected, established hedge fund operator who was innocent of any insider trading. Agents searched Mr. Ganek's office at Level Global, seizing his cell phone and other personal effects. As the press immediately observed—and Defendants knew in advance—the search warrants "may as well have been death warrants for the hedge funds raided." (Dkt. No. 1 (hereinafter "Compl.") ¶ 96).

Anxious to reassure his investors and save his business, Mr. Ganek commissioned an unfettered review by respected law firms which confirmed that he had not engaged in any insider trading. But because he had been named in the search warrant (signaling that he was a focus of the government's investigation), this review could not placate his investor's concerns. Representatives of Mr. Ganek and Level Global then reached out to the AUSAs, including supervisors up to U.S. Attorney Preet Bharara himself, communicating that the government had made a mistake about Mr. Ganek, that he was innocent, but that unless the government could clarify that Mr. Ganek was not a focus of the investigation—that is, that they did not allege they had probable cause to believe Mr. Ganek had engaged in wrongdoing—the business would fold. Defendants refused to do so, instead saying they stood by the raid and warrant.

While the raid itself was highly publicized, Defendants took pains to make sure that the basis for their raid remained under wraps. The Government did not bring any charges stemming from the raid for nearly 14 months, and it was not until nearly two years later, after the warrant affidavit was privately disclosed and witnesses testified under oath, that the truth came out.

*No* evidence had implicated Mr. Ganek. The only basis for the raid on Mr. Ganek—statements attributed to one witness, Mr. Adondakis—were *never said* by Mr. Adondakis. The

government agents fabricated them—just made them up. Nor is this a minor detail or a casual inadvertence. Defendants expressly asked about Mr. Ganek, and when they did not get the answer they wanted, lied about it. But by the time that Mr. Ganek found out about the lies, it was too late. His company, Level Global, had folded, its employees had lost their jobs, and the damage to Mr. Ganek's reputation and all of Level Global's employees was complete.

The government misconduct alleged is—in a word—astonishing. But perhaps worse is the government's position in their brief: not only that Mr. Ganek has no remedy, but that *no one* in his situation would have any remedy. The government does not claim Mr. Ganek is guilty of any crimes, or even that they had probable cause to believe he was guilty of any crimes. Yet it maintains that government agents could continue to do exactly what they did to Mr. Ganek—use fabricated evidence to destroy a business and reputation—free from fear of even having to be held to account, to explain themselves, to submit to a deposition, much less confront a jury.

Defendants trivialize the Adondakis lie and mischaracterize the allegations in the search warrant affidavit.[1] Mr. Ganek's case, Defendants say, rests on "one statement" in the affidavit, a statement that they claim was "non essential." (Dkt. No. 44 (hereinafter "Defs.' Br.") at 1–2, 4). Hardly. Based solely on the fabrication, the affidavit repeats Mr. Ganek's name seven times, lumping him in as an alleged co-conspirator in multiple paragraphs, when Defendants knew that Mr. Adondakis had *expressly stated that Mr. Ganek was not involved*. Far from being "non essential," this fabricated statement provides the only basis for probable cause to search Mr. Ganek. He is not mentioned in the previous paragraphs recounting overheard conversations, not in the subsequent paragraphs purporting to describe why exigent circumstances justified a search

---

[1] Defendants have attached the search warrant and affidavit to their brief. As described below, the Court may only consider this document for *what* is stated inside it, not as proof that what the affidavit alleges is true. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); (*infra* Part II.C).

rather than a subpoena. If the magistrate judge reviewing this affidavit had known what Mr. Adondakis had actually said, Mr. Ganek's name would not have been in this document at all.

Defendants' brief also relies on cherry picked portions of trial transcripts and refers to matters not provided to counsel or the Court—matters beyond the scope of a motion to dismiss and, worse, fundamentally misleading. For example, Defendants cite to a portion of the testimony in which Defendant Makol is shown notes from the Adondakis debriefing, dignifying the notes with the description "contemporaneously recorded notes of the meeting." (*See* Defs.' Br. at 9, 23). They give no weight, however, to Makol's categorical rejection of the contents of the notes (and subsequently-created report) just a few pages earlier. (*See* Compl. ¶ 144 (quoting Makol's testimony that he was "certain" that Mr. Adondakis did not say what is contained in the notes and subsequent report)). And those "contemporaneously recorded notes" (at least according to the Defendants' brief) are nothing more than "an arrow from the word 'David' to 'knew about contacts at Dell.'" (Defs.' Br. at 23). In any case, whatever these notes say when they are finally produced, however little they may justify Defendants' callous disregard for the truth, is an issue for trial, not this motion.

Next, Defendants emphasize that they had to conduct a public raid of Level Global rather than relying only on subpoenas (which they served at the same time) because of "exigent circumstances"—circumstances they well knew had absolutely nothing to do with Mr. Ganek, Level Global, or any of his employees. (*See id.* at 10 (citing Dkt. No. 45-1 (hereinafter "Affidavit") at 29–32, ¶¶ 15–18)). Paragraph 16 points to an email sent by an independent third-party consultant, John Kinnucan, at a different firm alerting his clients about a visit from the FBI—on October 26, nearly a month before the raid. (Affidavit at 30). Paragraph 17 refers in the most general terms to information from a "confidential source" who "works at a hedge fund

which used [certain third-party] consultants" in which his supervisor directed him to delete information about insider trading. (*Id.* at 31). Again, on their motion to dismiss, Defendants may not rely on statements in the affidavit for their truth. In any event, Plaintiff has alleged—and expects discovery will demonstrate—that this paragraph was fundamentally disingenuous, cleverly written in general terms about some unnamed "hedge fund" precisely to hint to the magistrate that Mr. Ganek was involved, when the government knew precisely which hedge fund the paragraph referred to, and that it had nothing to do with Level Global or any of its employees. If the affidavit had said so precisely, its claim of exigent circumstances to search Level Global would have evaporated.

Worse than the factual misrepresentations is the government's legal position. First, Defendants argue Mr. Ganek's suit is too late, that he should have brought suit while Defendants were hiding the evidence that established their misconduct. Unsurprisingly, the law does not hold plaintiffs to such an impossible standard.

Second, despite *sworn testimony* from the witness and one of the agents present at the meeting that the only person alleged to implicate Mr. Ganek *never said* what was attributed to him, Defendants claim that the Court cannot credit Mr. Ganek's assertions because it is "far-fetched" and "wholly implausible" that any federal agents or AUSAs would ever engage in intentional misconduct. (Defs.' Br. at 1). Sadly, experience teaches that this is not the case. Federal agents and AUSAs are human beings subject to the same temptations as anyone else; they do not suddenly become infallible as soon as they are hired by the federal government.

Finally, even assuming a jury could find intentional misrepresentations, Defendants assert they were "simply doing their jobs" and that they should be protected by qualified immunity, so that they may be permitted to continue doing their jobs in this fashion "without fear of harassing

litigation." (*Id.* at 1, 4). Their position is extraordinary. Qualified immunity is not intended to protect "those who knowingly violate the law"—exactly what Plaintiff alleges here. *Cf. Malley v. Briggs*, 475 U.S. 335, 341 (1986). Not only is there nothing improper about holding government agents to account when they engage in such misconduct, such suits serve an important deterrence function—"'[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991) (emphasis in original).

Indeed, Mr. Ganek's allegations are exceptionally well supported, particularly for this stage of the litigation, and, in any event, must be accepted as true on Defendants' motion to dismiss. They paint a disturbing picture of intentional misconduct by federal agents, made with no concern for the consequences to innocent victims, and no fear of ever being held to account. This lawsuit should proceed; it is precisely the kind of case for which a *Bivens* action was designed, to hold the government responsible for its misconduct.

## II.   LEGAL STANDARDS

### A.  Motion to dismiss standard

A Rule 12(b)(6) motion may not be granted if the complaint includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[I]n determining whether a complaint states a claim that is plausible, the court is required to proceed '*on the assumption that all the [factual] allegations in the complaint are true*,' [e]ven if their truth seems doubtful." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that the plausibility requirement '*does*

*not* impose a *probability* requirement at the pleading stage,' . . . 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Court must "construe [P]laintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor," *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (citation omitted); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,* 568 F.3d 374, 381 (2d Cir. 2009), including facts alleged on information and belief when those facts are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista*, 604 F.3d at 120 (citations omitted); *see also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014). Specific evidence of a defendant's mental state—*e.g.*, intent, motive, knowledge—is rarely available to plaintiffs pre-discovery, and thus need not be pleaded with full specificity. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The ultimate question . . . involves a defendant's motive and intent, both difficult to plead with specificity in a complaint. It is sufficient to allege facts from which [the pertinent] intent on the part of the defendants reasonably may be inferred." (citations omitted)).

### B.  Qualified immunity may rarely be decided on a motion to dismiss.

Because "[t]he fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial," *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976), a qualified immunity defense presented in a Rule 12(b)(6) motion "faces a formidable hurdle . . . and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004))."[A] defendant presenting an immunity defense on a Rule 12(b)(6)

motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna*, 386 F.3d at 436. In particular, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id*. "For these reasons, a motion to dismiss 'is a mismatch for immunity and almost always a bad ground of dismissal.'" *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (quoting *McKenna*, 386 F.3d at 436).

### C.  Evidence outside the Complaint may not be considered for its truth.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). A court ruling on a motion to dismiss may consider a document outside the complaint, *if* it is a document "upon which the complaint *solely* relies and which is *integral to the complaint*." *See Roth*, 489 F.3d at 509 (internal citation omitted). "[E]ven if a document is 'integral' . . . , it must be clear on the record that no dispute exists regarding the authenticity or accuracy . . . [or] relevance of the document," or it may not be considered. *Faulkner*, 463 F.3d at 134 (citations omitted); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002). And if the court may consider those documents, it is "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents.*'" *Roth*, 489 F.3d at 509 (internal citation omitted). The same is true if the court were to take judicial notice of public documents, "it does so in order 'to determine *what* statements [they] contained'—but '*again not for the truth of the matters asserted.*'" *Id.* (internal citation omitted, emphases added); *see also Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015). Further, it is error to "consider[] affidavits and exhibits submitted by defendants, or rel[y] on factual allegations contained in legal briefs or memoranda, in ruling on a [Rule 12] motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000).

