```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DAVID GANEK,

 4                 Plaintiff,

 5         v.                                  15 CV. 1446 (WHP)

 6   DAVID LEIBOWITZ, et al.,

 7                 Defendants.

 8   ------------------------------x
                                         New York, N.Y.
 9                                       November 20, 2015
                                         10:30 a.m.
10
     Before:
11
                       HON. WILLIAM H. PAULEY III,
12
                                         District Judge
13
                            APPEARANCES
14
     NEUFELD SCHECK & BRUSTIN, LLP
15        Attorneys for Plaintiff
     BY:  NANCY GERTNER
16        ANNA BENVENUTTI HOFFMANN
          FARHANG HEYDARI
17

18   UNITED STATES ATTORNEY'S OFFICE, SDNY
          Attorneys for Defendants
19   BY:  ANDREW EDWARD KRAUSE
          SARAH NORMAND
20

21

22

23

24

25
```

1          (Case called)

2          THE COURT:  Good morning to all of you.  This is oral

3    argument on the defendant's motion to dismiss.

4          Do you want to be heard, Mr. Krause?

5          MR. KRAUSE:  Yes, your Honor.  Thank you.

6          Your Honor, plaintiff's complaint should be dismissed

7    in its entirety for multiple reasons.  The complaint contains

8    grandiose allegations of conspiracy to improperly target

9    plaintiff, but those claims do not withstand scrutiny.

10         First the complaint was filed long after the statute

11   of limitations expired here.

12         Second, the plaintiff does not plausibly allege that

13   the search warrant affidavit contained a misstatement of any

14   sort, and that failure defeats both plaintiff's Fourth

15   Amendment claim and his Fifth Amendment claim.

16         Third the alleged false statement was not even

17   necessary for a finding of probable cause to search plaintiff's

18   office and his personal effects in light of the other

19   information contained in the search warrant affidavit.

20         Additionally, the Fifth Amendment claim independently

21   fails because plaintiff has not alleged he was deprived of

22   liberty or property without due process.

23         Finally, there's no basis in the complaint to

24   plausibly refer to the personal involvement of any of the

25   supervisors of defendants in any of the alleged wrongdoing.

1            We'll start with the statute of limitations argument,

2    Your Honor.  The plaintiff's claims accrued on the date that

3    the search warrant was executed, November 22, 2015.

4            The recent Second Circuit precedent has shown that in

5    search warrant cases -- or I should say in cases alleging

6    unconstitutional searches -- the harm from that

7    unconstitutional search occurs as a result of the search

8    itself.  Plaintiff certainly knew here that the search was

9    conducted on that day.

10           But, even applying the diligence discovery rule of

11   approval that plaintiff advocates for, the claims certainly

12   accrued within a short time after the search, if not on the day

13   of the search itself.

14           The plaintiff was well aware of the basic facts

15   regarding his alleged injury and didn't pursue a diligence

16   investigation of his claim.

17           It's not necessary under the diligence discovery rule

18   to have every relevant fact.  A claim will accrue when a

19   plaintiff knows or should know enough facts to protect himself

20   by seeking counsel, seeking advice of counsel, so that counsel

21   can then have time to investigate and determine whether or not

22   to bring the suit.

23           THE COURT:  Are you suggesting that the criminal

24   division of your office would have been open to unsealing the

25   warrant application for Mr. Ganek's benefit during it's ongoing

 1   investigation?

 2          MR. KRAUSE:  I'm not sure the answer to that,

 3   your Honor.  It's certainly possible that it might have been at

 4   some point in time -- I'm not sure when that might have been --

 5   or there might have been some way to have a limited disclosure

 6   or disclosure in redacted form as to relevant portions.  We

 7   don't know.  That's something that we don't have the

 8   opportunity to know because it was never sought.

 9          THE COURT:  That's remarkable.  You know, cases speak

10   of claims accruing when plaintiffs are able to discover their

11   claim with an exercise of reasonable diligence.

12          I take it that the government acknowledges that Bivens

13   claims are subject to equitable tolling.

14          MR. KRAUSE:  Yes, your Honor.  That they may be

15   subject to equitable tolling.  Yes.

16          THE COURT:  So how did the statute of limitations

17   begin to run on the day of the search when Mr. Ganek would have

18   no idea that there were material misrepresentations in the

19   search warrant application?

20          MR. KRAUSE:  Well, your Honor, there is the Northern

21   District case in Triestman that does say that even if the

22   search warrant affidavit is under seal, the statute of

23   limitations can run.

24          THE COURT:  That case I know you rely on, but it

25   really is an outlier, isn't it?  It's a one-page decision by

1    then Judge Pooler accepting and adopting the report and

2    recommendation of a magistrate.

3            MR. KRAUSE:  That is all true, your Honor.

4            THE COURT:  By the way, not that I'm faulting you

5    because it's not reported on Westlaw, but if you were to look

6    at the docket sheet for Triestman, you would find out and learn

7    that the case was actually reversed by the Second Circuit.  The

8    specific reasons are unclear on the docket sheet.

9            Because it's so long ago, it's not available to me on

10   ECF.  I'm not faulting you because you should be able to rely

11   on Westlaw.  But the case was vacated and remanded by the

12   Second Circuit.

13           MR. KRAUSE:  Okay, your Honor.  We were not aware of

14   that.

15           THE COURT:  In any event, I'm not bound by that case.

16           MR. KRAUSE:  Certainly.

17           THE COURT:  So do you have some other authority for

18   this proposition?

19           MR. KRAUSE:  That's the only authority, your Honor,

20   that we located for the comparable facts where a search warrant

21   affidavit had been under seal.

22           THE COURT:  Once again, just think about the logic of

23   it.  A search warrant is obtained.  The place and person to be

24   searched have no idea why they're subject to the search

25   warrant, and you make the argument that after the affidavit in

1    support of the warrant was disclosed, that then Ganek should

2    have filed a lawsuit.  Right?

3              MR. KRAUSE:  Well, certainly that he had ample time to

4    do so, your Honor.

5              THE COURT:  How would he know, looking at the

6    affidavit, that there was a falsehood, a material falsehood, in

7    the affidavit?

8              MR. KRAUSE:  Of course, we take issue, but it

9    certainly would require further investigation based on the

10   review of the search warrant.  That is an investigation he

11   certainly could have undertaken.

12             THE COURT:  You point out that Ganek would have had 20

13   months to bring suit following the trial testimony that put him

14   on notice of his claim; right?

15             MR. KRAUSE:  No.  If we said that, that's not exactly

16   right, your Honor.  It depends when, of course, you count the

17   date of accrual.

18             Even if you count the date of accrual from the date of

19   the search, the trial testimony was in December 2012.  So, if

20   that was the date of accrual, he would have had about a year, a

21   little less than a year.  Twenty months would have been from

22   the day that he alleges in the complaint that he received a

23   copy of the search warrant.