### III.     STATEMENT OF FACTS

The relevant facts, as determined by the legal standards discussed above, are as follows:

### A.  The FBI and USAO's insider trading investigations.

Beginning in 2007 or 2008, officials at the FBI and the U.S. Attorney's Office ("USAO") began devoting significant resources to the investigation of insider trading among financial professionals. (Compl. ¶ 48). These investigations required substantial sharing of information and resources, as well as the involvement of high-ranking supervisors up through and including Defendant Bharara. (*Id.* ¶¶ 48–49). Under Mr. Bharara, USAO and FBI officials made it a practice of using the media to publicize successful high-profile prosecutions. (*Id.* ¶ 50).

Insider trading investigations are particularly complex, because, as the Supreme Court has long recognized, there is nothing unlawful about trading based on nonpublic information developed through lawful research tools. (*Id.* ¶¶ 41, 43, 51); *see Dirks v. S.E.C.*, 463 U.S. 646, 657 (1983) ("repudiating any notion that all traders must enjoy equal information before trading"). As a result, the FBI and USAO relied on teams of investigators with specialized training to discern what activity was lawful and what crossed the line. (Compl. ¶¶ 48, 56–61, 75).

As a matter of investigative strategy, and consistent with the particularized showing necessary to prove insider trading and the devastating business consequences of a false accusation, the USAO had for many years investigated alleged wrongful activity at legitimate businesses using grand jury subpoenas. (*Id.* ¶ 51). Under Mr. Bharara's leadership, however, these investigations adopted techniques typically associated with the investigation of organized crime and other violent crime rings, including the use of informants and wiretaps. (*Id.* ¶ 52).

As Mr. Bharara told the press in June 2010: "We have never been working harder, have never put so many resources into investigating and prosecuting corporate fraud in this office." That same article also referred to sources who said Mr. Bharara himself was "overseeing some of

the highest-priority investigations." (*Id.* ¶ 54). The expenditure of significant manpower and resources on wiretaps and other aspects of these investigations created strong incentives to produce commensurately significant prosecutions. (*Id.* ¶¶ 53–54.)

**B.  Defendants target Mr. Ganek, but fail to obtain evidence against him.**

In late 2009, Mr. Bharara and his team began a wide reaching wiretap of 104 employees and clients of consulting firms that assisted financial professionals with research. (*Id.* ¶ 53). In 2010, the FBI and USAO's investigation turned to Level Global, a long-established, institutional quality investment fund. As a popular choice among conservative, institutional investors like state pension funds and university endowments, Level Global's business was routinely subject to extensive due diligence, including as recently as early 2010, when a sophisticated investor bought a passive, minority stake valued at over $400 million. (*Id.* ¶¶ 55, 34–38). As the senior partner, Mr. Ganek was the most attractive target at Level Global in an investigation seeking high-profile defendants. (*Id.* ¶¶ 39, 40, 68, 72).

Despite their already lengthy and resource-intensive investigation, Defendants understood that they had *no* evidence—no wiretap, no witness, no document—implicating Mr. Ganek in any kind of misconduct. (*Id.* ¶¶ 64–65, 74, 84, 88). But Defendants believed that they had developed wiretap evidence of insider trading implicating Sam Adondakis, a former mid-level analyst who was forced to leave Level Global months earlier after it was discovered that he violated the company's compliance regimen. (*Id.* ¶¶ 64–65; 42). So on October 14, 2010, FBI Defendants Hinkle and Makol, with Defendant Chaves' knowledge and approval, approached Mr. Adondakis in Central Park in an effort to obtain his cooperation and assistance with Defendants' investigation into Mr. Ganek and Level Global. (*Id.* ¶¶ 63, 66).

On November 2, 2010, Mr. Adondakis met with AUSA Defendants Brodsky and Leibowitz and FBI Defendants Makol, Hinkle, and Komar. (*Id.* ¶ 68). The goal of the November

2 meeting was straightforward—getting information from Mr. Adondakis regarding Mr. Ganek, (*id.*); Mr. Ganek was, after all, Defendants' highest-profile target at Level Global.

The conversation at the meeting focused on Dell, a publicly traded company that Mr. Adondakis covered while he was at Level Global. (*Id.* ¶¶ 69, 71). At the meeting, Mr. Adondakis expressly did *not* implicate Mr. Ganek in any insider trading. He told Defendants that he had not informed Mr. Ganek that he had obtained information from contacts inside Dell or from contacts breaching their fiduciary duties. (*Id.*). Mr. Adondakis confirmed this information—that Mr. Ganek had not engaged in insider trading—at subsequent meetings with Defendants Hinkle, Makol, Harris, Trask, and Brodsky. (*Id.* ¶ 78).

The results of the November 2 meeting and later discussions are not remotely surprising: Mr. Ganek *is* innocent—he did not engage in any insider trading. (*Id.* ¶¶ 4, 107–09, 112, 136).

Given Mr. Ganek's senior role at Level Global, the priority on prosecutions of high-level executives, and the experience of the AUSAs and FBI agents at the Adondakis interview, the subject of Mr. Ganek's involvement—and the lack of evidence against him—would have been discussed among not only the Defendants in the room, but also Defendant Trask, and their supervisors, Defendants Berger, Garcia, Zabel, Johnson, Bharara, Chaves, Carroll, Rojas, and Rodriguez (hereinafter "the Supervisor Defendants"). (*Id.* ¶¶ 72, 75, 77).

### C.  With no evidence, Defendants move forward with their search of Mr. Ganek.

After the November 2 meeting, Defendants Brodsky, Leibowitz, Makol, Hinkle and Komar—the Defendants at the meeting—along with Defendant Trask, fabricated evidence regarding Mr. Ganek's involvement in insider trading, to make Mr. Ganek the focus of their investigation. (*Id.* ¶¶ 76, 79, 83, 84). They eventually incorporated these fabrications into the Affidavit in support of their search warrant. (*See id.* ¶ 85 ("[T]he only allegations in the Affidavit implicating Mr. Ganek in insider trading were Defendants' fabrications.")). In particular,

Defendants included in the Affidavit the allegation that during the November 2 meeting, Mr. Adondakis informed Defendants that he had "informed [Mr. Ganek] . . . of the sources of the Inside Information." (*Id.* ¶ 85 n.1 (quoting Affidavit ¶¶ 11, 13) (emphasis removed)). This generic allegation—the only allegation in the 38 page Affidavit that implicated Mr. Ganek in misconduct—was not only false; it was fabricated by Defendants. (*Id.* ¶ 88).

Consistent with USAO and FBI practices, the Affidavit would have been reviewed not only by Trask (who signed it) but also by the Defendants present at the November 2 meeting. (*Id.* ¶ 83). Moreover, consistent with those practices, the Supervisor Defendants would have approved the raid and been responsible for making certain that it was lawful. (*Id.*).

On Sunday, November 21, Defendant Trask applied for a search warrant, supported by the Affidavit (and its fabrications), to a magistrate judge. (*Id.* ¶¶ 89–90). Without knowing that the evidence attributed to Mr. Adondakis was false and fabricated by Defendants, the magistrate judge authorized the warrant in full. (*Id.* ¶ 90). In relevant part, the search warrant authorized Defendants to seize: (1) Mr. Ganek's personal office, financial records, letters, correspondence, photographs, address book, telephone records, and cell phone; (2) Mr. Adondakis's desktop and laptop; and (3) Level Global's servers. (*See id.* ¶ 91; Affidavit at 47–48).

### D.  Based on Defendants' fabrications, they raid Mr. Ganek's Level Global offices.

On Monday, November 22, roughly two dozen FBI and USAO officials raided Level Global's midtown Manhattan offices. (Compl. ¶¶ 89–92). They searched Mr. Ganek's office, files, and electronic devices, including by making an electronic copy of his personal cell phone. (*Id.* ¶ 105). Neither Mr. Ganek, nor his attorney, was permitted to see the Affidavit. (*Id.* ¶ 106).

The decision to stage a raid—a tactic rarely (if ever) used against a financial fund without simultaneous criminal charges—was made by the Supervisor Defendants. (*Id.* ¶¶ 92–94). No exigent circumstances justified this public search rather than relying on a typical subpoena,

which Defendants also served on Level Global that same day; absolutely no information suggested that anyone at Level Global had or intended to destroy files or obstruct justice. (*Id.* ¶ 102).[2] Indeed, Defendants never used evidence obtained from the search in any proceeding, instead relying solely on documents produced by Level Global under subpoena. (*Id.* ¶ 168).

Rather, the purpose of the raid was to garner press attention for the investigations. One or more of the Defendants tipped the *Wall Street Journal* about the impending raids, which, under USAO customs and practices, were authorized by the Supervisor Defendants. (*Id.* ¶¶ 95–98). Defendants fully understood that both of these decisions—to conduct a raid and to tip off the media—were designed to maximize the harm to Mr. Ganek and Level Global. (*Id.* ¶¶ 99–104).

### E.  Defendants repeatedly refuse to correct their misconduct.

Because the Affidavit was sealed, Mr. Ganek did not know the allegations against him; he only knew he was innocent of any wrongdoing. (*Id.* ¶¶ 106–07). After the raid, Mr. Ganek hired well-respected outside counsel to perform a thorough, unfettered review of Level Global, (*id.* ¶¶ 108–09); this review confirmed he had not engaged in any insider trading, (*id.* ¶ 112).

At this point, it was still possible for Mr. Ganek to clear his reputation and to prevent Level Global from folding, so long as investors could be assured that Mr. Ganek, the principal of the fund, was not accused of wrongdoing. (*Id.* ¶¶ 113–14). However, because Mr. Ganek was a target of the raid—his offices, papers, and phone were searched and seized—and the Affidavit was sealed, Mr. Ganek could not give his investors the assurances they sought. (*Id.* ¶¶ 115–18).