24             THE COURT:  Even at trial -- when you make the

25   argument, whether it's 20 months when he received the affidavit

1    or less than 20 months when the trial testimony came to light,

2    aren't you essentially asking the Court to turn a statute of

3    limitations with equitable tolling into a strict statute of

4    repose that runs from the search under all circumstances?

5         MR. KRAUSE:  Well, your Honor, we think that even if

6    the discovery-based rule of accrual were to apply, a proper

7    accrual date still would have been within a short time after

8    the search was executed.

9         To allude back to your Honor's initial question,

10   because Mr. Ganek could have at least sought the unsealing of

11   the search warrant affidavit, which there's no indication that

12   he did --

13        THE COURT:  Haven't other circuits said that not only

14   do you have to know about the search, but you have to know

15   about the facts that make it unlawful?

16        MR. KRAUSE:  Well, I think, at the end of the day,

17   those cases do not necessarily stand for the proposition that

18   you need to know that there is potential liability.

19        The cases do refer to needing to know about the

20   cause -- here the cause, what prompted the search, was the

21   warrant itself.  The contents of the warrant underlie that.

22   The warrant itself was the immediate cause of the search.

23        If Mr. Ganek had sought to investigate further the

24   warrant, he might have then been able to continue his

25   investigation and discover what he believes to be a more

1    particularized issue here.

2           THE COURT:  Do you want to move on to other arguments.

3           MR. KRAUSE:  Sure.  I'll turn to the Fourth Amendment

4    argument first.  For a plaintiff seeking to challenge the

5    approval of a search warrant on the grounds that there was a

6    misrepresentation in the search warrant application, the

7    plaintiff must make a showing of a knowing, intentional, or

8    reckless false statement, and that false statement must be

9    necessary to the finding of probable cause.

10          The complaint here, your Honor, fails on both

11   accounts.  The alleged misstatement that's identified in the

12   complaint is based on an erroneous reading of the plain

13   language of the search warrant application itself.

14          The complaint focuses on the allegation that the

15   cooperator, who is referred to in the search warrant,

16   Mr. Adondakis, never told Mr. Ganek the sources of his inside

17   information about a particular public company, Dell,

18   Incorporated.

19          He provides trial testimony from the trial of his

20   cofounder at Level Global, Anthony Chiasson, indicating that

21   Mr. Adondakis testified that he never told Mr. Ganek about the

22   sources of his inside information about Dell.

23          But the relevant portions of the search warrant

24   affidavit don't refer to Dell specifically.  Instead they use

25   the term "inside information," a defined term in the warrant

1    affidavit, which is defined as material, nonpublic information

2    about public companies, not specific to Dell.

3         In fact, the warrant throughout refers to a number of

4    different public companies, which makes sense given that it was

5    a warrant that came at the early stages of the investigation

6    into potential insider trading violations.

7         As pointed out in the complaint, the warrant was

8    issued and executed in November 2010.  Mr. Chiasson wasn't even

9    charged for some time thereafter indicating that the

10   investigation was ongoing throughout that time.

11        THE COURT:  Doesn't the complaint allege that

12   Adondakis specifically told the defendants he could not

13   implicate Ganek in any insider trading?

14        MR. KRAUSE:  The way that we read the complaint,

15   your Honor, that those allegations pertain to Dell.  That comes

16   from the trial testimony.  The context of that trial testimony

17   is speaking about Dell in particular.

18        THE COURT:  Doesn't this Court, for the purposes of

19   this motion, have to expect the allegations as pleaded?

20        MR. KRAUSE:  Well, certainly to the extent those

21   allegations give rise to a liable inference of a claim.  Again,

22   if you look at that trial testimony, that testimony is

23   specifically about Dell and the source of inside information

24   from Dell.  I do not believe that it's plausible to take that

25   and extrapolate into a broader allegation that's not the core

1   of the complaint.

2           THE COURT:  Why not?  Why isn't that plausible at the

3   pleading stage, Mr. Krause?

4           MR. KRAUSE:  Your Honor, the trial testimony, at that

5   point, after the investigation was complete, two years when the

6   case proceeded to trial, there was certainly a focus on Dell

7   and one other stock that had been under investigation.

8           But, at the time of the search warrant application, as

9   indicated in the application, there were a number of different

10  avenues being pursued, a number of potential different sources

11  of inside information, a number of different publicly traded

12  companies at issue.

13          So, when the search warrant affidavit uses the term

14  "inside information," it uses that as a term as set forth in

15  the affidavit.  When referring to specific public companies, it

16  does so by name.

17          Had the purpose of that statement in the search

18  warrant affidavit been to indicate that Mr. Ganek had received

19  inside information about Dell in particular, I think we would

20  have a different position on that issue.

21          Because it's a reference to inside information, which

22  links to the broader investigation, I don't believe it's a

23  plausible inference to say the testimony about the one stock,

24  Dell, can be understood to essentially mean the same thing as

25  the broader defined term of "inside information."

1          THE COURT:  Ganek alleges that the government secured

2    a source warrant based on fabricated evidence, that you decided

3    to use a raid instead of a subpoena, and that it alerted "The

4    Wall Street Journal" of the raid for no other purpose than to

5    inflict damage on Ganek and its business and to drum up

6    publicity for the investigation.  Those are his allegations.

7          Is it the government's position that if those

8    allegations were true they would not violate the Fourth

9    Amendment's restriction on unreasonable searches or seizures?

10         MR. KRAUSE:  Well, with respect to the fabrication,

11   I've noted the first argument that we have with respect to the

12   fabrication, which is that that's not a plausible inference to

13   draw based on the language of the affidavit.

14         We also have the argument based on the corrected

15   affidavit analysis which I can turn to.  I'll try to take those

16   in pieces, your Honor, if I may.

17         THE COURT:  You may.

18         MR. KRAUSE:  If an alleged misstatement is not

19   required, then there is no Fourth Amendment violation.  Here,

20   based on the remaining information, even if your Honor were to

21   go through the corrected affidavit analysis and excise from the

22   search warrant application the one particular allegation that

23   Mr. Ganek allegations is a misstatement, there is probable

24   cause to search his office in Texas even without that

25   statement.

1          The search warrant affidavit contains a number of

2     additional statements and allegations which are not being

3     challenged here specifically.

4          THE COURT:  Under the corrected affidavit analysis,

5     wouldn't you not only have to excise the false information but

6     put in the correct information, namely, as Ganek alleges in his

7     complaint, that Adondakis never shared any inside information

8     with him?

9          MR. KRAUSE:  It is true.  You do need to supply the

10    allegedly omitted information.  Your Honor, even if that

11    statement were added to the search warrant affidavit, there is

12    probable cause to search Mr. Ganek's office and devices, not

13    necessarily because he is a culpable participant in the alleged

14    criminal activities, but because other people with whom he

15    worked closely were and because Mr. Ganek received that inside

16    information, which is stated in the affidavit and acknowledged

17    in the complaint.