---

[2] Defendants suggest they were concerned about the potential destruction of evidence, citing to the Affidavit. (*See* Defs.' Br. at 10 (citing Affidavit ¶¶ 15–18)). This argument is a nonstarter. First, Defendants may not rely on the Affidavit for its truth. *See Roth*, 489 F.3d at 509; (*supra* Part II.C). Second, Plaintiff has alleged, and discovery will demonstrate, that the allegations in the Affidavit did not create any actual concern for destruction of evidence at Level Global: the individuals destroying evidence had no tie to Level Global, and the information spurring the destruction was nearly a month old. Defendants' basis for "exigency" boils down to the contention that because one of the thousands of money management professionals destroyed evidence, the Government has reason to believe that *every* other professional would do the same.

Mr. Ganek reached out to Defendants in an effort to mitigate the damage done to him. First, on December 20, 2010, Level Global representatives met with USAO representatives, including Defendants Zabel and Leibowitz, and expressed concerns about the damage the raid and investigation were doing to Level Global. In response, Zabel and Leibowitz made clear that the raid had been carefully considered at the highest levels, with full appreciation for the likely commercial consequences, and that that all necessary precautions had been taken. (*Id.* ¶¶ 6, 110).

Next, around February 4, 2011, after the internal investigation had cleared Mr. Ganek, a highly respected former federal prosecutor who personally knew Mr. Bharara, contacted Mr. Bharara to inform him of the damage the search had done to Mr. Ganek and Level Global. (*Id.* ¶¶ 7, 119–20). The Level Global Attorney told Mr. Bharara, in substance, that the search had unnerved investors and that unless the government would clarify that Mr. Ganek was not the focal point of the investigation and that it did not allege there was probable cause to charge Mr. Ganek with insider trading, the hedge fund would fold and dozens of people would lose their jobs. (*Id.* ¶¶ 7, 120–21). In sum, the Level Global Attorney asked Mr. Bharara to make sure that his office was not unnecessarily causing the entire company to shut down based on the actions of one former employee. (*Id.*). Mr. Bharara agreed to look into the matter and, three days later, informed the Level Global Attorney that he had spoken to his team, that they had not conducted the raid without thinking through the consequences, that they stood by their actions, and that he was unable to say anything about the search or Mr. Ganek that would help. (*Id.* ¶¶ 8, 122–24).

At the same time that Mr. Ganek was trying desperately to avoid the destruction of his business, Defendants' were taking steps to exacerbate the harm to him. (*Id.* ¶ 134). Even after Mr. Ganek's attorneys contacted USAO representatives in December 2010, insisting that a mistake had been made, none of the Defendants sought to interview Mr. Adondakis again. (*Id.*

¶ 126). Instead, they did just the opposite. On February 3, 2011, four months after the initial Adondakis interview, one or more of the FBI Defendants drafted a report purporting to recount the Adondakis meeting of November 2, 2010. And that subsequently created report, like the Affidavit, reiterated the false and fabricated statements attributed to Mr. Adondakis—namely, that Mr. Ganek was "interested in the Dell information when Adondakis told them because the information came directly from contacts at Dell." (*Id.* ¶ 111).

On February 11, 2011, Mr. Ganek was forced to shut down Level Global, resulting in the loss of employment for dozens of employees and losses for the investors. (*Id.* ¶¶ 128, 135). Following press reports publicizing the closing of Level Global, AUSA Defendant Leibowitz and other federal agents *finally* arranged for a meeting with Mr. Adondakis to discuss Mr. Ganek. (*Id.* ¶ 129). This meeting confirmed what Defendants already knew based on the November 2 meeting—that the Affidavit's allegations implicating Mr. Ganek in insider trading were false and fabricated. (*Id.* ¶¶ 130–31; *see also id.* ¶ 133 (discussing subsequent meetings)). These facts, including that Mr. Adondakis' statements were in direct contradiction to the allegations used to support the raid and memorialized in the Affidavit and the subsequently created report, were relayed to the Supervisor Defendants. (*Id.* ¶ 132).

**F. Defendants' misconduct comes to light.**

Mr. Adondakis was not indicted until April 25, 2011; his indictment was filed under seal and not unsealed until January 18, 2012, the same date that Defendant Bharara publicly announced that several individuals (but not Mr. Ganek) were being charged with related crimes. (*Id.* ¶¶ 135, 137–38). The Affidavit itself remained sealed and unavailable to Mr. Ganek until March 1, 2012, when, pursuant to a protective order, Mr. Ganek's lawyers finally obtained access to the Affidavit to view the fabricated allegations against him. (*Id.* ¶¶ 139–40).

On November 7, 2012, Mr. Chiasson and another defendant proceeded to trial. (*Id.*

¶ 141). It was during this trial that Defendants' fabrications first came to light. On *direct* examination by the government, Mr. Adondakis testified that he "never" told Mr. Ganek about a source within Dell. (*Id.* ¶ 142). Mr. Adondakis went further on cross examination:

> Q. Well, you made assertions to the FBI that all three [*i.e.*, Ganek, Chiasson, and another employee] knew about the information from Sandy Goyal that you had received from Tortora correct?
> A. I don't know if those included Mr. Ganek.
>  . . . .
> Q. Let's refer to Mr. Ganek specifically. I'd like to read [from the subsequently created report of the November 2, 2010 meeting], if I may. "Chiasson and Ganek were both interested in the Dell information when Adondakis told them because the information came directly from contacts at Dell." Is that true as to Mr. Ganek or not true?
> A. *No, it's not true.*

(*Id.* ¶ 143). Defendant Makol confirmed this a few days later, testifying that he "was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell." (*Id.* ¶ 144). In sum, with respect to Mr. Ganek, the sworn trial testimony regarding the November 2 meeting directly contradicted the Affidavit and the subsequently created report of that meeting, indicating both had been fabricated. (*Id.* ¶ 145).[3]

### G.  Mr. Ganek's claims

Mr. Ganek filed his Complaint on February 26, 2015. The Complaint alleges: (1) that the non-supervisor Defendants violated Mr. Ganek's Fifth Amendment due process rights by depriving him of both liberty and property based on fabricated evidence; (2) that the non-supervisor Defendants violated Mr. Ganek's Fourth Amendment right to be free from unreasonable searches; (3) that all Defendants enabled the violations of Mr. Ganek's rights by failing to intercede; and (4) that the Supervisor Defendants, based on their personal involvement

---

[3] The Second Circuit overturned Mr. Newman and Mr. Chiasson's convictions, concluding that "the bare facts in support of the Government's theory of the case are as consistent with an inference of innocence as one of guilt." *United States v. Newman*, 773 F.3d 438, 455 (2d Cir. 2014) *cert. denied*, (U.S. Oct. 5, 2015).

and roles as supervisors, are liable for the aforementioned claims.

## IV.   ARGUMENT

### A.  Mr. Ganek's claims are timely

Defendants misstate the law of accrual. Although in the typical case a plaintiff's claims accrue "at the time of injury," *see, e.g.*, *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982), where "the government conceals the acts giving rise to the plaintiff's claim" or a plaintiff "would reasonably have had difficulty discerning the fact *or cause* of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." *Kronisch*, 150 F.3d at 121 (emphasis added); *see also A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 139 (2d Cir. 2011); *Gonzalez v. Hasty*, — F.3d —, 2015 WL 5155150, at *6 (2d Cir. Sept. 3, 2015) ("*Bivens* [claims] . . . typically are subject to a 'discovery-based trigger.'").

 Under the diligence-discovery accrual rule, a claim accrues only when the plaintiff knows or has reason to know *both* "that he has been hurt and who has inflicted the injury." *See Rotella v. Wood*, 528 U.S. 549, 555–56 (2000) (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)) (emphasis added); *Kronisch*, 150 F.3d at 121 (holding *Bivens* claim accrued only when "the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury *and its cause*") (emphasis added); *Barrett*, 689 F.2d at 327–29 & 333 (noting that "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause" and "knowledge of the identity of the tortfeasor is a critical element to the accrual of a claim" (citing *Kubrick*, 444 U.S. at 120 n.7)); *cf. Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997) ("It is a general principle of tort law that a tort victim who cannot identify the tortfeasor cannot bring suit.").

At the time of the search, the Affidavit was sealed. Despite every effort, including

multiple meetings with USAO Defendants, Mr. Ganek could not possibly have known even the allegations, let alone that Defendants had fabricated evidence to justify the search. Even once the Affidavit was disclosed (subject to a protective order) on March 1, 2012, Mr. Ganek still could not have known the *government* source of his injuries—the Affidavit attributed the allegations against Mr. Ganek to Mr. Adondakis. It was not until late 2012, when Mr. Adondakis and Defendant Makol testified at the *Newman* trial, contradicting the terms of the Affidavit and explaining that Mr. Adondakis never actually implicated Mr. Ganek in insider trading, that Mr. Ganek was on notice that *the government* (*i.e.*, the Defendants) had fabricated the pretext to search Mr. Ganek and ruin his business. *See, e.g.*, *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 178 (2d Cir. 2008) (articulating "settled law," in an FTCA case, that accrual is delayed until "government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered *the government cause*" (quotation marks omitted)).[4]

Although Defendants suggest that all claims relating to an unlawful search accrue at the time of the search, that is simply not the case.[5] Numerous courts have applied the diligence-discovery rule in the context of an unlawful search and delayed accrual of related claims until the plaintiff became aware of the basis for challenging the search as unlawful (i.e., the cause of the harm). *See, e.g.*, *Thomas v. McElroy*, 463 F. App'x 591, 592 (7th Cir. 2012) ("A claim asserting

---

[4] Explications of the discovery accrual rule in the FTCA context also govern *Bivens* actions. *See, e.g.*, *Kronisch*, 150 F.3d at 123; *Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 309 n.4 (E.D.N.Y. 2008) (quoting *Barbaro v. United States*, 521 F. Supp. 2d 276, 280 (S.D.N.Y. 2007)).