18         The trade is based on that information.  The complaint

19    takes the position that he did not know -- he was not knowingly

20    participating in the insider trading because he did not know

21    the source of that information.

22         There's no allegation that he didn't have the

23    information or that he didn't trade on the information.

24         THE COURT:  Wouldn't ultimately that be an issue for a

25    finder of fact under the Velardi decision?

1          MR. KRAUSE:  Your Honor, we think the facts and

2     circumstances of this case are such that it is possible to make

3     a determination with respect to the corrected affidavit

4     analysis on the face of the warrant and the application itself.

5          In Escalera and the succeeding line of cases following

6     Escalera, the determination is to consider, from a qualified

7     immunity standpoint, whether a reasonable officer had an

8     objective basis to believe that there would be probable cause

9     even with a corrected affidavit analysis.

10          Admittedly the circuit case law on this is

11    complicated.  There are different strains of interpretation

12    that a corrected affidavit analysis, the Escalera line of cases

13    being a more recent line of cases than the Velardi line of

14    cases.

15          Following that line of cases, we certainly think that

16    based on the facts and circumstances of this particular case,

17    given what is and what is not be challenged in the search

18    warrant affidavit, that a ruling on our motion to dismiss is

19    possible.

20          To just go back to your Honor's broader question about

21    the various different aspects of the potential Fourth Amendment

22    violation, the decision to use a search warrant as opposed to a

23    subpoena in this case which plaintiff alleges is in and of

24    itself unreasonable and a violation of the Fourth Amendment,

25    there is no requirement that the government demonstrate that a

1    subpoena would not be sufficient as a method of collecting

2    documents when there is probable cause to search a particular

3    location.

4              If there is probable cause, then a search warrant is

5    an absolutely appropriate tool to use as part of an

6    investigation.

7              Not only is there no clearly established law to the

8    contrary, but it's quite clear from Zurcher on down that the

9    government need not rule out the possibility of using a

10   subpoena in order to be allowed to use a search warrant.

11             The affidavit states -- again, there's no allegation

12   in the complaint that this is part of the purported

13   misstatement.

14             The affidavit states a basis for searching the various

15   locations at the offices because of a concern about loss of

16   evidence as set forth in the affidavit itself.  There's no

17   allegation that that is a misstatement in any way.

18             As to the alleged ticking of the news media, as a

19   threshold matter, that allegation fails to allege a personal

20   allegation of a particular defendant.  There's no allegation

21   that any one person was responsible in sort of a leading

22   allegation which is insufficient on its face.

23             But beyond that, the question comes down to a

24   balancing of privacy interests and legitimate law enforcement

25   interests.  Here there's no indication of the media intrusion

1    into Mr. Ganek's office or into the office of Level Global

2    itself or of the building, let alone into his home where there

3    are a series of cases where media intrusion into a home has

4    been found to be problematic with respect to the Fourth

5    Amendment.

6           There's no indication here that Mr. Ganek himself was

7    photographed or recorded in any way.  So the privacy interests,

8    if any, are miniscule here.  The law enforcement interests,

9    which plaintiff takes issue with, as to notifying the public of

10   efforts to combat crime, facilitating accurate reporting,

11   deterrence, transparency -- these are interests that have been

12   discussed in various different contexts and have been found to

13   be legitimate law enforcement interests in certain contexts and

14   not legitimate law enforcement interests in other contexts.

15          But the context in which those claim to be not

16   legitimate law enforcement interests have been situations where

17   the privacy interest has vastly outweighed those potential law

18   enforcement interests, which the courts have rejected.

19          But, in any event, your Honor, the analysis here is

20   also there's no clearly established law that this type of

21   ticking, even if it did occur, would constitute a Fourth

22   Amendment violation.

23          There's no controlling case law along these lines.

24   The cases that actually both sides cite in their papers and

25   interpret differently, but the cases don't point to anything

1   remotely comparable.

2          This is not like Wilson or Ayeni where you have the

3   media invited along to participate in an intrusion into

4   somebody's home where those camera crews and reporters were

5   photographing individuals in their homes, their private spaces.

6          It's not the staged perp walk case where in fact, a

7   prisoner had been transported from one location to another in

8   the traditional way that we sometimes see on the news media,

9   but the media wasn't there for that.

10          So they invited the media back and did the walk again,

11   which clearly at that point that served no legitimate law

12   enforcement interest because the legitimate law enforcement

13   interest of transporting the individual from one place to

14   another had already been accomplished, and the entire charade

15   was staged for the media at that point.  That's not what

16   happened here.

17          So we believe the Fourth Amendment allegations with

18   respect to the manner and scope of the search as to the good

19   use of the warrant or the subpoena or the alleged ticking of

20   the news media are not sufficient to support a Fourth Amendment

21   violation.

22          THE COURT:  If an individual is subject to such a

23   search as alleged in the complaint, is it the government's

24   position that there is no duty to limit collateral damage of

25   that search if the individual is not reasonably suspected of

FRKYLEIG

 1   criminal behavior?

 2          MR. KRAUSE:  I don't think that that argument is --

 3   no, your Honor.  We're not suggesting that.  At the same time,

 4   the law enforcement interest of searching for evidence of a

 5   crime is a critical interest and cannot be set aside.

 6   Certainly those potential collateral consequences, as

 7   your Honor referred to, very likely would be.

 8          In fact, the allegation here is that those

 9   consequences were considered.  So there's no allegation in the

10   complaint before us that there was no consideration given to

11   potential -- again, to use your Honor's phrase, collateral

12   consequences in this particular search.

13          THE COURT:  Let's say that after meeting with Ganek's

14   attorney, the U.S. Attorney's Office determined that there were

15   material omissions and misrepresentations in the search warrant

16   affidavit.

17          What, if anything, would the U.S. Attorney's Office be

18   legally obligated to do?

19          MR. KRAUSE:  In terms of a legal obligation, I'm not

20   entirely sure.  I think, as a practical matter, what very well

21   might happen is there would be an effort to correct that

22   because we're dealing with a situation where that is coming to

23   light ex post.  The search has already happened.  It's not a

24   situation where it's been discovered --

25          THE COURT:  It's this case.  It's the allegations in

1   this case, not in another case.  It's ex post.

2          MR. KRAUSE:  Your Honor, under those circumstances, I

3   could envision a scenario where the office would go back to the

4   magistrate judge with a corrected affidavit and seek to

5   determine whether or not the search in fact would have been

6   appropriate in light of a corrected affidavit, much the same

7   analysis that the Court would have to go through in this case

8   based on the corrected affidavit analysis.