[5] Defendants rely heavily on *Triestman v. Probst*, 897 F. Supp. 48, 49–50 (N.D.N.Y.1995), which holds, with little explanation, that claims for an illegal search accrue on the date of the search. But *Triestman* predated the Second Circuit's decision in *Kronisch*, which clarified that a claim accrues only when "the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury *and its cause*." 150 F.3d at 121; *see also O'Ferrell v. United States*, 998 F. Supp. 1364, 1373 n.7 (M.D. Ala. 1998) (distinguishing *Triestman*).

that a search violated the Fourth Amendment accrues—and the limitations period begins to run—as soon as the plaintiff knows, or should know, about the search *and the facts making it unlawful*." (emphasis added)); *Adrian v. Selbe*, 364 F. App'x 934, 936 (5th Cir. 2010) (finding August 2003 accrual—the date plaintiff had actual knowledge of a lie in the warrant affidavit—rather than 1997, the dates of the searches and warrants); *O'Ferrell*, 998 F. Supp. at 1373–74 ("[I]t is uncontested that the search warrants were not unsealed until 1996. Until then, [Plaintiffs] could not have known who all had sworn to the match of the documents, or exactly what they swore to. There is at least a dispute, therefore, whether [Plaintiffs] could have realized the nature of the injury or who inflicted the injury until the affidavit was unsealed."); *cf. Bailey v. City of New York*, 79 F. Supp. 3d 424, 444 (E.D.N.Y. 2015) ("A claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated . . . ." (internal citation and quotation omitted)). Any contrary rule would illogically require a plaintiff to bring suit against government actors before having any factual basis to claim wrongdoing on their part.[6]

### B. Mr. Ganek has more than adequately alleged a fabrication claim.

#### i. *Defendants fail to address the core of Mr. Ganek's fabrication claim.*

In their lengthy brief, Defendants offer no legal basis to dismiss Mr. Ganek's core due process claim—that he was unlawfully deprived of property (primarily his business, Level Global) based on Defendants' "manufacture of false evidence." *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000). There is none.

---

[6] Even if Mr. Ganek's claims accrued at the search, this case presents a rare circumstance where equitable tolling should permit Mr. Ganek "to avoid the bar of the statute of limitations" because "despite all due diligence he [wa]s unable to obtain vital information bearing on the existence of his claim." *Valdez*, 518 F.3d at 182. Although equitable tolling applies where defendants engaged in wrongful fraudulent concealment, it "is not limited to such cases." *Id.* (citing *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004)).

As the Second Circuit has explained, "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Zahrey*, 221 F.3d at 355–57 (holding same standard applies to prosecutors acting in an investigative capacity); *Morse v. Fusto*, — F.3d —, 2015 WL 5294862, at *6–7 (2d Cir. Sept. 11, 2015) (same).

That is precisely what Plaintiff alleges here: that Defendants fabricated evidence suggesting Mr. Ganek had engaged in insider trading, and used that fabricated evidence to falsely implicate him, foreseeably causing the destruction of his business.

"Information may be 'false' if material omissions render an otherwise true statement false." *Morse*, 2015 WL 5294862, at *7. Such a fabrication claim is independent of any Fourth Amendment claim, and may be pursued whether or not there was probable cause. *See Ricciuti*, 124 F.3d at 130–31 (rejecting argument that, so long as there is probable cause, officers could fabricate evidence against suspect, holding that would "make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice"); *Morse*, 2015 WL 5294862, at *3, 10 (affirming jury verdict against investigator and prosecutor who fabricated evidence against dentist, causing loss of his business, even though malicious prosecution claim was dismissed because there was probable cause against him).

Citing no law, Defendants simply assert that they "are entitled to qualified immunity" on the fabrication claim. (Defs.' Br. at 34). Not so. As the Second Circuit recognized, "*Ricciuti* and its progeny, including *Zahrey*, clearly establish that qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant

knowingly fabricated evidence and where a reasonable jury could so find." *Morse*, 2015 WL 5294862, at *10 (denying qualified immunity to investigator and prosecutor who created and used materially inaccurate summaries of the evidence) (internal quotation omitted).

The prohibition on using false evidence against a suspect has been recognized by the Supreme Court for at least 80 years. *Zahrey*, 221 F.3d at 355 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "Any prosecutor aware of these cases would understand that fabricating evidence in his investigative role violates the standards of due process." *Id.* at 356 (denying qualified immunity to AUSA alleged to have fabricated evidence, causing a deprivation of protected interest without due process). Other circuits uniformly agree. *E.g.*, *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) ("[A]ll courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause."); *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").[7]

### ii. *Mr. Ganek has plausibly alleged that Defendants deliberately fabricated evidence against him.*

At various points, Defendants incredibly suggest that Mr. Ganek has failed to plausibly allege that Defendants deliberately fabricated any evidence. Defendants' contentions either ignore the facts alleged, or, relying on documents outside the Complaint, ask this Court to credit

---

[7] In the most common scenario, an investigating officer's fabrication of evidence causes a deprivation of liberty, rather than property, and as a result most cases discuss the violation in those terms. But as the Second Circuit noted in *Zahrey*, "the Constitution does not guarantee 'due process' in the abstract; it guarantees that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.' U.S. Const. amend. V." *Zahrey*, 221 F.3d at 348 n.4. Given the "fundamental" prohibition on such fabrication, no reasonable officer could have believed that fabricating evidence to deprive an individual of property would be any more constitutional that doing so to deprive that individual of liberty.

Defendants' version of the facts over those alleged. Neither tactic is appropriate for a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

### 1. Defendants fabricated that Mr. Adondakis implicated Mr. Ganek in insider trading.

Defendants argue that the Complaint does not allege that *anything* in the Affidavit is false or fabricated because the Affidavit defines "Inside Information" broadly, while Plaintiff's "only offer of proof" (testimony from the *Newman* trial) is limited to Dell securities. (*See* Defs.' Br. 19–21). But Defendants have it wrong at the outset; to survive "a motion to dismiss, Plaintiffs need not *prove* their allegations; they must *plausibly plead* them." *Turkmen v. Hasty*, 789 F.3d 218, 240 (2d Cir. 2015); *see also Vega v. Hempstead Union Free School District*, — F.3d —, 2015 WL 5127519, at *10 n.8 (2d Cir. Sept. 2, 2015) ("Of course, at the pleading stage, Vega was not required to 'demonstrate' or 'establish' discrimination; he was required only to *plead* a claim upon which relief could be granted."). That Mr. Ganek already has *any* sworn testimony proving a fabrication at all, at this early stage of litigation, demonstrates the extraordinary strength of his allegations, not any failings. And the Complaint is absolutely clear that Mr. Adondakis *never* implicated Mr. Ganek in any insider trading—whether about Dell or any other company—yet Defendants falsely reported that he did. (Compl. ¶¶ 73, 78, 86, 141). This allegation is supported, not only by the trial testimony, but by the fact that Mr. Ganek never actually committed insider trading, (*id.* ¶¶ 4, 107–09, 112, 136), and that the Government, despite its vast resources and interest in Mr. Ganek, never obtained *any* evidence implicating Mr. Ganek during the months of investigation prior to the raid, (*id.* ¶¶ 64–65, 74, 84, 88). Moreover, Mr. Ganek has clearly alleged that the only substantive conversation between Defendants and Mr. Adondakis regarding Mr. Ganek prior to the raid was on November 2; that the November 2 meeting focused on a discussion of Dell trades; that Mr. Adondakis did not implicate Mr. Ganek

in insider trading; and that Defendants eventually fabricated that Mr. Adondakis had implicated

Mr. Ganek with regard to the Dell trades—a specific fabrication that later made its way into the

302 and was stated in an intentionally general form in the Affidavit. (*Id.* ¶¶ 70, 76).[8]

### 2.   The fabrication is plausible.

Defendants next assert that any false statement in the affidavit could not "plausibly" be a

reckless/intentional fabrication as opposed to merely a negligent mistake. (Defs.' Br. at 22–25).

In support, Defendants make the impermissible leap of rejecting Mr. Ganek's allegations that

following the November 2 meeting, each Defendant understood that there was no evidence

against Mr. Ganek, (Compl. ¶¶ 72–73, 75, 131, 141, 143, 150, 174), substituting their own

assumptions that "the FBI agents and AUSAs who attended the November 2, 2010[ ] meeting

came away with different understandings of what Adondakis said." (Defs.' Br. at 23).

Defendants may not do so; Plaintiff's allegation must be taken as true at this stage, *Anderson

News, L.L.C.*, 680 F.3d at 185, and all inferences drawn in his favor, *Selevan*, 584 F.3d at 88.[9]

Furthermore, Mr. Ganek has supported his allegations that Defendants knew *exactly* what

they were doing: Defendants were members of specialized FBI and USAO task forces whose

specific job was to investigate insider trading. (Compl. ¶¶ 56–61). Defendants' investigations

---

[8] The vagueness of the Affidavit's allegations with respect to Mr. Ganek also support the existence of a fabrication; had Defendants had any specific information implicating Mr. Ganek, they would have included it in the Affidavit (as they did with others).

[9] Defendants also reference their interpretation of what they describe as "contemporaneously recorded notes." (Defs.' Br. at 23). But these notes are not part of the Complaint and cannot be considered to prove the truth of their contents. *See Roth*, 489 F.3d at 509. The same is true for the various portions of trial testimony, also not referenced in the Complaint, that Defendants claim supports their defense. Given that a jury will be permitted to disregard certain portions of that testimony while believing other parts; certainly Defendants may not rely on hand-picked portions of the testimony to contradict facts clearly alleged in the Complaint. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (explaining, in the context of judgment as a matter of law, that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe").

were one of the USAO's top priorities, involved the allocations of significant man-power and financial resources, and drew the attention of the highest levels of supervisors at both the FBI and USAO. (*Id.* ¶¶ 48–53, 62). As a result of the high-profile nature of these investigations and the resources used, there was unique pressure to investigate the highest-profile targets possible, which in the case of Level Global, was Mr. Ganek. (*Id.* ¶¶ 39–40, 66, 68). And this focus was critically important at the November 2 meeting with Mr. Adondakis. (*Id.* ¶ 68).

Given Mr. Ganek's primary role at Level Global, the priority placed on prosecutions of high-level executives, and the experience level of the AUSAs and FBI agents present at the interview of Mr. Adondakis, the subject of Mr. Ganek's involvement must have been fully discussed and vetted during and after the November 2 meeting. (*Id.* ¶ 72). But however hard Defendants tried, Mr. Adondakis clearly never implicated Mr. Ganek. (*Id.* ¶ 70). By the close of the meeting and certainly afterward, Defendants understood that there was insufficient evidence that Mr. Ganek was involved in insider trading. (*Id.* ¶ 75). Only then, *knowing it was not true*, did Defendants fabricate the statement in the Affidavit—that Mr. Adondakis had told Mr. Ganek that he had received insider information from an inside source at Dell and that he had told Mr. Ganek that the information came from someone breaching his fiduciary duty. (*Id.* ¶ 76); *see, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) ("At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities."); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 360 (2d Cir. 2013) ("*Iqbal* . . . requires assertions of facts supporting a *plausible* inference of fraud—not of facts which can have no conceivable other explanation.").