9          THE COURT:  But even in that situation, it's months

10  after the affidavit has been received by the magistrate judge,

11  the warrant has been issued, and it's been executed, and it's

12  still all under seal.

13         And, presumably in the hypothetical that we're

14  discussing, the government would then be coming back to that

15  magistrate with something, once again, under seal.

16         MR. KRAUSE:  Presumably, right.  I think that's right,

17  your Honor.

18         THE COURT:  What does that do for Mr. Ganek?

19         MR. KRAUSE:  I understand that question, your Honor.

20  I think what Mr. Ganek was seeking at that point in time was

21  some sort of statement from someone in the office that he was

22  not a target of the search.

23         There was no probable cause to believe that -- I'm

24  sorry.  Not that he was not a target of the search.  There was

25  no probable cause to believe that he had committed any sort of

1   insider trading violation.

2           Your Honor, those discussions were happening at a very

3   preliminary stage of this investigation.  So even had there

4   been some determination made that it was a misstatement or an

5   omission in the search warrant, I don't see that there's any

6   way Mr. Ganek would have been given the assurance that he

7   sought at that point.

8           Again, even if that determination had been made,

9   there's no telling that that determination would have been

10  necessarily led to that consequence that he was seeking, which

11  was to have some sort of public name clearing or exoneration or

12  whatever exactly it was and he had hoped to obtain.

13          I don't think there's any basis for that to be offered

14  at that point in time or any point in time in this case.  So

15  it's a difficult question because it's a hypothetical that I'm

16  not sure exactly what would have happened in terms of what the

17  office would have attempted to do to address a

18  misrepresentation that it became aware of.  I'm sure there

19  would have been something.

20          With respect to this case and the relief or the

21  outcome that Mr. Ganek sought, even had that information been

22  uncovered through subsequent discussions, the relief he sought

23  would not have necessarily been forthcoming.

24          THE COURT:  All right.  Anything else?

25          MR. KRAUSE:  Your Honor, I would touch upon the Fifth

1    Amendment arguments.

2            THE COURT:  You can discuss them briefly.

3            The parties didn't address the Second Circuit's

4    Turkmen decision in their briefs.  I'm going to ask both sides

5    to give me a simultaneous letter submission on the import of

6    Turkmen where the Second Circuit revived a Bivens claim against

7    the Attorney General and the director of the FBI finding that

8    the complaint plausibly pled that they were aware of allegedly

9    unconstitutional post 9/11 detention policies and practices.

10           So on the question of supervisory liability or the

11   duty to intercede, I'm going to ask both sides to submit a

12   letter on that.

13           MR. KRAUSE:  Okay.  I would thank you, your Honor for

14   that opportunity to do that.

15           Just to very briefly address that point, in Turkmen,

16   there's a lot of factual material that the circuit relied on in

17   determining that those high-level supervisors were aware of or

18   should have been aware of the alleged constitutional

19   violations.

20           We think that that's quite distinguishable from the

21   facts here.  We'll certainly address that.

22           THE COURT:  Thank you.

23           MR. KRAUSE:  Again.  Thank you for the opportunity to

24   do that, your Honor.

25           On the Fifth Amendment, as I'm sure your Honor has

1    seen, the parties have gone past each other a little bit on the

2    proper way to organize the claims.

3          From our perspective, your Honor, as we set forth in

4    our brief, the Fifth Amendment claim is entirely disposed of by

5    the Fourth Amendment claim because the Fourth Amendment claim

6    fails for the reasons we've outlined in our brief and what

7    we've discussed today.

8          Either one of those would be a complete disposition of

9    the Fifth Amendment claim as well.  But, even if the Fourth

10   Amendment claim were to survive, the Fifth Amendment claim

11   independently should fail because there's an absence of

12   allegation that Mr. Ganek was deprived of liberty or property

13   without due process.

14         As to liberty, the only liberty allegation that's

15   discernible from the complaint, Mr. Ganek was never arrested.

16   He was never imprisoned for any length of time.

17         So the only liberty issue is a stigma plus claim based

18   on a defamatory statement leading to allegedly a state-imposed

19   additional burden.

20         But Mr. Ganek doesn't allege a stigma plus claim here

21   on either prong of the stigma plus test.  There's no defamatory

22   public statement.

23         The news articles that are cited in the complaint

24   don't mention Mr. Ganek.  The news articles -- one of them may

25   have mentioned Mr. Ganek but not as part of the statement

1    uttered by any government official, let alone any of the

2    defendants.

3         My recollection is the only statement from a

4    government official is a spokesperson that says that search

5    warrants were being executed.  In fact, that's a true

6    statement.  So that can't be the basis of a stigma plus claim

7    either.

8         To the extent the allegation is the alleged

9    misstatement in the warrant affidavit is the stigmatizing

10   statement, that statement was not public and was never made

11   public.

12        In fact, it was only made public here pursuant to

13   motion filed by the New York Times, and the government was

14   prepared to submit a redacted version.

15        And, in fact, the version that is public is a redacted

16   version, redacted for privacy interests for a number of

17   individuals and companies who were never charged with any

18   misconduct.

19        Mr. Ganek's name would have been redacted from that as

20   well had his counsel actually not told us that he wanted his

21   name to be included, again, presumably to facilitate this

22   lawsuit not under seal.  We understand the reasons.

23        It's not possible for that to be a public defamatory

24   statement or even a defamatory statement that was likely to be

25   made public for purposes of a stigma plus claim.

1              To the extent the argument in favor of a stigmatizing

2    public statement is meant to be the actions of the government,

3    the fact that a search warrant was executed, the alleged

4    ticking of the media, and any inferences drawn from those

5    actions, that can't be the basis for a stigma claim either.

6              The O'Connor case from the Second Circuit have

7    discussed that allegations that actions by a government entity

8    as part of the stigma plus claim and rejects that possibility.

9              So, even if the stigma plus claim fails for the simple

10   reason there's no defamatory public statement at all -- and on

11   top of that, there's no additional state-imposed burden that

12   would satisfy the plus element.

13             The deleterious effects flowing from the damaged

14   reputation -- it's quite clear that that it is not a plus

15   element for purposes of the stigma plus analysis.

16             That's the Sadallah case.  To the extent the

17   allegation here is that the business closed several months

18   later as a result of the execution of the search warrant, the

19   allegations in the complaint talk about the business failing

20   after investors learned of the investigation and the execution

21   of the search warrant withdrew their funds, which is a

22   quintessential example of harm or alleged harm based on

23   reputational damages.

24             Your Honor, I'm happy to defer discussion of the

25   failure to proceed in supervisory liability in light of

1   your Honor's comment and to address that further in a

2   subsequent briefing.

3          THE COURT:  What's, in your view, the difference

4   between supervisory liability and failure to intercede in this

5   case?