Perhaps the best evidence that Defendants' misconduct was intentional, and not mere negligence, is that Defendants never did anything to correct their misconduct. Even after the

23

meeting with Defendants Zabel and Leibowitz, (Compl. ¶¶ 6, 110), and after the calls to

Defendant Bharara, (*id.* ¶¶ 7–8, 119–24), Defendants never even went back to Mr. Adondakis to

check their information. In fact, the first time Defendants went back to Mr. Adondakis was only

after press reports publicized the closing of Level Global. (*Id.* ¶¶ 128–29). When Mr. Adondakis

again refused to implicate Mr. Ganek, Defendants still did nothing. (*Id.* ¶¶ 130–32).

In a vain attempt to avoid these well pleaded allegations, Defendants assert what they

claim are "common sense" arguments that prove beyond any question that Plaintiff's accusations

are wrong. For example, Defendants argue that "it defies logic and common sense to suppose

that [Defendant] Makol helped to 'fabricate' evidence for use in the search warrant, only to then

testify in a manner that would call attention to this purported misconduct." (Defs.' Br. 24; *see*

*also id.* (noting that "[s]ubstantial portions of the trial testimony on which Ganek relies was

elicited by the government")). Defendants essentially would have us believe that everyone hired

by the FBI or USAO is beyond intentional misconduct. Sadly, we know that this is not the case.

*See, e.g.*, *Zahrey*, 221 F.3d 342 (*Bivens* action against AUSA); (Dkt. No. 31 at 3 n.3). Not only

are these Defendants just as capable of misconduct as other government officials, but misconduct

is particularly likely in a case like this—where the conduct occurs behind closed doors (and

under seal) and Defendants do not expect to be held accountable.

The more likely explanation for Defendant Makol's trial testimony is that Makol and the

trial prosecutors were forced to acknowledge the truth following Mr. Adondakis's testimony

(which they anticipated would be elicited on cross-examination, if they did not bring it out on

direct). It is also likely that at that point their single-minded focus was on securing the

convictions at hand (in particular, countering the defense point that the then-accused defendants

were innocent in part because Mr. Ganek was not also charged). Operating with that single-

minded focus, bolstered by the political and personal incentives to secure convictions in such a high-profile white-collar case, Defendants likely never imagined that Mr. Ganek would file a civil suit attempting to hold them accountable for their misconduct. That is what Plaintiff has alleged, and certainly, it is at least *plausible*—all that is necessary at this stage.

Similarly, Defendants are free to argue at trial that they were confused or careless, however implausible that may be in the light of these facts. But in light of the allegations in the Complaint, this is an issue of fact for the jury. *See, e.g.*, *Nielsen v. Rabin*, 746 F.3d 58, 64 (2d Cir. 2014) ("We would love to live in a world where it is implausible for a doctor to disregard her oath and refuse to treat a patient she believed had attacked a female officer—just as we would love to live in a world where it is implausible for an employer to be so irrational as to refuse to hire a qualified applicant because of the applicant's skin color. Unfortunately, we do not."); *see also United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (explaining, in context of *Franks* inquiry, "[w]hether an individual had a particular mental state 'is a *question of fact* subject to demonstration in the usual ways, including inference from circumstantial evidence'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))).

### C.  Mr. Ganek has adequately pled a violation of his Fourth Amendment rights.

Mr. Ganek has also adequately alleged that Defendants violated the Fourth Amendment's protections against unreasonable searches and seizures. Although this claim also relies on the fabrications in the warrant, it is separate and distinct from Mr. Ganek's fabrication claim. In particular, the Fourth Amendment examines the "totality of the circumstances" in order to determine whether a search was "reasonable." *See, e.g.*, *Samson v. California*, 547 U.S. 843, 848 (2006). Unlike Mr. Ganek's fabrication claim, there is no requirement that the violation of Mr. Ganek's Fourth Amendment rights be intentional. *See Hudson v. New York City*, 271 F.3d 62, 70–71 (2d Cir. 2001) (explaining there is no requirement that all Fourth Amendment violations

"must be intentional" and the Fourth Amendment "has no intent requirement").

The search in this case was unreasonable in two primary respects: First, Mr. Ganek has alleged that absent the fabrications in the Affidavit, there was no probable cause to search his office, personal papers and effects, and his personal cellular phone. Second, Mr. Ganek alleges that it was unreasonable for Defendants to conduct a publicized raid of his office, effects, and phone based on fabricated evidence. Each of these theories of Fourth Amendment liability is independent of Mr. Ganek's Fifth Amendment fabrication claim.

### i. The search lacked probable cause.

Probable cause to search exists "where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found *in a particular place*." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011). A warrant is unconstitutionally overbroad unless there exists probable cause to support the breadth of the places searched and the items seized. *See, e.g.*, *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013). The "required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants, instruments reviled by the Founders who recalled their use by Crown officials 'to search where they pleased.'" *Clark*, 638 F.3d at 94 (quoting *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965); citing *Boyd v. United States*, 116 U.S. 616, 624–30 (1886)).

Although there is a presumption of validity with respect to a probable-cause affidavit supporting a magistrate-issued search warrant, this is not the case when the facts presented to the magistrate contain deliberate or reckless false statements or omissions. *See Franks v. Delaware*, 438 U.S. 154, 165, 171 (1978) ("[It would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment."). A civil rights plaintiff challenging the validity of a warrant must show that the warrant application (1) contains deliberately or recklessly made

false statements or material omissions, and (2) that such statements or omissions were necessary to the finding of probable cause. *See Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870–71 (2d Cir. 1991)). Mr. Ganek has made both of these showings.

### 1.   The Affidavit contained multiple false statements and omissions.

Defendants argue (incredibly) that Mr. Ganek has not made a sufficient showing that the Affidavit contained an intentionally or recklessly false statement. (Defs.' Br. 18–19). As discussed in great detail above, Mr. Ganek has surely met this standard. Mr. Ganek has come forth with sufficient factual allegations to plausibly state that the only information implicating Mr. Ganek in the Affidavit was *false*—that Mr. Adondakis *never* told Defendants that he told Mr. Ganek about the source of *any* inside information. Although Mr. Ganek need show only that these false statements were made recklessly, *see Franks*, 438 U.S. at 165, he has plausibly alleged that fabrications were *deliberate*. (*See supra* Part IV.B.ii).

Because, at this early stage, the Court must accept Mr. Ganek's allegations as true, Defendants attempt to disguise their disagreement with the facts that Mr. Ganek has alleged by claiming that Mr. Ganek has not made a "substantial preliminary showing" of a false statement. (Defs.' Br. at 18–19). Defendants borrow this phrase from *Franks*, but it has little, if any, relevance to this context. In the *Franks* context, a criminal defendant is required to make a "substantial preliminary showing" in order to obtain an evidentiary hearing before the trial court, which serves as the factfinder on any motion to suppress. The need for a preliminary showing derives from a "concern[ ] that frivolous challenges could lead to unnecessary pretrial delays" and thus requires a court to use a "sensible threshold" before reevaluating any warrant. *United States v. Figueroa*, 750 F.2d 232, 237 (2d Cir. 1984) (citing *Franks*, 438 U.S. at 170). But Mr. Ganek's case is governed by the rules of Civil Procedure, providing that no evidence need be

introduced at the pleading stage and that allegations in his complaint, if well pled, must be accepted as true. *See, e.g.*, *Walker v. Mendoza*, No. 00-CV-93, 2000 WL 915070, at *3 (E.D.N.Y. June 27, 2000) ("Walker has alleged that Mendoza intentionally made false statements that were necessary to the finding of probable cause with respect to all of the charges. Taking these allegations as true, as I must, I find that Walker has stated a claim for false arrest."). Moreover, in the civil context, it is the jury, not the court, that serves as the ultimate factfinder.[10]

The Affidavit also contains critical omissions that should have been before the magistrate as part of the probable cause determination. First and foremost, the Affidavit omitted that although specifically asked, Mr. Adondakis told Defendants that he could *not* implicate Mr. Ganek in any insider trading or any other crime. Similarly, the Affidavit omits all other exculpatory information known to the Government at the time, including that, despite their extensive investigation, Defendants had no information from any other source indicating that Mr. Ganek had traded based on inside information—no wiretap, (Compl. ¶¶ 65, 74, 84), no confidential informant, (*id.* ¶ 74), no trading record, (*id.* ¶ 87), and indeed no document of any kind, (*id.* ¶¶ 74, 84, 165). *See Rajaratnam*, 719 F.3d at 154 (explaining that "reckless disregard" can be "*inferred* from the omission of critical information in a wiretap application." (citing *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) ("Recklessness *may* be inferred where the omitted information was clearly critical to the probable cause determination." (emphasis supplied) (internal quotation marks omitted)))).

---

[10] The cases Defendants cite discussing the "substantial preliminary showing" in a civil context address motions for summary judgment, not motions to dismiss. (*See* Defs.' Br. at 18). The sole exception, *Calderon v. City of New York*, makes clear that all that is needed is factual allegations making the fabrication plausible, not evidence. No. 14 Civ. 1082, 2015 WL 2079405, at *8 (S.D.N.Y. May 4, 2015).

## 2. A neutral magistrate would not have issued the search warrant based on the corrected Affidavit.

Next, Defendants argue that these false statements and omissions were of no consequence because, even without the false statements and with the omitted materials, the warrant was supported by probable cause. (Defs.' Br. 25–29). In essence, Defendants suggest that although the Affidavit presented to the magistrate described three Level Global executives who were all part of an insider trading conspiracy, the magistrate would have issued the same warrant even knowing that Mr. Ganek was not part of this conspiracy or any illegal activity. This argument defies both common sense and the law.[11]

Defendants' argument relies on the "corrected-affidavit doctrine." *See United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000); *Velardi*, 40 F.3d at 573. This doctrine provides that, after excising false statements and adding omissions, the court should review the corrected affidavit *de novo* to determine if probable cause still exists. *See Canfield*, 212 F.3d at 718. This doctrine provides qualified immunity in cases where, "after correcting for the false or misleading statements, the affidavit accompanying the warrant was sufficient to support a reasonable officer's belief that probable cause existed." *Southerland v. City of New York*, 680 F.3d 127, 144 (2d Cir. 2012) (quotation marks and citation omitted).