6          MR. KRAUSE:  Your Honor, we actually have been

7   struggling to understand that as well in light of the position

8   taken in plaintiff's opposition brief that they don't seem to

9   be contesting our argument in our opening brief that there's no

10  allegation of grossly negligent supervision or anything like

11  that.

12         The argument in opposition is essentially that both of

13  the supervisors here were personally involved in the conduct.

14  If that's the case, it's not really supervisory liability.

15         It's liability for supervisors, but it's not

16  supervisory liability in the sense that they would be liable

17  because of gross negligence.

18         They also don't allege that the supervisors are

19  individually liable for either the Fourth or the Fifth

20  Amendment claims.  The supervisors are only alleged to be

21  liable for failing to support the fourth claim for supervisory

22  liability.

23         So I think, to your Honor's point, we really do see

24  them as essentially collapsed for purposes of this case based

25  on the position that the plaintiff has taken in their

1    opposition brief.

2         THE COURT:  All right.  Thank you, Mr. Krause.

3         Ms. Gertner.

4         MS. GERTNER:  Thank you.  From your Honor's remarks,

5    it's not clear to me that I need to address the question of

6    statute of limitations, but I will for a moment.

7         It's hard to imagine any point in the time after the

8    November 2010 search that it would have been appropriate to

9    bring this case other than the time that it was brought.

10   Your Honor's questions make that clear.

11        In November 2010, all Mr. Ganek knew is that there was

12   a search warrant with his name on it expressly identifying his

13   offices as among the offices of Level Global to be searched.

14        He doesn't see the affidavit.  He immediately

15   complains to the government about what's going on.  The next

16   thing that happens that is public is the arrest, some 14 months

17   later, of individuals who are named.

18        So all he knows is that he was searched.  He doesn't

19   know the reason.  He doesn't have the affidavit.  Mr. Adondakis

20   had been charged, but his materials were sealed.

21        Everything is sealed up until the moment of the arrest

22   of Mr. Chiasson and Mr. Newman.  At that point all he knows is

23   that they were arrested, and he's not.

24        He moves to unseal the complaint, the affidavit

25   rather.  What he gets at that point is that there was an

1    informant out there who is saying that he did something wrong.

2         He doesn't know that the informant never said that he

3    did something wrong.  So, at that point, there's no basis on

4    which to go to court.

5         So the only moment in which he could have gone to

6    court is when he knew, very stunningly I might add, in facts

7    that we never, ever see, that the informant never identified

8    him.  And the FBI agent, Mr. Makol, also underscored the fact

9    that Adondakis never said Mr. Ganek.

10        It was at that point he knew he had a claim.  If we

11   set up rules with respect to statute of limitations requiring

12   people to go into court when they're searched and they don't

13   believe they should be, this Court would be flooded with claims

14   like that.

15        If he should have brought the claim the minute he

16   found out about an affidavit and disagreed with what the

17   informant was saying in the affidavit, this Court would be

18   flooded with claims.

19        The only moment he knew he had a claim was the moment

20   that he knew that Adondakis had never implicated him, not in

21   Dell, not in any insider trading whatsoever.  So, if the

22   standard is due diligence, it was clearly at that moment in

23   this case is timely.

24        The government's claim that these allegations are

25   implausible would make sense in any other case in which there

1   is not sworn testimony in open court by a government official

2   saying, no.  Adondakis never said this to me, and sworn

3   testimony by Adondakis saying, no.  I never implicated Ganek in

4   any other way.

5          At one point in their papers, the government says why

6   would the government leak to the media?  Why would it not just

7   characterize the affidavit as they did but, in addition, do

8   this as a search warrant and in addition leak this?  Why was

9   the Fourth Amendment violated in the ways that we describe?

10          The government says why would it make sense for the

11   government to leak to the media when what they were concerned

12   about was the destruction of evidence?

13          I spent some time thinking about that argument.  Why

14   would the government leak the search to the media?  What we've

15   seen is a series of pleas of guilty since the insider trading

16   investigations became public based essentially largely on

17   pressure people felt because their name was sullied in the

18   media.

19          So why would the government leak the search to the

20   "Wall Street Journal"?  Why is that remotely implausible?

21   That's the way in which people came forward.

22          More than that, the government says why would we leak

23   to the media.  That's not a plausible allegation because it

24   only leads to further destruction of evidence.

25          This case is about an affirmative misrepresentation,

1    the misrepresentation about Adondakis.  But the next line in

2    the affidavit which says a supervisor in a hedge fund told his

3    employee to destroy evidence generally described is a material

4    omission.

5         We will be able to show -- this is public documents --

6    that that concerned an entirely different hedge fund,

7    your Honor, with respect to an entirely different man.  Indeed

8    that the person who was threatening to destroy the evidence was

9    someone that the government had under surveillance.

10        There was never any danger of the destruction of

11   evidence.  So not only is the Adondakis statement contrived,

12   but there's a material omission because the government had

13   specific evidence to suggest that that really wasn't at risk in

14   the Level Global case at all.

15        So why would the government release this to the press?

16   The government released it to the press because there was no

17   risk of any destruction of evidence, and there was ancillary

18   advantages to releasing information to the press.

19        Why would they go forward with this knowing that Makol

20   and Adondakis were going to testify to a statement?  If the

21   statements weren't made, why would they do that?

22        Well, they had to.  Adondakis was going to take the

23   stand.  He was going to be testifying precisely about whether

24   he had implicated any of these other individuals.  He was going

25   to be cross-examined.  It was appropriate that they came

1   forward and said that.

2          Candidly, the government never believed that anyone

3   would ever sue them over this.  Is it implausible to believe --

4   and you're right.  I want to start in a sense with the last

5   discussion that you had with counsel.

6          The claims against higher-ups essentially in the

7   office are claims of both supervisory liability and direct

8   involvement.

9          It's very difficult to read the press concerning

10  insider trading accusations and not believe -- and not

11  understand that this was not a side prosecution.

12         This was a central prosecution, and, in fact, we made

13  allegations of direct involvement, direct involvement in the

14  debriefing of Adondakis, direct involvement in the search

15  warrant, direct involvement in the decision to use the search

16  warrant, and direct involvement in terms of the leak to "Wall

17  Street Journal."

18         In addition, making supervisory accusations --

19         THE COURT:  In view of Zurcher, how can it be said

20  that the use of a search warrant instead of a subpoena would

21  violate a clearly established ground?

22         MS. GERTNER:  First of all, that's part of the

23  misrepresentation claim here.  The justification for exigent

24  circumstances was itself a misrepresentation.

25         The notion here is that -- it's not that you can't use

 1    a search warrant.  That's certainly within the government's

 2    tool kit.  The notion here is part and parcel of an intentional

 3    use of fabricated evidence in a search warrant affidavit, the

 4    use of a search warrant then to surface that and the tipping to

 5    the "Wall Street Journal."