"The materiality of a misrepresentation or an omission in this context is a mixed question of law and fact." *Velardi*, 40 F.3d at 574 (citing *Golino*, 950 F.2d at 871). The question of whether the false or omitted information is "relevant to the probable cause determination" is for

---

[11] This post-hac justification is not how the Government approached the search of Diamondback Capital, raided on the same day as Level Global. (Compl. ¶¶ 92, 96). Although Plaintiff does not have access to the Diamondback Affidavit, he expects discovery to reveal that Diamondback's principals, although perhaps authorizing trades based on information referenced in that Affidavit, were not named in that warrant and their offices were not searched. As a result, Diamondback was able to reassure its investors—many of whom were also Level Global investors—and was not forced to fold shortly after the raid.

the Court, but "[t]he weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Id.*; *see also Golino*, 950 F.2d at 872 (denying summary judgment where misrepresented or undisclosed information was "not immaterial" to question of probable cause as a matter of law).

It is important to understand the incredible breath of the Warrant in this case. Defendants must demonstrate probable cause for each place to be searched and each item to be seized, for a warrant is impermissibly overbroad if its description of the objects to be seized or searched "is broader than can be justified by the probable cause upon which the warrant is based." *See United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (internal quotation marks omitted).

The Warrant sought authorization to search Mr. Ganek's records, documents, notebooks, letters, photographs, travel documents, telephone records, computers, cellular phones, and "other records and documents." By including personal electronic devices, like Mr. Ganek's computer and cell phones, Defendants ensured that Mr. Ganek's personal information would be swept into the search. *See, e.g.*, *United States v. Cioffi*, 668 F. Supp. 2d 385, 391–92 (E.D.N.Y. 2009) (explaining "[t]he risk of exposing intimate (and innocent) correspondence to prying eyes is magnified because '[c]omputers . . . often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize." (quoting *United States v. Vilar*, No. 305-CR-621, 2007 WL 1075041, at *35 (S.D.N.Y. Apr. 4, 2007))).

Among these various items to be searched, the Warrant authorized the Government to seize "any and all documents relating to, reflecting, and/or concerning information about public companies" and for "any and all evidence reflecting communications about trading based on information about public companies." (Affidavit at 47–50). Given that Level Global's entire business involved trading on information about public companies, essentially the Warrant

30

authorized a complete seizure of all of Level Global's records. *See Vilar*, 2007 WL 1075041, at *22 (explaining that warrants seeking "any or all records of a particular type" are frequently held to violate the Fourth Amendment (citing *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993))). This broad seizure from Mr. Ganek's effects was *in addition* to seizure of Mr. Adondakis's desktop and laptop, a complete mirror image of Level Global's servers, and equivalent searches of the offices of Mr. Chiasson and another Level Global employee.

In contrast to the incredibly broad scope of this search, a corrected-affidavit would offer no probable cause to believe that any item of evidentiary value would be found among Mr. Ganek's personal effects. Defendants argue that they had probable cause to search Mr. Ganek's belongings for "evidence of a crime believed to have been committed by others." (*See* Defs.' Br. at 27). On the facts alleged, however, Defendants' argument fails as a matter of law.

First, a corrected-affidavit would have made clear, not only that there was absolutely no evidence connecting Mr. Ganek to any crime (no witness, no record, no wiretap), but also that the Government's star cooperating witness could *not* implicate Mr. Ganek. To his knowledge, Mr. Ganek was not part of any conspiracy. These differences completely alter the tenor of the Affidavit, which, as drafted, portrayed Mr. Ganek as a conspirator. *See McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 824 (2d Cir. 2014) (explaining that material omissions alter the "totality of the circumstances" upon which probable cause is assessed). It would be unlikely, to say the least, that the magistrate would have treated Mr. Ganek just like the alleged conspirators when there was no evidence that he was involved in any conspiracy.

Second, although Defendants correctly state that a search warrant does not require probable cause that the property owner committed a crime, Defendants must still provide probable cause to believe that evidence of a crime will be found in the place to be searched. *See,*

*e.g.*, *Clark*, 638 F.3d at 94; *Zemlyansky*, 945 F. Supp. 2d at 464. The Affidavit, even if corrected, does not explain why evidence of a crime would be in Mr. Ganek's office, on his phone, in his travel records, among his photographs, and so on. The specific evidence referred to in the Affidavit—Mr. Adondakis' notes and emails—was on Level Global's servers, not among Mr. Ganek's effects. (Affidavit ¶ 13(c), (k)). Furthermore, the Affidavit explains that the only other evidence Defendants hoped to find was from *"participants in fraudulent schemes,"* who, based on the agents' experience, maintain evidence in their offices and personal effects. (*See id.* ¶¶ 19–22). But a corrected-affidavit would make clear that Mr. Ganek was *not* a participant in any fraudulent scheme and therefore offers no basis to expect he would have evidence of a crime.

Third, the Government's belated suggestion that they may search Mr. Ganek for evidence of the crimes of others based on one or two conversations with Mr. Adondakis is contrary to well-established law. The law is clear that "probable cause to search must be based on particularized information about the place to be searched, not simply on a target's mere propinquity to others independently suspected of criminal activity." *Walczyk v. Rio*, 496 F.3d 139, 162–63 (2d Cir. 2007) (quotation marks omitted) (quoting *United States v. Martin*, 426 F.3d 68, 81 (2d Cir. 2005)). *Martin*, on which Defendants' rely, (*see* Defs.' Br. at 27), makes this point perfectly clear. In *Martin*, the Court approved a search of a home where one individual in the home was a member of a "girls12–16" website, the purpose of which the Court found was plainly unlawful. 426 F.3d at 75–76. In this case, however, Level Global is unquestionably a legitimate business with dozens of employees; every employee's daily activity involved legitimate trades and research regarding public companies.[12] Mr. Ganek's involvement,

---

[12] Given the lack of any nexus between Mr. Ganek's effects and the probable cause in the warrant, *see Clark*, 638 F.3d at 94 (quoting *Stanford*, 379 U.S. at 481), it is unclear whether Defendants contend that they may search Mr. Ganek simply because Level Global was his

therefore, is no indication that he had any evidence of criminal misconduct.

Fourth, absent any evidence specific to Mr. Ganek, the stale nature of the information of the warrant would have likely played an even bigger role in the magistrate's assessment. *See Walczyk*, 496 F.3d at 162 ("In evaluating probable cause, a magistrate is always required to consider whether the facts adduced in the warrant application 'appear[ ] to be current, i.e., true at the time of the application,' or whether they have 'become stale.'" (quoting *Rivera*, 928 F.2d at 602)). In this case, the magistrate would have seen an Affidavit relying primarily on Mr. Adondakis, whose wiretaps and trades were nearly a year old and who had not worked at Level Global for approximately six months.[13]

Essentially, Defendants are asking this Court to bless a search of some of Mr. Ganek's most private property—his personal cell phone, his travel plans, any papers found in his private office—although there was *zero* evidence indicating that he had anything to do with insider trading and where the business itself was unquestionably a legitimate business.[14]

---

business and there was some indication that two or three employees (out of nearly 60) were implicated in insider trading. Such a position would have no merit. The legal standard for this type of search is clear: an entire business is subject to search, thereby permitting the Government to seize all business records, only where the business is "permeated with fraud." *See United States v. Feng Ling Liu*, No. 12 CR. 934, 2014 WL 101672, at *7 (S.D.N.Y. Jan. 10, 2014) (quoting *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980)); *cf. Clark*, 638 F.3d at 95 ("[T]he search of a multiple-occupancy building must be supported by probable cause to believe that evidence of criminality will be found throughout the building"). In this case, given the limited nature of the suspected insider trading and the size of Level Global's legitimate investments, there is no basis to suggest the warrant met this standard. *See Vilar*, 2007 WL 1075041, at *21 (rejecting similar argument where company managed approximately $1.2 billion in assets and some portion, if not substantial majority, of them were "managed lawfully").

[13] In fact, the Dell trades that were the basis of the Government's eventual (unsuccessful) prosecution were from mid-2008—over two years before the search. *United States v. Todd Newman, et. al*, No. 12 Cr. 121, Dkt. No. 26 at 15–19 (S.D.N.Y. Feb. 7, 2012).

[14] Given Defendants' deliberate misconduct in this case, qualified immunity would be patently inappropriate. *See Golino*, 950 F.2d at 871 ("Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a

### ii.   Defendants conducted their search in an unreasonable manner.

It is well-established that the Fourth Amendment can be violated when a search is permissible, but the extent or manner of the search is unreasonable. *See Lauro v. Charles*, 219 F.3d 202, 209 (2d Cir. 2000) ("[T]he Fourth Amendment's proscription of unreasonable searches and seizures 'not only . . . prevent[s] searches and seizures that would be unreasonable if conducted at all, but also . . . ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out.'" (quoting *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994))). In this case, Mr. Ganek alleges that Defendants entire course of conduct regarding the search— from the decision to stage a raid rather than use a subpoena, to tipping off the *Wall Street Journal*—was done knowing that it would amount to a death penalty for Level Global.

### 1.   Defendants again misapply the law and improperly dispute the facts as alleged in Mr. Ganek's Complaint.

Defendants improperly reject Mr. Ganek's allegation "[t]here were no exigent circumstances that justified this public search method rather than a subpoena." (Compl. ¶ 102). Defendants disputes this allegation, citing portions of the Affidavit claiming that they believed evidence was about to be destroyed. But on a motion to dismiss Defendants may not rely on the truth of these statements. (*See supra* Part II.C). Nor should they be able to here, where parts of the Affidavit are known to be fabricated and the "exigent" statements themselves in no way tie to Level Global. (*See supra* pages 3–4). Plaintiff has alleged that such raids were exceedingly uncommon, that subpoenas were traditionally used, that there was no reason to believe that the subpoena served that same day would not produce the same information, and that Defendants chose to raid for the publicity and pressure such a public accusation of criminal misconduct would put on Level Global. (Compl. ¶¶ 92–93, 100–02). Indeed, Defendants ultimately used

---

material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost." (citations omitted)).

only documents they obtained via subpoena, and not from the raid. (*Id.* ¶ 168).