 6          It's not Zurcher.  It's not just any old search

 7    warrant as a method of gathering evidence.  It's the whole

 8    complex of the way this was done that essentially maximized the

 9    damage to Mr. Ganek.

10          So I think that the notion of implausibility is

11    addressed by the facts that we have.  This is not Iqbal and

12    Twombly.  We have the facts in this case, your Honor.

13          We have indeed many more facts than that because all

14    of these insider trading investigations have been, for the most

15    part -- not all.  Most of them have been out as a result of the

16    Chiasson immunity decision, and we know a great deal about the

17    office.

18          So the allegations with respect to the Fourth

19    Amendment --

20          THE COURT:  Doesn't the government say that we have to

21    look at the law as the government understood it at the time as

22    opposed to the law as it's recently been held to be by the

23    Second Circuit?

24          MS. GERTNER:  The law as the government understood it,

25    one hopes, is the law that you cannot lie in a search warrant

```
 1    affidavit.  The law, as the government understood it, is that
 2    you cannot contrive a public --
 3              THE COURT:  My point is just responding to your
 4    statement that most of these statements have now been nullied
 5    as a consequence of the Second Circuit's decision.
 6              Why should I take that into consideration in this
 7    motion?
 8              MS. GERTNER:  I misspoke.  What I meant was that the
 9    plausibility analysis -- the plausibility to some degree comes
10    from the facts we already have.
11              We know there was a lie in this affidavit.  We know it
12    was a high-profile prosecution.  We have these facts, and you
13    have to take the facts in the complaint.
14              I was making a broader point, which is that --
15    in fact, perhaps it was inappropriate.  We will know more about
16    what was going on in the government's investigation in this
17    case than most similarly situated plaintiffs know precisely
18    because affidavits are being unsealed and information is being
19    obtained.  That's all that I was saying.
20              That will make it clear that the facts that we
21    describe are not remotely implausible.  I understand what
22    you're saying.  It's not the Chiasson and Newman case and the
23    reversal that gives plausibility to what I'm doing.  These
24    facts stand on their own.
25              I think that there's no question again that we have
```

 1   alleged enough for a Fourth Amendment violation with respect to

 2   the fabrication, the manner, and the leak.

 3           The Fifth Amendment issues -- again --

 4           THE COURT:  Is your stigma plus claim dependent on the

 5   allegations regarding leaks to the "Wall Street Journal"?

 6           MS. GERTNER:  No.  There is a search warrant that says

 7   that part of the places to be searched is -- one part is

 8   Ganek's private office.  It's not just Level Global.  It is

 9   Ganek's private office, papers, cell phone, etc.

10           Anyone reading that search warrant, which was a public

11   document, would have understood that that is the functional

12   equivalent of saying we believe something illegal is going on.

13           Let me contrast that with the Diamondback -- there

14   were three search warrants that were executed the same day.

15   Diamondback was another hedge fund where in fact they only had

16   information as against a lesser individual, Todd Newman, and

17   the search warrant affidavit does not implicate in any way the

18   owner of the hedge fund.  It was only with respect to Level

19   Global that the search warrant did.

20           THE COURT:  I noticed that in a footnote in your

21   brief.  It's sort of provocative.  Is that pleaded in the

22   complaint?

23           MS. GERTNER:  No, it is not.  No, it is not.  That is

24   outside the complaint.  That's true.  There's no way out of

25   that statement.  It is outside of the complaint.

 1              THE COURT:  All right.

 2              MS. GERTNER:  It is simply -- using it to show you

 3    that there was a way that they could have crafted the search

 4    warrant in a way that would not have had the consequences to

 5    Mr. Ganek that this search warrant did.

 6              So it's not just "The Wall Street Journal" tip that

 7    was the problem.  It is a search warrant that named Ganek's

 8    personal effects as being part of what was searched.

 9              It's more than just the Sadallah case.  It's more than

10    just -- the case law is ripe with cases in which the government

11    may have misspoken in a public statement and someone is harmed

12    by it.  But this is a search.  This is a seizure.  This is

13    different.

14              THE COURT:  How is it more than the Sadallah case?  I

15    guess I'm asking you to distinguish the plus prong there.  In

16    shorthand, why should a hedge fund be treated differently under

17    the law than a restaurant and dance hall in Utica?

18              MS. GERTNER:  There's a philosophical answer to that,

19    but I won't get into it.

20              THE COURT:  Give me the legal.

21              MS. GERTNER:  It's because the nature of the

22    government's act was different.  In the Sadallah case, it was a

23    statement.  The government casted dispersions on the plaintiff

24    indicating they were the subject of an investigation.

25              This is a situation in which it's more than that.  If

1    the standard for plus is a materially altered situation as a

2    result of government conduct, this is in the police search

3    warrant seizure of his personal effects in a public document

4    which the government executed.

5            We don't have many cases like this, your Honor,

6    because it is so rare that people sue on this basis.  But it

7    seems to me the plus here is the government's action that is

8    clear and unmistakable.

9            In addition, apart from stigma plus, there's a body of

10    law that suggests the government simply cannot use fabricated

11    evidence.

12            My colleague has reminded me of a Second Circuit case

13    called Morse which was decided September 11, 2014.  It's in our

14    paper.

15            The dentist was accused of Medicaid fraud.  He was

16    acquitted in the course of the case.  There were allegations

17    and proof of false summary sheets, false summary sheets that

18    were used as part of the fraud.

19            He's acquitted.  He nevertheless sues under 1983

20    because of the false summary sheets.  He wins a verdict, and

21    the verdict was sustained by the Second Circuit.

22            So the notion is it is a substantive due process

23    violation whenever the government lies, when the government

24    fabricates evidence, when the government uses it in any

25    situation.

1              That's very different -- uses it not in any situation,

2     uses it in a formal situation, in a trial, in a search warrant

3     affidavit.  That's really very different than a press release

4     about a dance hall.

5              THE COURT:  The case law seems pretty clear that a

6     court shouldn't analyze a substantive due process claim where

7     the claim stands under the Fourth Amendment.

8              So I'd ask you to tell me why I should consider an

9     argument to the contrary and what that argument is.

10             MS. GERTNER:  That line of case law is concerned about

11    essentially collapsing whatever restrictions we put on a Fourth

12    Amendment.

13             In this situation, the substantive due process

14    arguments are very different because it is whether or not there

15    was probable cause in the rest of the search warrant, which I

16    will get to in a minute, the fact of being named is what we are

17    concerned about.

18             The fact of being named, not just once, not just

19    incidental, not just minor but seven times in the search

20    warrant affidavit is part of the litany of what was rotten

21    about Level Global.  That's what we're concerned about.  It was

22    the fact of being named, and that was the act that had

23    consequences.

24             In that situation, it is much more analogous to the

25    false summary sheets in Morse.  It's much more analogous to a

 1    case out of Massachusetts called Limone where the government

 2    lied in its papers to the Court.