Next, Defendants claim they can disregard Plaintiff's allegation that Defendants tipped the media regarding the raid on Level Global because it was made "upon information and belief." (Defs.' Br. at 31–32). But there is nothing impermissible about pleading "'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." *Arista*, 604 F.3d at 120 (quotation mark omitted). Nor is the allegation improbable, as Defendants claim—the campaign of public accusations against legitimate businesses generates pressure to force guilty pleas. And when suspects plead guilty, no one is the wiser as to what the government did or did not do during the investigation. The allegation that Defendants tipped off the media is also supported by the allegations that Defendants choice to conduct a raid was itself for publicity purposes, (Compl. ¶¶ 100–02, 168), the office-wide public relations strategy regarding insider trading cases, (*id.* ¶¶ 103–04), and the fact that "the *Journal* posted immediate and prominent coverage of the raid," (*id.* ¶¶ 95–96). Taken as true, these facts demonstrate that Defendants were not genuinely concerned about the destruction of documents. The "exigency" was a ploy to authorize a publicized raid; the publicity of the raid was the object, not the documents seized.

### 2. The Complaint states a clearly-established Fourth Amendment claim.

Mr. Ganek has alleged that Defendants secured a search warrant targeting him based on fabricated evidence, that they made the extraordinary decision to conduct a physical raid, that they notified major media outlets of their plan so that they could maximize Mr. Ganek's exposure, and that they did all of this without any evidence that Mr. Ganek committed insider trading and while knowing the impact it would have on Mr. Ganek's business.

These facts, if proven, unquestionably allege an invasion of Mr. Ganek's Fourth

Amendment interests; even if the search were itself lawful, the Fourth Amendment is implicated

by the government-created publicity. *E.g.*, *Ayeni*, 35 F.3d at 685, 688 (rejecting argument that

unreasonable manner of search is limited to searches of the home and holding that "obtaining

and broadcasting images of the Ayenis in a humiliating situation itself infringed on their Fourth

Amendment privacy rights"); *Lauro*, 219 F.3d at 212 (finding Fourth Amendment violated by

public "perp walk" in front of television cameras although seizure itself was justified).

       This highly publicized raid, and its adverse effects on Mr. Ganek's privacy and business

might have been reasonable under the Fourth Amendment, if it was "sufficiently closely related

to a legitimate governmental objective." *Id*. It was not. Mr. Ganek has clearly alleged that the

government objective in this case was to inflict additional harm on Mr. Ganek's business—to

advance Defendants' personal and political objectives. (Compl. ¶¶ 100–04, 169–70). The

generalized concerns in Defendants' brief are post-hoc attorney-created rationalizations, many of

which have been specifically rejected in analogous contexts. *See, e.g.*, *Wilson v. Layne*, 526 U.S.

603, 612 (1999) ("Were such generalized 'law enforcement objectives' themselves sufficient to

trump the Fourth Amendment, the protections guaranteed by that Amendment's text would be

significantly watered down."). At a minimum this type of balancing cannot occur at the motion

to dismiss stage. *See, e.g.*, *Ayeni*, 35 F.3d at 689 (sending to the jury the question of whether "the

search was conducted in an unreasonably intrusive manner"); *Conradt v. NBC Universal, Inc.*,

536 F. Supp. 2d 380, 390 (S.D.N.Y. 2008) ("At this early stage of the litigation, I conclude that a

fair issue exists as to the reasonableness of the police officers' (and NBC's) actions in this case.

Based on the allegations of the amended complaint, I conclude that a reasonable jury could find

that the intrusion on Conradt's privacy substantially outweighed the promotion of legitimate

governmental interests.").

Nor would qualified immunity be appropriate on the facts alleged. "The purpose of the doctrine is to ensure that the official being sued had 'fair warning' that his or her actions were unlawful." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Hope v. Pelzer*, 536 U.S. 730, 739–40 & n.10 (2002)). "The precedent establishing a constitutional right must be more precise than, for example, the 'broad history and purposes of the Fourth Amendment.' But, in some cases, a generally phrased statement of the law may provide sufficient warning that the defendant's conduct is unconstitutional." *Id.* at 230 n.11; *see also Hope*, 536 U.S. at 741 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."). The "salient question" is whether the state of the law at the time of the act gave Defendants fair warning that their alleged conduct was unconstitutional. *Terebesi*, 764 F.3d at 230 n.11.

Under the facts alleged, Defendants had more than fair warning that their conduct was unconstitutional. *Wilson*, *Ayeni*, and *Lauro* clearly establish that even when conducting an otherwise lawful search or seizure, law enforcement must independently justify the involvement of press and media personnel, even outside the home and even when they are not part of the search itself. In this case, the Complaint alleges not only that there was *no* legitimate law enforcement purpose for tipping off the media, but that Defendants chose to do so with the *intent* of exacerbating the harm to Mr. Ganek's business and while *knowing* that they did not have evidence that Mr. Ganek was involved in insider trading. *See Caldarola v. Cnty. of Westchester*, 343 F.3d 570, 575 (2d Cir. 2003) ("A careful reading of *Lauro* . . . reveals that it was not the magnitude of Lauro's privacy interest that enabled him to prevail on his claim, but instead the

lack of any legitimate purpose served . . . .”). Because these allegations must be accepted as true,

Defendants certainly had fair warning that their conduct was unconstitutional.[15] *Russo v. City of*

*Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007) (denying qualified immunity where “the proffered

evidence would support a jury finding that [defendants] acted intentionally in hiding exculpatory

evidence and misleading [plaintiff]”; the question is if “reasonable officers could disagree about

*whether* conduct is illegal, not . . .[if] they know the precise constitutional reason *why* it is not

lawful”) (emphasis in original).

### D.  Mr. Ganek has stated a stigma-plus claim.

Beyond Mr. Ganek’s primary fabrication claim, which Defendants fail to address,

Defendants argue at length that Mr. Ganek cannot state a due process claim arising from the

reputational harm he suffered from being a target of the search warrant. Such “stigma plus”

claims require a plaintiff to allege “(1) the utterance of a statement about her that is injurious to

her reputation, ‘that is capable of being proved false, and that he or she claims is false,’ and (2)

‘some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.’”

*Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (quoting *Doe v. Dep’t of Pub. Safety ex rel. Lee*,

271 F.3d 38, 47 (2d Cir. 2001), *rev’d on other grounds sub nom. Conn. Dep’t of Pub. Safety v.

Doe*, 538 U.S. 1 (2003)); *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (same) (quoting *Sadallah

v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)).

---

[15] In fact, Defendants’ conduct appears to violate the Department of Justice’s own guidelines.
*See* Dep’t of Justice, *U.S. Attorney Manual* § 1-7.401(C) (outlining “exceptional circumstances
when it may be appropriate to have press conferences or other media outreach about ongoing
matters before indictment or other formal charge,” none of which apply to this case), *available
at:* http://www.justice.gov/usam/usam-1-7000-media-relations#1-7.401.This is yet another
indication that Defendants had fair warning that their conduct was unconstitutional. *See Okin v.
Vill. of Cornwall-On-Hudson Police Dep’t*, 577 F.3d 415, 433-34 (2d Cir. 2009) (“[W]e may
examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme
Court law to determine whether an individual had fair warning that his or her behavior would
violate the victim’s constitutional rights.”).

### i.   *Defendants' stigmatizing statement regarding Mr. Ganek.*

Defendants first suggest that Mr. Ganek has no claim because Defendants did not make a public statement about Mr. Ganek to the media, and that media reports regarding the search only stated that a search had occurred. (Defs.' Br. 35–36). But the Second Circuit has made clear that a stigmatizing statement does not need to be a *public* statement, only one that is likely to become known to others in some form. In *Brandt v. Board of Cooperative Educational Services*, for example, the court found that a false statement in an employee's personnel file qualified as a stigmatizing statement because "[i]n applying for [future] jobs, if Brandt authorizes the release of his personnel file, the potential employer would find out about the allegations of sexual misconduct and probably not hire him. If he refuses to grant authorization, that, too, would hurt his chances for employment." 820 F.2d 41, 45 (2d Cir. 1987); *see also Doe*, 271 F.3d at 59 (citing *Brandt* with approval); *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631–32 (2d Cir. 1996) (same). The Second Circuit reaffirmed and extended *Brandt* in *Valmonte v. Bane*, holding that a false statement placed in database implicated the plaintiff's liberty interest because although it would "not be disclosed to the public," it would be "disclosed to . . . potential employers." 18 F.3d 992, 1000 (2d Cir. 1994). Although such claims typically arise in the context of government employment, they are not so limited. *See White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1063 (2d Cir. 1993) ("The right not to be so defamed is not limited to situations involving termination of employment; it extends as well to defamation occurring in the course of termination of some other legal right o[r] status." (quotation marks omitted)).

Like *Brandt*, *Valmonte*, and other cases, although the Government's false statement about Mr. Ganek was not quoted verbatim in a press release, it still invoked a public stigma sufficient to implicate Mr. Ganek's liberty interests. In fact, Mr. Ganek has alleged that Defendants' conduct in this case—the fabrication, the choice to conduct a raid, the tip to the *Wall Street*

*Journal*, and the subsequent failure to take corrective action—was *designed* to publicly harm Mr. Ganek. These actions had their desired effect because Defendants knew the relevant audience would receive the message. Like the potential employers in *Brandt* and *Valmonte*, Mr. Ganek's sophisticated investors inevitably drew the precise conclusion that Defendants intended—that the Government had evidence that Mr. Ganek had committed insider trading. Indeed, Mr. Ganek informed Defendants that his investors drew this conclusion and that Mr. Ganek could not assuage the investors because of the allegations in the Affidavit. Defendants did nothing to correct the stigma that their fabrications imposed.