 3         This is an independent Fifth Amendment argument about

 4    which candidly courts should be concerned because it is lying

 5    to officers of the court.  That seems to me to be a very

 6    different issue.

 7         If I could roll back just to an argument that I missed

 8    which is that the notion that there would have been probable

 9    cause here, going back now to the Fourth Amendment argument,

10    that there would have been probable cause if we excised

11    Mr. Ganek's name from the affidavit.

12         The Court's questioning was exactly right.  It wasn't

13    just because of excising Mr. Ganek's name.  The government had

14    information that he was not Ganek.  That ought to have been in

15    the search of Level Global.  There was not sufficient probable

16    cause with respect to the rest of this leak.

17         Wiretaps -- the description of the wiretaps implicated

18    others in the office, not Mr. Ganek.  The allegation about

19    destruction of evidence in other hedge funds didn't implicate

20    Mr. Ganek.

21         Even if he was, as the government described, an

22    unwitting participant in an insider trading ring, it would not

23    have justified the search of his office and personal effects.

24    That would have made a difference.

25         It was the personalness of this search warrant

1    affidavit, naming him, seeking his cell phone, his address

2    book, the contents of his office that was the issue.  That

3    search warrant would have looked different if that had been

4    taken out of it.

5           So I think that the search would have been different

6    under these circumstances.  As the Court rightly noted, whether

7    or not the search would have been -- whether or not the

8    magistrate would have granted a warrant without the Ganek

9    information is a question of fact which we are entitled to try.

10          There's a Supreme Court case -- Lewis is the case --

11   that suggests it is a question of fact, not a question of law.

12   I think it's a question of fact in our favor.

13          Just to recap, the statute of limitations we sued the

14   moment we could.  With respect to the Fourth Amendment

15   allegations, we have alleged both knowing fabrication and

16   either direct knowledge of people up the line or at the very

17   least, supervisory liability.  We've alleged the improper

18   manner of the execution of the search warrant.  We've alleged

19   the tipping to the "Wall Street Journal."

20          Given the incredible press surrounding this

21   investigation and all these investigations, it is -- I want to

22   reverse the Iqbal Twombly comment.  It would be implausible to

23   believe that everyone in the office did not know about this,

24   that everyone in the office was not intimately involved in

25   this.

1        So I think we have met the Fourth Amendment standard,

2   and we have met the Fifth Amendment standard.

3        THE COURT:  On your failure to intercede claim, who

4   specifically should have interceded and when should they have

5   interceded?

6        MS. GERTNER:  You can characterize that as a failure

7   to intercede or contradicting a false statement in an

8   affidavit.  We have in fact gone back-and-forth on that.

9        If there had been a correction -- the complaint

10  alleges that Mr. Ganek went to the U.S. Attorney's Office as

11  soon as possible after the search was executed.

12       If there had been, for example, a statement that said

13  that there was a mistake in the affidavit, that Ganek should

14  not have been mentioned and that, if in fact, that nothing

15  should have been taken from his office, that's all they had to

16  do.

17       I would characterize this as a failure to intercede

18  which makes it an unusual kind of case because the government

19  doesn't exonerate when there aren't charges brought, but the

20  notion that they had a duty to correct a misstatement on an

21  affidavit seems to me to is both to the benefit of the Court

22  and to the citizens who were mistakenly named.

23       THE COURT:  Is it your argument that the U.S. attorney

24  was constitutionally obligated to make an exonerating statement

25  to the press about Mr. Ganek?

1          MS. GERTNER:  Well, again, he was constitutionally

2     obligated not to permit a lie in the initial search warrant.

3     And then, when the lie was brought to his attention, which I

4     believe was immediately -- I believe we indicate in our

5     complaint that Mr. Adondakis was interviewed again after Level

6     Global had failed.

7          So we're not talking about a year from the execution

8     of the warrant.  We're talking about a very short time after

9     the execution of the warrant.

10          If there had been a correction that there was a

11     mistake in the warrant, that's all.  Failure to intercede I

12     understand creates a broader constitutional responsibility, but

13     the failure to correct a misstatement in the search warrant

14     would have had salutary consequences for Mr. Ganek and would

15     have made a difference.

16          THE COURT:  As far as the supervisory defendants are

17     concerned, is there any meaningful difference -- I'm putting

18     the same question to you that I asked of Mr. Krause.

19          Is there any real difference between supervisory

20     liability and the failure to intercede?

21          MS. GERTNER:  There's a timing question.  The question

22     is what their responsibility was for the lie in the

23     first instance.

24          We're saying, given the allegations in the complaint

25     that given the nature of this investigation, we believe that

1    this was not the act of a low-level assistant and a low-level

2    FBI agent.

3         The supervisory issues are at the moment of the lie,

4    the fabrication, as well as the failure to correct the

5    fabrication.  I think it's in both places.

6         One doesn't need a broad concept of failure to

7    intercede to say that the supervisors of the drafters of this

8    affidavit and everyone who knew about it ought to have

9    corrected it, either at the moment before the search or shortly

10   thereafter.

11        In other words, I don't think that I'm broadening this

12   area of the law, and I can well understand that that's not

13   appropriate.  I can well understand the policy reasons for not

14   wanting to do that.  But we're not talking about that.

15        We're talking about the responsibility of the

16   higher-ups for that fabrication, and the responsibility of the

17   higher-ups for not contradicting it when it should have been

18   apparent to them, and we believe it actually was apparent that

19   Mr. Ganek was not named.

20        The set of fact is really quite unique.  If we lack

21   cases that are exactly on point, it's because one rarely has a

22   situation where there's sworn testimony at trial saying X and

23   sworn testimony in an affidavit saying not X, and an individual

24   willing to sue.

25        So we're drawing from analogies from the case law, but

1    we think it's entirely appropriate.

2           THE COURT:  All right.

3           MS. GERTNER:  Thank you.

4           THE COURT:  Thank you, Ms. Gertner.

5           Mr. Krause.

6           MR. KRAUSE:  Thank you, your Honor.

7           Your Honor, a number -- there are a number of

8    responses.  I'll try to organize them as best as I can.  I

9    might jump around a little bit.

10          On the point about the Fifth Amendment, counsel

11   suggested that Morse indicates that there's a substantive due

12   process violation here.  That's not what Morse stands for.  The

13   fabrication at issue in Morse was something before a grand

14   jury.

15          All of the cases that plaintiff cites involve

16   deprivations of liberty.  All of the case law specifically

17   refers to the right having been identified as a right not to be

18   deprived of liberty based on fabrication of evidence by a

19   government employee.  That's Zahrey.  That's Morse.

20          In the circuit, the circuit in Morse in the footnote

21   noted that there are different strains of cases, some of which

22   locate that right in the Fifth Amendment, the right not to be

23   deprived of liberty without due process.