### ii.   Mr. Ganek's atypical injuries constitute a "plus."

Finally, Defendants argue that Mr. Ganek has failed to allege any injury beyond mere reputational harm and therefore does not satisfy the "plus" requirement of this claim. (Defs.' Br. at 37–38). This is simply not the case.

Although the "typical consequence[s]" of an injured reputation do not qualify as a "plus," *see Valmonte*, 18 F.3d at 1001, the consequences of Defendants' fabrications in this case were anything but typical. First, the intentional harm done to Mr. Ganek's reputation—which Defendants knew would happen given the sophisticated professionals and investors in this industry—resulted in atypical damages to his property interests: Mr. Ganek was forced to close the multi-billion dollar investment fund that he had successfully operated for years. *See, e.g.*, *Greenwood v. N.Y., Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998) (holding that deprivation of a property interest will satisfy the "plus" prong of the stigma plus test, and in that case loss of clinical staff privileges at hospital were enough); *see also Patterson v. City of Utica*, 370 F.3d 322, 332 (2d Cir. 2004) (requiring "significant alteration of plaintiff's employment status" to qualify as "plus" but finding that two-week suspension was not enough). Second, by deliberately staging a public raid, Defendants knowingly and directly interfered with Mr.

Ganek's business and personal property. *See, e.g.*, *Sadallah*, 383 F.3d at 38 (noting with approval that "[o]ther circuits have found that direct interference with a plaintiff's business may also constitute a 'plus' under this doctrine" (citing *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 375 (9th Cir. 1999))); *Greenwood*, 163 F.3d at 124 ("Burdens that can satisfy the 'plus' prong under this doctrine include the deprivation of a plaintiff's property . . . ."). These injuries are all the more significant because they are connected with independent constitutional violations—in this case, an unlawful search and fabrication of evidence. *See, e.g.*, *Gobel v. Maricopa Cnty.*, 867 F.2d 1201, 1205 (9th Cir. 1989) (holding plaintiffs properly alleged "defamation plus" injury where they alleged the false statements were made in connection with their illegal arrest).

### iii. Post-Deprivation Remedies are inadequate

Defendants do not appear to argue that any post-deprivation remedies available to Mr. Ganek are meaningful enough to bar Mr. Ganek's stigma-plus claim. Defendants do argue, however, that any due process claim arising out of the seizure of Mr. Ganek's personal property is barred by the availability of Federal Rule of Criminal Procedure 41(g). (Defs.' Br. 38–39).

Generally, due process requires meaningful process *prior* to depriving an individual of a liberty or property interest. *See DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). There is a narrow exception, however, for "random and unauthorized" deprivations at the hands of "lower-echelon . . . employees" without "final authority over significant matters." *Id.* Defendants in this case are nothing like the cases that have fit within this exception, which has its origins in suits for destruction of prisoner mail or property by prison guards and mailroom staff. *See Hudson v. Palmer*, 468 U.S. 517, 534 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541 (1981).

The Complaint alleges that the unconstitutional actions in this case included over a dozen individual Defendants from elite FBI and USAO task forces, and that the non-supervisor Defendants acted with knowledge and approval of their supervisors. (*See infra* Part IV.G

(detailing allegations of supervisor involvement)). Actions taken with approval up through the chain of command are hardly "random and unauthorized." *See, e.g.*, *DiBlasio*, 344 F.3d at 303 (finding decisions of "high-level" officials "more closely resemble established state procedures than the haphazard acts of individual state actors"); *Velez*, 401 F.3d at 92 (same).

### E. Defendants violated Mr. Ganek's substantive due process rights.

"[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). "[F]or executive action to violate substantive due process, it must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Bolmer v. Oliveira*, 594 F.3d 134, 142–43 (2d Cir. 2010) (quoting *Lewis*, 523 U.S. at 847 n. 8). The course of conduct alleged in the Complaint meets this standard.

Mr. Ganek has alleged that Defendants deliberately fabricated evidence, chose to stage a public raid in order to maximize their political gain and maximize the injury to Mr. Ganek, and subsequently refused to correct their misconduct when given the opportunity to do so. *See Lewis*, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). Defendants' conduct is particularly outrageous in this case because they "had ample opportunity" over "days, weeks and months" to appreciate the harm their misconduct caused to Mr. Ganek, and they declined to change course. *See Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005).

Nor is Mr. Ganek's substantive due process claim foreclosed by the applicability of other Amendments. Although substantive due process may be inappropriate if a plaintiff's claims are "covered by" the Fourth Amendment, *see Lewis*, 523 U.S. at 843, the entirety of Defendants' misconduct in this case exceeds what is cognizable under the Fourth or Fifth Amendments alone. *Compare Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (relating to the timing of a search); *Biswas*

*v. City of New York*, 973 F. Supp. 2d 504, 523–24 (S.D.N.Y. 2013) (claiming false arrest). Mr. Ganek alleges the deliberate misuse of government authority from the initial fabrication through the later failure to correct their actions; therefore he is not tied to a particular amendment. *Cf. Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 253 (2d Cir. 2001) ("[I]ndividuals possess a Fourteenth Amendment substantive due process right 'in the non-seizure, non-prisoner context' to be free from excessive force employed by government actors acting under the color of government authority."); *Rodriguez v. Phillips*, 66 F.3d 470, 477 (2d Cir. 1995) (same).

**F.  Defendants' violated Mr. Ganek's right by failing to intercede on his behalf.**

Defendants do not dispute that they had an affirmative duty to act to protect Mr. Ganek's constitutional rights, *see, e.g.*, *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988), but insist that they did not know or have reason to know that Mr. Ganek's rights were being violated and thus had no realistic opportunity to intervene to protect Mr. Ganek. Essentially, Defendants claim that only those Defendants who were at the November 2 meeting could have known about this misconduct, and the other Defendants must have relied on their colleagues' good faith.

Once again, although Defendants are free to argue this theory to the jury, at this stage they are bound by Mr. Ganek's allegations. *Iqbal*, 556 U.S. at 678. The Defendants who met with Mr. Adondakis on November 2 certainly knew that he never implicated Mr. Ganek. The Complaint also alleges that all Defendants—including Trask and the Supervisor Defendants— discussed the evidence obtained at the November 2 meeting. Absent discovery regarding these conversations, it is certainly plausible that in this high-profile investigation, all Defendants fully understood and agreed on a course of conduct. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement' . . . ."); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (citation and internal quotation

marks omitted)). Moreover, Defendants' may not artificially limit their failure to intercede to the November 2 meeting. For example, the decisions to target Mr. Ganek, to use a physical raid, to tip off the media, and to stand by their actions involved all Defendants.

It is no response to claim that Defendants had no constitutional obligation to "publicly vouch" for Mr. Ganek. (Defs.' Br. at 43). Defendants deliberately or recklessly created the harm, they therefore had an obligation to take steps to correct it. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (recognizing constitutional obligation to provide protection, "either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual" (citation omitted)). At a minimum, Defendants were under well-established ethical obligations to correct the misrepresentations made to the magistrate during the warrant process. *See, e.g.*, *In re Dinova*, 212 B.R. 437, 447 (B.A.P. 2d Cir. 1997) ("Candor to the Court, though desirable under any circumstances, is mandated in *ex parte* proceedings, where the Court is deprived of the benefits of the 'dialectic of the adversary system.'"); *Morales v. Portuondo*, 165 F. Supp. 2d 601, 612 (S.D.N.Y. 2001) ("While all lawyers owe a duty of honesty and candor to the Court, this obligation lies most heavily upon a District Attorney and Assistant District Attorneys who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially." (quotation marks omitted)).

### G. The Supervisor Defendants were personally involved and thus liable for the violations of Mr. Ganek's constitutional rights.

Lastly, the Supervisor Defendants argue that Mr. Ganek has failed to plausibly allege their personal involvement because, they contend, it is not plausible that they knew or should have known that the non-Supervisor Defendants had fabricated evidence. (Defs.' Br. at 43–45). But this argument neglects to deal with the facts of the Complaint.

The Complaint alleges, with abundant support, that the investigation into Mr. Ganek drew the attention of FBI and USAO supervisors and that these supervisors were kept in the loop regarding the evidence being developed. Although the Supervisor Defendants may not have attended the November 2 Adondakis meeting, they were kept abreast of developments because of the significant resources that the investigation required, (*id.* ¶¶ 48–49, 52–54), the priority placed on the prosecution of high-level executives, (*id.* ¶¶ 72, 75, 77), USAO and FBI practice requiring supervisory approval before staging such an unprecedented physical raid, (*id.* ¶¶ 83, 92–94), and USAO and FBI practice requiring supervisory approval before tipping the *Wall Street Journal*, (*id.* ¶¶ 95–98). There is also additional direct evidence: following the raid, Defendants Zabel and Bharara each evaluated the evidence against Mr. Ganek in enough detail to stand by the conduct of their subordinates. (*See id.* ¶ 110 (Zabel), ¶¶ 119–24 (Bharara)). Given all this, the allegation that the Supervisor Defendants were all involved in this wrongdoing is not only not "implausible," it is the most likely inference of all.

Of course, it is also *possible* that the non-Supervisor Defendants lied to their Supervisors regarding certain critical details. Should discovery reveal that any particular Supervisor Defendants were not personally involved, Plaintiff will voluntarily dismiss any claims against them. But given that the particular facts of each individual Defendants' involvement are uniquely within Defendants' control, Mr. Ganek is not required to provide specifics he could not possibly obtain before discovery. *See Arista*, 604 F.3d at 120. At this stage, it is enough to allege facts sufficient to support the plausible inference that all Defendants, from those in the November 2 interview up through the chain of command, were personally involved in the misconduct alleged in the Complaint. This he has done.

## V.    CONCLUSION

Defendants present no basis to dismiss the complaint. Their motion should be denied.

**RESPECTFULLY SUBMITTED.**

**Dated:** New York, NY
        October 7, 2015

**NEUFELD, SCHECK & BRUSTIN, LLP**

 /s/ Anna Benvenutti Hoffmann

Barry C. Scheck
Nick J. Brustin
Nancy Gertner
Anna Benvenutti Hoffmann
Farhang Heydari

Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel: (212) 965-9081
Fax: (212) 965-9084

*Counsel for Plaintiff*
*David Ganek*