24          Some located that right within the Sixth Amendment

25   right to a fair trial.  A.Q.C., which is one of the cases cited

1    by plaintiff in their brief, refers to the right to a fair

2    trial.

3            But the circuit has developed a standard, a five-part

4    standard for the right to a fair trial claim, the fifth element

5    of which is to not be deprived of liberty.  Again, I think

6    there's a significant difference.  There's no liberty claim

7    here.

8            Another reason why there are no cases like this in a

9    search warrant context -- first of all search warrants don't

10   typically involve -- I can't think of a case where a search

11   warrant involved depravation of liberty, unless if someone was

12   detained during the course of the execution of the warrant,

13   which is not what we have here.

14           Also the corrected affidavit analysis is a sort of

15   unique creature to deal with the possibility of a misstatement

16   in a search warrant.

17           There's no comparable legal framework for potentially

18   finding qualified immunity even in the event of a misstatement

19   in the search warrant.  So we don't have that in the grand jury

20   context or in the case where misstatements made by the

21   government are made at trial.

22           So there's a very good reason why we don't see cases

23   like that in a search warrant context, both because of the

24   corrected affidavit analysis and because of the liberty

25   consideration.

 1          Towards the beginning of her comments, counsel

 2    mentioned something about Mr. Adondakis' testimony being that

 3    he never implicated Mr. Ganek at all.  That's not his

 4    testimony.

 5          The testimony that's cited in the complaint says,

 6    specifically when asked a question about whether he implicated

 7    Mr. Ganek, he says he doesn't know.

 8          Then he's asked -- this is in paragraph 143 of the

 9    complaint.  Then he's asked follow-up questions about Dell

10    specifically.  And then he testifies that he didn't tell

11    Mr. Ganek the information about Dell specifically.

12          So that sort of circles back to our earlier point

13    about the difference between a broader statement by Adondakis

14    about securities generally and what he did testify to about

15    Dell in particular.

16          As to the notion of the exigent circumstances -- that

17    issue is addressed in the search warrant affidavit.  It's not a

18    requirement that the government demonstrate exigent

19    circumstances in order to have probable cause to execute a

20    search warrant.

21          In any event, in addition to the one application that

22    counsel described, which is not pled with any specificity in

23    the complaint as to this other hedge fund that she says there's

24    information that's publicly available about.

25          The next paragraph talks about a particular individual

1    defendant identified in the search warrant, Mr. Kinnucan, who

2    is also mentioned in the November 19 news article that's cited

3    in the complaint as having sent an email out to all of his

4    contacts saying that he had been visited by the FBI and that he

5    believed he was the subject of a wiretap.

6           In the affidavit it also indicates that Mr. Kinnucan

7    had contact with Mr. Chiasson at Level Global.  So the exigent

8    circumstances points are more complicated than the one

9    paragraph, first of all.  It does touch upon Level Global.  In

10   any I vent, it's not the relevant finding for a probable cause

11   for the search.

12          The one point I believe I heard at least that a

13   suggestion was that we could just excise Mr. Ganek's name from

14   the search warrant affidavit, that that was the government's

15   position.

16          That's actually not the government's position at all.

17   We think what would be excised from the warrant would be much

18   narrower because there are references to Mr. Ganek that in the

19   complaint are not challenged, in particular, that Mr. Ganek

20   received inside information from Mr. Adondakis and executed or

21   caused others to execute trades based on that information.

22          We understand that the allegation in the complaint is

23   that he did not know that the inside information was coming

24   from a source inside the company and was breaching a fiduciary

25   duty.  But the alleged misstatement is that with respect to the

45

1    source, did Mr. Ganek know the source.

2              There's no allegation that the statement that he

3    received, the information, was inaccurate or that he executed

4    or caused others to execute trades based on that information

5    was inaccurate or that Mr. Chiasson or the other Level Global

6    employee whose name was redacted from the warrant also received

7    the same inside information, did in fact know the source of

8    that information, and also executed trades based on that

9    information.

10             So we're not talking about a situation where Mr. Ganek

11   is operating in isolation.  All of this is alleged in the

12   warrant.  The fair probability standard of finding evidence of

13   a crime is satisfied because of all the other elements that are

14   described in the warrant affidavit.

15             The notion that a statement that his office was

16   searched was a defamatory public statement.  His office was

17   searched.  It does say that in the search warrant, but it was

18   searched.  That's a true statement.

19             THE COURT:  What's the relevance to the reference in

20   your motion that Ganek was returned to be an unindicted

21   coconspirator during the Newman trial?

22             MR. KRAUSE:  I'm sorry.  What is the significance of

23   that?

24             THE COURT:  Yes.  Why is that relevant?

25             MR. KRAUSE:  We just ask that your Honor take judicial

1    notice of that ruling.

2              THE COURT:  Why should I?

3              MR. KRAUSE:  The complaint makes sweeping allegations

4    of misconduct.  It virtually alleges that the government

5    engaged in a witch hunt against Mr. Ganek.  That ruling is one

6    example of how those allegations are misleading we submit and

7    implausible.

8              The warrant obtained here was to search for evidence

9    of a crime.  Mr. Ganek received inside information and traded

10   on decisions based on that information.

11             As a result of that information, from which the

12   warrant was part of the initial stages of the information, two

13   Level Global employees were convicted of insider trading.

14             THE COURT:  Anything further?

15             MR. KRAUSE:  No, your Honor.

16             THE COURT:  Anything further?

17             MS. GERTNER:  Can I just address the coconspirator

18   issue?

19             THE COURT:  Very briefly.

20             MS. GERTNER:  The finding that was made by the Court

21   was made as a result of information that was obtained after the

22   search.  So the notion that that finding could have buttressed

23   information in the search warrant affidavit is simply not true.

24             As your Honor knows, Mr. Ganek's lawyer was not

25   present during that discussion, and that is not a very

1    substantial threshold.  That led to the introduction of two

2    emails.  There was an evidentiary ruling.

3          If the government is trying really at this late hour

4    to suggest that that means there was more -- there's not just

5    smoke but fire here, then that makes these accusations

6    implausible.  That would be extraordinary and unfair.

7          That finding was a very limited finding of evidence

8    obtained after the search warrant, very low threshold, and

9    without counsel.  In addition, it should not be part of this

10   Court's consideration of the face of the complaint under Roth

11   v. Jennings.  Thank you.

12         THE COURT:  Thank you both for your arguments and your

13   thoughtful briefs on this motion.  I'll ask that you submit

14   letters to me on the Turkmen issue let's say by December 7.

15         With respect to the motion, decision is reserved.

16   Have a good weekend.

17         MS. GERTNER:  Thank you.

18         MR. KRAUSE:  Thank you, your Honor.

19         (Adjourned)

20

21

22

23

24

25