USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3-10-16___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
DAVID GANEK,
                                          :
                    Plaintiff,
                                          :          15cv1446
          -against-
                                          :          MEMORANDUM & ORDER
DAVID LEIBOWITZ, *et al.*,
                                          :

                    Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          In late 2010, the FBI executed coordinated raids on several well-known hedge

funds in a highly touted investigation of insider trading.  Plaintiff David Ganek's hedge fund,

Level Global Investors, was among them.  These raids sent shockwaves through Wall Street:

investment bankers and traders were indicted, and multi-billion dollar businesses—including

Level Global—were shuttered.  But five years later, a different picture has emerged.  The Second

Circuit rejected the Government's theory of insider trading.  Criminal convictions were vacated,

and indictments dismissed.  And in a nearly unprecedented role-reversal, the SEC agreed to

disgorge monies it collected in connection with consent judgments against various hedge funds,

including Level Global.

          In this lawsuit, Ganek seeks to hold government agents accountable for violating

his civil rights.  More specifically, Ganek alleges that the affidavit supporting the Government's

request for a search warrant of Level Global and his office contained deliberate

misrepresentations that were later exposed by sworn trial testimony of an FBI agent and a

government informant.  According to Ganek, that fabricated evidence led a magistrate to issue

the warrant.  That, coupled with Defendants' heavy-handed tactics, precipitated the closure of Level Global.  These are grave allegations.

Ganek asserts claims against FBI Agents Holly Trask, David Makol, James Hinkle, and Matt Komar, along with Assistant United States Attorneys Reed Brodsky and David Leibowitz, for violation of his Fourth and Fifth Amendment rights.  Ganek also asserts claims against Preet Bharara, Boyd Johnson III, Richard Zabel, Christopher Garcia, Marc Berger, Diego Rodriguez, Rachel Rojas, David Chaves, and Patrick Carroll (the "Supervisor Defendants") for supervisory liability and failure to intercede.  Ganek seeks compensatory and punitive damages pursuant to <u>Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 338 (1971).

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, Defendants' motion is granted in part and denied in part.

<u>BACKGROUND</u>

The following facts are gleaned from the Complaint and presumed true for purposes of this motion.  Level Global was a successful hedge fund with approximately 60 employees and $4 billion in assets under management.  (Compl. ¶¶ 38, 41.)  Ganek was its co-founder and principal partner.  (Compl. ¶ 39.)

In 2008, federal authorities in New York began devoting significant resources to insider trading investigations among financial professionals.  (Compl. ¶ 48.)  In 2009, Bharara, the United States Attorney for the Southern District of New York, publicized those investigations as one of his signature initiatives, noting that his Office was utilizing "covert methods" typically

reserved for violent criminal organizations, including informants and wiretaps.  (Compl. ¶¶ 49-53.)

Agents Trask, Komar, Makol and Hinkle conducted the investigation.  (Compl. ¶ 56.)  Chaves and Carroll led the investigative team, and Rodriguez and Rojas had overall supervisory responsibility within the FBI.[1]  (Compl. ¶ 57.)  These FBI personnel worked closely with Assistant United States Attorneys in the SDNY's Securities and Commodities Task Force (the "Task Force").  (Compl. ¶¶ 58-59.)  Brodsky and Leibowitz reported to Berger and Garcia. Zabel supervised the Task Force, and reported to Johnson and Bharara.  (Compl. ¶¶ 59-60.)  In 2010, the Task Force targeted Level Global.  (Compl. ¶ 55.)

<u>The Level Global Investigation</u>

In October 2010, Agents Hinkle and Makol (with Chaves' approval) approached Sam Adondakis in Central Park and confronted him with wiretap evidence implicating him in insider trading.  (Compl. ¶¶ 63-66.)  Earlier that year, Level Global had fired him from his research analyst position for violating compliance protocols.  (Compl. ¶ 47.)  Confounded with recorded evidence of his own illegal activity, Adondakis agreed to cooperate with the FBI. (Compl. ¶¶ 65-67.)

On November 2, 2010, Adondakis met with AUSAs Brodsky and Leibowitz, and FBI Agents Makol, Hinkle, and Komar, and admitted to trading on material non-public information regarding Dell (the "November 2, 2010 Meeting").  (Compl. ¶¶ 68-69.)  He implicated two other Level Global employees in insider trading, explaining that they also

---

[1] Rodriguez was, at the time, head of the Criminal Division of the FBI's New York field office.  Rojas was the Assistant Special Agent in Charge for the White Collar Branch of the FBI's New York field office.

received the information, knew its source, and traded on it.  During the November 2, 2010

Meeting, Adondakis explicitly denied ever informing Ganek that the information came from

corporate insiders.  (Compl. ¶ 70.)  Ganek alleges (upon information and belief) that the

participants in the November 2, 2010 Meeting shared the results of the interview with FBI

Agents Trask, Chaves, Carroll, Rojas and/or Rodriguez, and with AUSAs Berger, Garcia, Zabel,

Deputy US Attorney Johnson and/or US Attorney Bharara.  (Compl. ¶ 77.)

On November 19, 2010—the same day the *Wall Street Journal* reported that

federal insider-trading charges against financial professionals were imminent—Agent Trask

signed a 37-page affidavit outlining the evidence uncovered in the Government's investigation

(the "Affidavit").  (Compl. ¶¶ 80-83.)  The Affidavit stated that Adondakis "obtained Inside

Information from insiders at public companies through third-party consultants . . . . On Certain

occasions, ADONDAKIS provided this Inside Information to DAVID GANEK, . . . and GANEK

. . . executed and caused others to execute certain securities transactions based, in part, on the

Inside Information, and that ADONDAKIS informed GANEK . . . of the sources of the Inside

Information.  (Krause Decl. Ex. A, (ECF No. 45-1) at ¶ 13 (emphasis added).)[2]  In the same

paragraph, the Affidavit again stated that "ADONDAKIS  . . . informed GANEK . . . regarding

the sources of the Inside Information."[3]  Ganek maintains that Defendants fabricated the

Affidavit's allegation that Adondakis informed him of the sources of any inside information.

---

[2] See also Aff. ¶ 13 (At the November 2, 2010 Meeting, "ADONDAKIS . . . admitted his participation in obtaining Inside Information knowing that the Inside Information came directly and/or indirectly from public employees who were violating a duty of confidentiality that prohibited them from disclosing the information, providing the Inside Information to DAVID GANEK, ANTHONY CHIASSON, [NAME REDACTED], among others, at Level Global Investors who then executed . . . securities transactions based in part on the Inside Information, and exchanging that Inside Information with other individuals.") (emphasis added).

[3] The Affidavit defined "Inside Information" as "material, nonpublic information regarding certain public companies' quarterly earnings releases and other market moving events."  (Aff. ¶ 3.)

### The Raid on Level Global

On November 21, 2010, Trask presented the Affidavit to a magistrate as part of a search warrant application.  (Compl. ¶ 89.)  As a target of the warrant, Ganek's personal office, financial records, correspondence, photographs, address book, phone records, and cell phone would be subject to search.  (Compl. ¶ 91.)  The magistrate issued the search warrant.  The following morning, the Government executed it on Level Global as part of coordinated raids on certain hedge funds.  (Compl. ¶¶ 92-94.)  Two dozen agents searched Level Global's offices, seizing, inter alia, Ganek's personal files and cell phone.  (Compl. ¶ 105.)

Prior to executing the warrant, the Government alerted the *Wall Street Journal* that it would be raiding Level Global's offices.  Because the *Wall Street Journal* was "tipped off," it was able to publish photographs of FBI agents carrying boxes of documents from Level Global's office.  (Compl. ¶ 95.)  Only the Supervisor Defendants had the authority to alert the media.  (Compl. ¶ 98.)  Ganek alleges that the sole purpose of executing a highly publicized raid on his office (as opposed to issuing a subpoena), was to maximize publicity and damage his reputation. (Compl. ¶ 100.)  On the day of the raid, the Government provided Ganek's attorney with a copy of the warrant, but not the Affidavit.  (Compl. ¶ 106.)

### Level Global's Closure

On December 20, 2010, Level Global representatives met with Zabel, Chief of the Criminal Division, and AUSA Leibowitz to express concern about unnecessary damage inflicted on the firm.  (Compl. ¶ 110.)  Zabel and Leibowitz informed Level Global that the likely commercial consequences of the raid "had been carefully considered at the highest levels" before it was initiated.  (Compl. ¶ 110.)  In the wake of that rebuff, Ganek commissioned an

independent investigation by outside counsel.  In January 2011, the investigation concluded that Ganek did not engage in insider trading.  (Compl. ¶¶ 108-09, 112.)  Nevertheless, Level Global's investors were unnerved, and continued to have questions regarding the scope of the Government's investigation that Ganek could not answer because the Affidavit remained sealed. (Compl. ¶¶ 113-17.)

In a last-ditch effort to save his business, Ganek had one of his attorneys—a former AUSA in the Southern District of New York—reach out directly to Bharara.  On February 3, 2011 one or more of the FBI Defendants drafted a report about the November 2, 2010 Meeting (the "Report").  The Report reiterated the fabricated information: that Adondakis informed the agents that Ganek was "interested in the Dell information when Adondakis told [him] because the information came directly from contacts at Dell."  (Compl. ¶ 111.)  On February 4, 2011, Ganek's attorney informed Bharara that Level Global would close if the Government failed to clarify publicly that Ganek was not a target of the insider trading investigation.  (Compl. ¶¶ 119-21.)  Although Bharara promised to look into the matter, none of the Defendants followed up with Adondakis.  Three days later, Bharara explained to Ganek's attorney that although Bharara and his team understood that Level Global might be forced to close its doors, he would not intervene.  (Compl. ¶ 123.)  With his options exhausted, Ganek shut down Level Global on February 11, 2011.  (Compl. ¶ 128.)

On the same day that Level Global closed, AUSA Leibowitz and others met with Adondakis for the first time since the November 2, 2010 Meeting.  (Compl. ¶ 129.)  At that February 11, 2011 meeting, Adondakis reiterated that he never informed Ganek about his sources.  (Compl. ¶ 130.)  Ganek alleges that these facts were relayed to the Supervisor

Defendants, who failed to take any ameliorative action.  (Compl. ¶¶ 132-34.)

The <em>Newman</em> Trial

In January 2012, Bharara announced that the US Attorney's Office had filed charges against seven individuals, only one of whom had been employed by Level Global. (Compl. ¶¶ 135-37).  Bharara also unsealed an Information against Adondakis, who, unbeknownst to Ganek, had already pled guilty.  (Compl. ¶ 138.)  Ganek was not mentioned— much less indicted—in connection with any of the charges.  (Compl. ¶ 137.)

In March 2012, the district judge presiding over a criminal case relating to four of the charged individuals entered a protective order permitting disclosure of the Affidavit to the defendants, their counsel, and prospective witnesses and their counsel.  (Compl. ¶ 140.)  Through that protective order, Ganek's counsel obtained access to the Affidavit.  In November 2012, two of those charged individuals went to trial ("the Newman Trial").  Both Adondakis and Agent Makol testified at the Newman Trial regarding the November 2, 2010 Meeting.  Specifically, Adondakis testified that he "never told [Ganek]" about [his source within Dell]."  (Compl. ¶ 142 (citing November 28, 2012 trial testimony).)  Cross-examination elicited similar testimony:

> Q. Let's refer to Mr. Ganek specifically. I'd like to read [from the Report], if I may. "Chiasson and Ganek were both interested in the Dell information when Adondakis told them because the information came directly from contacts at Dell."  Is that true as to Mr. Ganek or not true?
>
> A. No, it's not true.

(Compl. ¶ 143.)  On December 10, 2012, Defendant Makol took the stand, corroborated Adondakis' trial testimony, and disclaimed responsibility for the Report's contents.  In particular, Makol testified:

> I recall from that meeting specifically at that meeting that there was confusion about

7

> this paragraph [of the Report] because I know coming away from that meeting that I didn't write the report. I was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell, so it was confusing.

And on subsequent questioning by the Government about the November 2, 2010 Meeting, Makol

gave the following testimony:

> Q. Separate and apart from that, what's written there, do you have a recollection of what Mr. Adondakis said during the initial proffer about what he told Mr. Ganek about the source of the inside information?
>
> A. Yes.
>
> Q. And what is that recollection?
>
> A. Mr. Adondakis did not say that he told Mr. Ganek that the Dell information was coming from a source inside Dell.

(Compl. ¶ 144.)  Until this trial testimony, Ganek alleges that Defendants' misconduct was not

fully revealed.[4]  Ganek filed this action on February 26, 2015.[5]

DISCUSSION

Defendants assert that the statute of limitations bars Ganek's claims and that his

Complaint fails to state a claim.

I.   Statute of Limitations

Defendants argue that Ganek's claims accrued on November 22, 2010—the day

Level Global was raided.  Ganek counters that they did not accrue until late 2012—when

---

[4] On December 10, 2014, the Court of Appeals overturned the Newman Trial jury's guilty verdict, and vacated the convictions of both defendants.  See United States v. Newman, 773 F.3d 438, 448 (2d Cir. 2014) ("[W]e find no support for the Government's contention that knowledge of a breach of the duty of confidentiality without knowledge of the personal benefit is sufficient to impose criminal liability.").

[5] Following motion practice by The New York Times Company seeking to unseal the search warrant and supporting affidavits, the district judge in the Newman Trial directed the Government to publicly file the redacted warrant materials on February 25, 2015.  United States v. Newman, 12-cr-121, ECF No. 434 (S.D.N.Y. Feb 25, 2015).

Adondakis and Agent Makol testified at the <u>Newman</u> Trial.

"The statute of limitations for <u>Bivens</u> actions arising in New York is three years." <u>Tapia-Ortiz v. Doe</u>, 171 F.3d 150, 151 (2d Cir. 1999).  Such claims typically accrue "at the time of injury," but they "will be equitably tolled so long as defendants' concealment of their wrongdoing prevented plaintiff from becoming aware of, or discovering through the exercise of reasonable diligence, his cause of action."  <u>Kronisch v. United States</u>, 150 F.3d 112, 123 (2d Cir. 1998); <u>see also</u> <u>Gonzalez v. Hasty</u>, 802 F.3d 212, 221 (2d Cir. 2015) ("<u>Bivens</u> . . . claims . . . typically are subject to a 'discovery-based trigger.'")

In support of their statute-of-limitations argument, Defendants rely principally on <u>Triestman v. Probst</u>, 897 F. Supp. 48 (N.D.N.Y. 1995).  In <u>Triestman</u>, the district judge approved a magistrate's recommendation that federal civil rights claims premised on false statements in a sealed affidavit accrued on the date of the search, even though the affidavit was unavailable to the plaintiff at the time.

<u>Triestman</u> is unpersuasive for several reasons.  First, <u>Triestman</u> conflicts with several decisions from other circuits.  <u>See</u> <u>Thomas v. McElroy</u>, 463 F. App'x 591, 592 (7th Cir. 2012) ("A claim asserting that a search violated the Fourth Amendment accrues—and the limitations period begins to run—as soon as the plaintiff knows, or should know, about the search <u>and the facts making it unlawful</u>.") (emphasis added); <u>Adrian v. Selbe</u>, 364 F. App'x 934, 937 (5th Cir. 2010) (holding that a <u>Bivens</u> claim accrued on the date plaintiff "had actual knowledge . . .  that [the affiant] allegedly lied in his affidavit"); <u>O'Ferrell v. United States</u>, 998 F. Supp. 1364, 1373-74 (M.D. Ala. 1998) (rejecting a statute of limitations defense where "it [was] uncontested that the search warrants were not unsealed until 1996.  Until then, [plaintiff]

could not have known who all had sworn to the match of the documents, or exactly what they swore to."). Second, analogous Sixth Amendment claims premised on an officer's fabrication of evidence "accrue[] when the alleged conduct has caused the claimant harm <u>and the claimant knows or has reason to know of the allegedly impermissible conduct</u> and the resulting harm." <u>Mitchell v. Home</u>, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005) (emphasis added). Such a rule makes sense here. And the coup de grâce dooming Defendants' reliance on <u>Triestman</u>, is the fact that the Second Circuit vacated that decision in a summary order. <u>See Triestman v. Probst</u>, 95-cv-682, ECF No. 12 (N.D.N.Y. Dec. 6, 1995).[6]

In short, Defendants' proffered approach would excise the doctrine of equitable tolling from <u>Bivens</u> claims, turning a statute of limitations into a strict statute of repose running from the date of an allegedly unlawful search. Generally, plaintiffs should not face the "Hobson's choice" of either prematurely bringing claims or forfeiting their legal rights. While Ganek may have first been injured on the date the search warrant was executed, it was not until after the Affidavit was unsealed that Ganek reasonably became aware of any <u>Bivens</u> claims. Accordingly, this lawsuit is timely.

II.   <u>Failure to State a Claim</u>

On a motion to dismiss, the factual allegations in a complaint are accepted as true and all reasonable inferences are drawn in Plaintiff's favor. <u>See Rescuecom Corp. v. Google Inc.</u>, 562 F.3d 123, 127 (2d Cir. 2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 663, 678 (2009) (citation omitted); <u>Nielsen v. Rabin</u>, 746 F.3d

---

[6] Notably, neither LexisNexis nor Westlaw report the Second Circuit's rejection of <u>Triestman</u>.

58, 62 (2d Cir. 2014).  However, a claim must rest on "factual allegations sufficient to raise a

right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007).  A pleading offering "labels and conclusions" or a "formulaic recitation of the elements

of a cause of action" fails to state a claim.  Iqbal, 556 U.S. at 678 (citation omitted).

Because this is a case against government officials, this Court must apply the

doctrine of qualified immunity.  "[Q]ualified immunity protects government officials from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555

U.S. 223, 231 (2009) (citation and internal quotations omitted).  "A defendant is entitled to

qualified immunity at the pleading stage if he can establish (1) that the complaint fails to

plausibly plead that the defendant personally violated the plaintiff's constitutional rights, or (2)

that the right was not clearly established at the time in question."  Turkmen v. Hasty, 789 F.3d

218, 246 (2d Cir. 2015).  "Where qualified immunity is clearly warranted at the second step of

analysis, courts may simply rule on that basis without employing 'scarce judicial resources to

resolve difficult and novel questions of constitutional or statutory interpretation that will have no

effect on the outcome of the case.'"  DiStiso v. Cook, 691 F.3d 226, 240 (2d Cir. 2012) (quoting

Ashcroft v. al–Kidd, 563 U.S. 731 (2011)).  However, Defendants must overcome "a formidable

hurdle" when raising qualified immunity at the pleadings stage.  Field Day, LLC v. County of

Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006); see also Schiller v. City of New York, No. 04-cv-

7922, 2009 WL 497580, at *7 (S.D.N.Y. Feb. 27, 2009) ("[C]ourts are reluctant to find that

defendants are entitled to qualified immunity at the initial stages of the pleadings.")

A.  Fourth Amendment Violation

The Fourth Amendment to the Constitution enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and establishes that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  Ganek argues that (1) the search lacked probable cause, and (2) the search was conducted in an unreasonable manner.

1.  Probable Cause

The Fourth Amendment's probable cause and particularity requirements combat the "evils" of "indiscriminate searches and seizures conducted under the authority of 'general warrants.'"  Payton v. New York, 445 U.S. 573, 583 (1980).   "[P]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (internal citation omitted).  Accordingly, a nexus must exist between the items sought and the particular place to be searched.  See Clark, 638 F.3d at 94.  To challenge the finding of probable cause underlying a search warrant, Ganek must plead: (1) that government agents knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in a warrant application; and (2) "that such statements or omissions were necessary to the finding of probable cause."  Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994).

a.  False Statements and Omissions

Defendants argue that the plain language of the Affidavit belies Ganek's claims

12

that the statements about him were "fabricated."  The relevant portions of the Affidavit state that "Adondakis informed Ganek . . . of the sources of the Inside Information."  Defendants focus on the fact that "Inside Information" was a defined term, which referred to inside information generally and did not mention Dell.  Because the trial testimony of Makol and Adondakis only addressed inside information regarding Dell, Defendants argue that the statements in the Affidavit were not false.

This argument misses the mark.  The plain language of the Affidavit states that Ganek was informed of the sources of all "Inside Information."  But trial testimony indicated that Adondakis did not inform Ganek of any source of "Inside Information" as defined by the Affidavit.  And Adondakis allegedly told Defendants he could not implicate Ganek in any insider trading.  Ganek has adequately pled that the Affidavit contained materially false statements and/or omissions.[7]

### b.  Relevance

Even if Ganek adequately alleges a false statement, Defendants argue that the Fourth Amendment claim still should be dismissed because the false statement was unnecessary to the magistrate's probable cause finding.  This argument relies on the "corrected affidavit" doctrine, which entitles defendants to qualified immunity "unless the false statements in the

---

[7]  Defendants argue that Ganek is burdened with making "a substantial showing of a false statement" at this stage of the case.  Defendants borrow that language from Franks v. Delaware, 438 U.S. 154, 165 (1978)—the seminal case addressing the showing a criminal defendant must make in order to obtain an evidentiary hearing on a motion to suppress.  While Defendants' argument finds some support (see Velardi, 40 F.3d at 573), such a rule would be in tension with Fed. R. Civ. P. 12(b)(6), which requires this Court to accept well-pled allegations as true.  Cf. Walker v. Mendoza, No. 00-CV-93(JG), 2000 WL 915070, at *3 (E.D.N.Y. June 27, 2000) ("[Plaintiff] has alleged that [defendant] intentionally made false statements that were necessary to the finding of probable cause with respect to all of the charges. Taking these allegations as true, as [the court] must, . . . [plaintiff] has stated a claim for false arrest.")  But even under Defendants' proposed standard, this Court would find that the Affidavit and Newman Trial testimony suffice to make such a showing at this stage.

affidavit were necessary to the finding of probable cause." Southerland v. City of New York, 680 F.3d 127, 143 (2d Cir. 2012) (quotation and citations omitted).  Making such a determination requires courts to "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported the finding [of probable cause]." Southerland, 680 F.3d at 143-44 (quotations, citation and brackets omitted).  "The materiality of a misrepresentation or an omission in this context is a mixed question of law and fact" requiring courts to assess the relevance of the misleading information under controlling law, and requiring the finder of fact to determine "the weight that a neutral magistrate would likely have given such information." Velardi, 40 F.3d at 574.

Under Southerland, the hypothetical "corrected affidavit" would not only excise the allegedly false material—references to Ganek being informed of the sources of the inside information—it would "supply any omitted information" —that when Adondakis met with Defendants at the November 2, 2010 Meeting, he specifically informed them that he never told Ganek his sources.  (See, e.g., Compl. ¶ 86.)  Certainly, such changes would be relevant to a magistrate's determination of whether to authorize a search of, among other things, Ganek's computers, cell phone, and "all emails and documents authored by, sent to, and/or received from David Ganek."  (Aff. Attachments A, B.)  Moreover, the Affidavit states that Defendants were seeking evidence from "participants in fraudulent schemes" and treats Ganek just like those individuals identified by Adondakis as having known the sources of the Inside Information.  (Aff. ¶¶ 19-20.)

Essentially, Defendants posit that probable cause existed to search all of Ganek's personal devices and emails stored at his office—treating him as if he were directly implicated in

an insider trading scandal—even though the Government's sole witness disclaimed that Ganek was aware of the source of the Inside Information.  Given the tremendous amount of personal information such a search would likely ensnare, the argument that a corrected affidavit would not have been relevant to the magistrate's determination is unpersuasive.  Cf. United States v. Cioffi, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) (suppressing overbroad warrant permitting a search of criminal defendant's personal email, recognizing that "[t]he risk of exposing intimate (and innocent) correspondence to prying eyes is magnified because computers often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize") (quotations, brackets and ellipses omitted).  Indeed, "probable cause to search must be based on particularized information about the place to be searched, not simply on a target's mere propinquity to others independently suspected of criminal activity."  Walczyk v. Rio, 496 F.3d 139, 162-63 (2d Cir. 2007).  In short, the changes in a hypothetical "corrected affidavit" would bear on the "totality of the circumstances" on which the magistrate assessed probable cause and the breadth of the warrant.  See McColley v. Cty. of Rensselaer, 740 F.3d 817, 824 (2d Cir. 2014).  Accordingly, Ganek states a claim for violation of the Fourth Amendment's probable cause requirement.[8]

2.  Reasonableness

Ganek's Fourth Amendment claim also challenges the "reasonableness" of the

---

[8] Defendants advance other arguments to explain the discrepancy between the Affidavit and the trial testimony, and argue that Ganek's claim is implausible.  For example, Defendants posit: (1) that they may simply have had different understandings of Adondakis' comments at the November 2, 2010 Meeting, (2) it would make no sense for Agent Makol to help fabricate evidence in the Affidavit but testify to the contrary at the Newman Trial, and (3) that it is implausible that Agent Trask—the affiant who was not present at the November 2, 2010 Meeting—would have known that the Affidavit contained false or misleading statements.  While discovery may lend credence to these arguments, it would be inappropriate for this Court to credit them on a motion to dismiss.

method by which the Government conducted the search.  "[T]he Fourth Amendment's proscription of unreasonable searches and seizures not only prevents searches and seizures that would be unreasonable if conducted at all, but also ensures reasonableness in the manner and scope of searches and seizures that are carried out."  Lauro v. Charles, 219 F.3d 202, 209 (2d Cir. 2000) (quotations, ellipses, and brackets omitted).  Ganek alleges that it was "unreasonable": (1) for the Government to use a "raid" rather than subpoenas to search Level Global and (2) for the Government to tip off the *Wall Street Journal* in advance of the raid.

a.  Utilization of a Search Warrant

Defendants argue that the decision to execute a search warrant rather than issue a subpoena was justified by exigent circumstances.  The Affidavit affirms that "on November 19, 2010, a confidential source . . . who works at a hedge fund . . . informed the FBI that [a] supervisor directed him to delete and discard evidence."  (Aff. ¶ 17.)  The Complaint does not contravene that assertion.  More importantly, Ganek does not cite any authority establishing that the decision to use a search warrant rather than a subpoena can be considered a Fourth Amendment violation.  The Supreme Court rejected that argument in Zurcher v. Stanford Daily, 436 U.S. 547 (1978).  There, the Court held that police officers who executed a search warrant on a newspaper publisher did not violate the Fourth Amendment, even though the newspaper staff were not criminal suspects and the police could have issued a subpoena duces tecum:

> The Fourth Amendment has itself struck the balance between privacy and public need, and there is no occasion or justification for a court to revise the Amendment and strike a new balance by denying the search warrant in the circumstances present here and by insisting that the investigation proceed by subpoena duces tecum, whether on the theory that the latter is a less intrusive alternative or otherwise.

<u>Zurcher</u>, 436 U.S. at 559.[9]   Thus, it is not "clearly established" that Defendants' decision to

resort to a search warrant rather than a subpoena would violate Ganek's constitutional rights.  To

the contrary, Supreme Court precedent establishes that it is not a violation.[10]

### b.   The *Wall Street Journal* "Tip"

Ganek argues that Defendants notified the *Wall Street Journal* of the impending

raid for the sole purpose of inflicting additional harm on his business for personal and political

objectives.  Even accepting that allegation as true, Defendants argue that they are entitled to

qualified immunity because it was not "clearly established" that tipping the news media would

violate Ganek's constitutional rights.  Moreover, Defendants posit that publicizing the raid in the

financial media underscored the Government's initiative against insider trading, and the

importance of deterring wrongdoing on Wall Street.

In <u>Lauro v. Charles</u>, the Second Circuit held that the Fourth Amendment forbids

the police from making a suspect perform a staged "perp walk" for the press if the walk serves

no other law enforcement purposes.  219 F.3d 202, 203 (2d Cir. 2000).  <u>Lauro</u> distinguished

between the "common[ cases in which an] arrestee is filmed while in the normal course of being

transferred" (in which case "the police may . . . notify the press that the arrestee will be moved,

and is thus available for photographing, at a particular time") and cases in which the perp walk is

"staged . . . at the request of the press, for no reason other than to allow him to be photographed."

---

[9] <u>Zurcher's</u> holding was subsequently limited by statute, but only in the context of "government searches for documents and materials that are <u>intended for publication</u>."  <u>Sennett v. United States</u>, 667 F.3d 531, 535 (4th Cir. 2012) (discussing the Privacy Protection Act).

[10] That is not to say that the decision to execute a search warrant is necessarily irrelevant to a finding of reasonableness under the totality of the circumstances.  <u>See</u> <u>Zurcher</u>, 436 U.S. at 570 ("[T]he magistrate must judge the reasonableness of every warrant in light of the circumstances of the particular case, carefully considering the description of the evidence sought, the situation of the premises, and the position and interests of the owner or occupant.") (Powell, J., concurring).

Lauro, 219 F.3d 204.  While the principles outlined in Lauro apply here, namely that there

should generally be a legitimate, specific law enforcement rationale justifying media presence,

the facts of Lauro were markedly different:

> [After being lawfully arrested], Lauro was physically restrained, by handcuffs and
> by the grip of Detective Charles on his arm. In that humiliating position, he was
> made to walk outside the precinct house, was driven around the block, and was then
> forced to walk back into the precinct house, in front of television cameras.

Lauro, 219 F3d at 212.  In contrast, here the media was documenting the execution of a search

warrant rather than a staged event.

Ganek's reliance on Wilson v. Layne, 526 U.S. 603 (1999), and Ayeni v. Mottola,

35 F.3d 680 (2d Cir. 1994), is similarly misplaced.  In those cases, television cameras or

newspaper photographers recorded individuals and their personal effects inside their homes

during a search.  Here, even accepting Ganek's allegations as true, the *Wall Street Journal*

reporters did not enter a private home or play any direct role in the investigation.  Moreover, it

cannot be said that it is "clearly established" that advising the media that a search warrant would

be executed violates the Fourth Amendment's prohibition on unreasonable searches and seizures,

even if Defendants could have conceivably used a subpoena duces tecum.  At a minimum,

Defendants are entitled to qualified immunity on this claim.

B.  Fifth Amendment Violation

The Fifth Amendment to the Constitution establishes that "[n]o person shall . . .

be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

"[T]he touchstone of due process is protection of the individual against arbitrary action of

government."  Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v.

McDonnell, 418, U.S. 539, 558 (1974)).

Supreme Court precedent separately categorizes the protections afforded by the Due Process Clause as "procedural due process" (i.e., "a denial of fundamental procedural fairness") and "substantive due process" (i.e., "the exercise of power without any reasonable justification in the service of a legitimate governmental objective").  Cty. of Sacramento, 523 U.S. at 845-46.  Ganek alleges both procedural due process and substantive due process violations.

1.   Procedural Due Process

The Second Circuit has recognized, in the context of a "procedural" due process claim, that there is a "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity."  Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages.")  As discussed in the Fourth Amendment analysis, Ganek plausibly alleges that the non-Supervisor Defendants fabricated evidence by misrepresenting in the Affidavit what Adondakis said during the November 2, 2010 Meeting.  And while typical Fifth Amendment manufactured-evidence claims allege deprivation of liberty, Ganek's claim focuses on deprivation of property—another enumerated interest protected by the Fifth Amendment. Specifically, Ganek alleges that he was deprived of: (1) his business and reputation (though this could be construed as a property/liberty hybrid), and (2) tangible property seized in the Level Global raid.

19

a.   <u>Reputational and Business Harm</u>

The "[l]oss of one's reputation can . . . invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." <u>Patterson v. City of Utica</u>, 370 F.3d 322, 329-30 (2d Cir. 2004).  Such claims are commonly referred to as "stigma-plus" claims.  <u>Patterson</u>, 370 F.3d at 330.  To state a stigma-plus claim, a plaintiff must allege: "(1) the utterance of a statement about [him] that is injurious to [his] reputation, that is capable of being proved false and he or she claims is false; and (2) some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." <u>Velez v. Levy</u>, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks omitted); <u>accord</u> <u>Segal v. City of N.Y.</u>, 459 F.3d 207, 212 (2d Cir. 2006).  "The defamatory statement must be sufficiently public to create or threaten a stigma."  <u>Velez</u>, 401 F.3d at 87.  The second prong— the "plus"—"must be a specific and adverse action clearly restricting the plaintiff's liberty." <u>Velez</u>, 401 F.3d at 87-88.  While the "plus" alleged is often termination of employment, it also applies to "termination of some other legal right or status."  <u>White Plains Towing Corp. v. Patterson</u>, 991 F.2d 1049, 1063 (2d Cir. 1993) (citation, quotations and brackets omitted).

Defendants argue that Ganek fails to allege a stigmatizing statement, pointing out that Ganek does not identify any public false statements by a government official (much less a Defendant) that could underpin a stigma-plus claim.  Indeed, in the press reports cited by Ganek, the only particularized statement made by a government agent was by a non-party FBI agent who stated that "[t]he FBI is executing court-authorized search warrants in an ongoing investigation."

(Krause Decl. Ex. E, ECF No. 45-5.)  Not only was that statement true,[11] it was no more

stigmatizing than Level Global's own statement (in the same *Wall Street Journal* article)

"confirm[ing] that agents from the Federal Bureau of Investigations visited our office this

morning as part of what we believe to be a broader investigation of the financial services

industry discussed in media reports over the weekend."  (Krause Decl. Ex. E.)

        Ganek also implies that the misstatements in the Affidavit itself could be the basis

of a stigmatizing statement, despite the fact that the Affidavit was under seal.  This argument

finds support in a handful of Second Circuit decisions clarifying that a stigmatizing statement

need not be disclosed to the general public if it could "be disseminated widely enough to damage

the [plaintiff]."  Brandt v. Bd. of Co-op. Educ. Servs., Third Supervisory Dist., Suffolk Cty.,

N.Y., 820 F.2d 41, 45-46 (2d Cir. 1987) (holding that stigmatizing comments in an employee's

personnel file were sufficient to satisfy any "public disclosure" requirement of a stigma-plus

claim due to the likelihood that they would be disclosed to prospective employers); see also

Valmonte v. Bane, 18 F.3d 992, 1000 (2d Cir. 1994) (holding that a plaintiff's inclusion on a

nonpublic register of suspected child abusers could serve as a stigmatizing statement because it

could be disclosed to potential employers).

        Here, Ganek alleges that the Affidavit contained an injurious false statement—

namely, that Ganek knowingly traded on information from corporate insiders.  While the

statement may have been directly disseminated only to the magistrate and other government

officials, it arguably had a stigmatizing effect.  It was calculated to buttress probable cause,

---

[11] "[T]rue public statements that a party is under investigation, or in this case a statement merely indicating that charges are pending, are not 'stigmatizing.'"  Rinaldi v. City of New York, No. 13-cv-4881 (LAK) (JLC), 2014 WL 2579931, at *8 (S.D.N.Y. June 10, 2014) (quotation and citation omitted), report and recommendation adopted, No. 13-cv-4881 (LAK), 2014 WL 4626076 (S.D.N.Y. Sept. 15, 2014).

which in turn led a magistrate to issue the warrant, precipitating a very public raid on Ganek's office.  Indeed, news of the raid flashed across the world.[12]  In this way, it could be at least as publicly stigmatizing as the statement in the employment file in Brandt, or the inclusion of the plaintiff on a child abuse registry in Valmonte.

However, under controlling precedent, Ganek cannot satisfy the "plus" prong.  "[D]efamation is not by itself a deprivation of a liberty interest unless coupled with the termination of government employment or deprivation of some other legal right or status."  Valmonte, 18 F.3d at 1000 (quotation and citation omitted).  "[D]eleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine."  Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004).  "[D]eprivation of the good will" in a business that "discourage[s] customers from availing themselves of the Plaintiffs' [business]" is not a "plus" "in addition to the alleged defamation but rather [a] direct deleterious effect[] of that deprivation."  Sadallah, 383 F.3d at 38-39.  But Ganek's stigma-plus claim seeks to recover on precisely such a theory.  This case is not legally distinguishable merely because Level Global was a "multi-billion dollar investment fund" (Opp'n at 40) as opposed to the restaurant and banquet hall that was allegedly defamed in Sadallah.  Accordingly, Ganek fails to plead a "stigma-plus" due process claim.

---

[12] See, e.g., Susan Pulliam et al., *Hedge Funds Raided in Probe—FBI Agents Seize Documents in 3 Cities as Insider-Trading Investigation Widens*, WALL ST. J., Nov. 23, 2010, at A1; *FBI raids three hedge funds in insider trading case*, Reuters, Nov. 23, 2010, http://www.reuters.com/article/uk=hedgefunds-fbi-idUSLNE6AM01N2010 1123; Peter Lattman & Azam Ahmed, *F.B.I. Agents Raid 3 Hedge Fund Offices*, N.Y. TIMES, Nov. 22, 2010, http://dealbook.nytimes.com/2010/11/22/f-b-i-agents-raid-2-hedge-funds-offices; Patricia Hurtado & Saijel Kishan, BLOOMBERG, *FBI Raids Said to Stem From Hedge Fund Insider Probes*, Nov. 22, 2010, http://www.bloomberg .com/news/articles/2010-11-22/diamondback-capital-s-offices-in-connecticut-searched-by-fbi-agency-says; Zachary A. Goldfarb, WASH. POST., *FBI raids hedge funds Level Global, Diamondback and Loch Capital in insider-trading probe*, Nov. 22, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/11/22/AR2010112204613.html.

b.  <u>Tangible Property</u>

"An unauthorized intentional deprivation of property by a [government]

employee does not constitute a [procedural due process] violation . . . if a meaningful

postdeprivation remedy for the loss is available."  <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984);

<u>see also</u> <u>Stuto v. Fleishman</u>, 164 F.3d 820, 825 (2d Cir. 1999) ("[T]he negligent or intentional

deprivation of property through the random and unauthorized acts of a state or federal employee

does not constitute a deprivation of due process if a meaningful postdeprivation remedy for the

loss is available.") (quotations and citation omitted).  Fed. R. Crim. P. 41(g) provides that "[a]

person aggrieved by an unlawful search and seizure of property or by the deprivation of property

may move for the property's return."  Defendants argue that this forecloses Ganek's procedural

due process claim—at least as it relates to the seizure of his personal property—because Rule

41(g) provided Ganek with an "adequate post-deprivation remedy."

Ganek asserts that the authorities Defendants rely on are inapposite because they

address "random and unauthorized" deprivations by "lower echelon . . . employees" without

"final authority over significant matters."  <u>DiBlasio v. Novello</u>, 344 F.3d 292, 302 (2d Cir.

2003).  In <u>DiBlasio</u>, the Commissioner of the New York State Department of Health issued a

press release indicating that the plaintiff, a radiologist, had been suspended from practice based

on a finding of incompetence and "criminal[]" behavior.  <u>DiBlasio</u>, 344 F.3d at 295.  Dr.

DiBlasio sued Commissioner Novello, asserting, among other things, a procedural due process

violation.  The Second Circuit rejected the Commissioner's argument that "adequate" post-

deprivation procedural remedies could address a procedural due process violation where the

"government actor in question is a high ranking official with final authority over significant

matters." <u>DiBlasio</u>, 344 F.3d at 302.  The Second Circuit emphasized "that due process dictates that persons ordinarily deserve some kind of hearing <u>prior</u> to the deprivation . . . and that it is only where the state is effectively unable to anticipate and prevent a random deprivation . . . that post deprivation remedies might satisfy due process."  <u>Velez v. Levy</u>, 401 F.3d 75, 91 (2d Cir. 2005) (discussing <u>DiBlasio</u>) (citations, brackets and quotations omitted).

Here, the Defendants are not low-level employees who engaged in a "random and unauthorized" seizure of Ganek's property; they were highly trusted government agents and attorneys operating within the framework of a multi-year investigation touted by Bharara as a "top criminal priority" for his office.[13]  Moreover, Ganek alleges that Defendants not only foresaw the potential consequences of their actions, but that they affirmatively acknowledged the harms and disregarded them.  (<u>See</u> Compl. ¶ 110 (alleging admission that the consequences of the raid "had been carefully considered at the highest levels" before it was executed).)  Further, it is of no moment that the authorities cited by the parties analyze deprivations of liberty rather than property, as the Fifth Amendment does not distinguish between these constitutionally protected interests.  In short, based on the allegations in the Complaint, this Court cannot conclude that Rule 41(g) forecloses Ganek's procedural due process claims.  Because Ganek adequately pleads that the seizure of his personal items was premised on fabricated evidence, he states a Fifth Amendment procedural due process claim.[14]

---

[13] (Krause Decl. Ex. C (ECF No 45-3) at 4.)

[14] This Court views Ganek's Fifth Amendment due process fabrication claim through the lens of a procedural due process analysis, and acknowledges that some courts have held that "procedural due process claims cannot be predicated upon the same factual basis as [] Fourth Amendment . . . claims."  <u>Levantino v. Skala</u>, 56 F. Supp. 3d 191, 203 (E.D.N.Y. 2014).  But the issue of whether Ganek's due process fabrication claim will be absorbed by the Fourth Amendment probable cause claim is a question that cannot be resolved on this motion.

2.   <u>Substantive Due Process</u>

"[F]or executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  <u>Bolmer v. Oliveira</u>, 594 F.3d 134, 142 (2d Cir. 2010) (quotations and citation omitted); <u>see also</u> <u>Johnson v. Newburgh Enlarged Sch. Dist.</u>, 239 F.3d 246, 252 (2d Cir. 2001) ("[M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.  Such acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency.")  "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."  <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994).  In determining whether conduct is "conscience shocking" in the context of a qualified immunity defense on the pleadings, courts analyze whether the "conduct [was] (1) maliciously and sadistically employed in the absence of a discernible government interest and (2) of a kind likely to produce substantial injury."  <u>Johnson v. Newburgh Enlarged Sch. Dist.</u>, 239 F.3d 246, 252 (2d Cir. 2001).

Defendants posit that this Court need not reach the issue of whether their alleged conduct was "conscience shocking," arguing that Ganek's "substantive due process claim . . . merges with his Fourth Amendment claim because the former claim arises from the same set of actions that allegedly violated his Fourth Amendment rights."  <u>Maliha v. Faluotico</u>, 286 F. App'x 742, 744 (2d Cir. 2008).  This argument is buttressed by a line of Supreme Court decisions, starting with <u>Graham v. Connor</u>, 490 U.S. 386 (1989).  Specifically, <u>Graham</u> held that an excessive force claim arising out of an unlawful seizure should be analyzed as a Fourth

Amendment violation, reasoning that "[b]ecause the Fourth Amendment provides an explicit

textual source of constitutional protection against this sort of physically intrusive governmental

conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be

the guide for analyzing these claims." 490 U.S. at 394-95; accord Albright v. Oliver, 510 U.S.

266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of

constitutional protection against a particular sort of government behavior, that Amendment, not

the more generalized notion of 'substantive due process,' must be the guide for analyzing these

claims.") (quotations and citation omitted).  In deciding those cases, the Court expressed its

"reluctant[ance] to expand the concept of substantive due process because the guideposts for

responsible decisionmaking in this unchartered area are scarce and open-ended." Albright, 510

U.S. at 271-72.

       Ganek argues that Graham and its progeny are inapposite because "the entirety of

Defendants' misconduct . . . exceeds what is cognizable under the Fourth or Fifth Amendments

alone."  (Plaintiff's Br. at 42.)  In other words, he should not be cabined to a Fourth Amendment

or Fifth Amendment procedural due process claim where the alleged misuse of authority extends

beyond the fabricated evidence undergirding the search and seizure.  Nevertheless, where a claim

can be analyzed through the explicit text of the Fourth or Fifth Amendment, the Supreme Court

instructs that it must be analyzed as such.  Thus, because Ganek's fabricated evidence claim is

cognizable under the Fourth Amendment's probable cause requirement (and arguably the Fifth

Amendment's procedural due process protections), this Court need not reach for a substantive

due process claim.

C.  Failure to Intercede

Ganek brings failure to intercede (or failure to intervene) claims against all Defendants.  "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. . . . In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring."  Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  A plaintiff must plausibly plead that "the failure to intercede was a proximate cause of the harm."  Bah v. City of New York, No. 13-cv-6690 (PKC), 2014 WL 1760063, at *7 (S.D.N.Y. May 1, 2014); accord O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).

The non-Supervisor Defendants argue that the failure to intercede claim against them is "entirely duplicative" of the underlying Fourth and Fifth Amendment claims.  But this Court reads Ganek's failure to intercede claim as being pled in the alternative.  For example, if certain defendants took a more active role in shaping the Affidavit, they might be found directly liable for violating Ganek's constitutional rights, while other defendants may have simply had a realistic opportunity to intervene before the Affidavit was submitted to the magistrate.  See Ricciuti, 124 F.3d at 128-29 (holding that failure to intercede liability could arise from officers "cooperating" with a false arrest based on an allegedly fabricated confession despite "kn[owing] there was no probable cause to justify the arrest").  While such distinctions may have few practical implications, this Court sees no reason to dismiss Ganek's failure to intercede claims against the non-Supervisor Defendants at this stage.

Ganek's failure to intercede allegations against the Supervisor Defendants are

somewhat more elliptical.  For example, Ganek theorizes that the Supervisor Defendants' duty to intercede obligated them to correct the misrepresentations in the Affidavit submitted to the magistrate, noting that "[c]andor to the Court, though desirable under any circumstances, is mandated in ex parte proceedings, where the Court is deprived of the benefits of the dialectic of the adversary system."  In re Dinova, 212 B.R. 437, 447 (B.A.P. 2d Cir. 1997) (quotations and citations omitted).  See also Morales v. Portuondo, 165 F. Supp. 2d 601, 612 (S.D.N.Y. 2001) ("While all lawyers owe a duty of honesty and candor to the Court, this obligation lies most heavily upon [prosecutors] who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially.") (quotations and citation omitted).

Ganek's general premise resonates with this Court.  Unquestionably, there are circumstances where government agents would be ethically and constitutionally obligated to correct misrepresentations made in a warrant application.   But it is unclear how the failure to notify the magistrate, after the warrant was executed, could be the proximate cause of Ganek's alleged constitutional injuries.  That may be a wide synapse for Ganek to bridge.  The Government applied for the warrant on Sunday, November 21, 2010, and the magistrate granted it.  The search warrant was executed on Monday morning.

Ganek also proffers that Defendants—particularly Bharara (with whom Ganek's attorney spoke personally), and Zabel and Leibowitz (with whom Ganek's attorneys met personally)—should have publicly clarified that Ganek, and Level Global generally, were not the targets of the insider trading investigation after learning that the Affidavit misrepresented Adondakis' proffer during the November 2, 2010 Meeting.  Certainly, government attorneys are ethically obligated to limit the collateral damage resulting from government investigations.  C.f.

28

S.E.C. v. Caledonian Bank Ltd., No. 15-cv-894, --- F.Supp.3d ----, 2015 WL 6971535, at *17 (S.D.N.Y. Nov. 10, 2015) ("During an ex parte proceeding to freeze assets, where the adversary process is not in play, the SEC has an obligation to timely alert the court to foreseeable collateral damage."); Gate Guard Servs., L.P. v. Perez, 792 F.3d 554, 555 (5th Cir. 2015) ("When the government acknowledges mistakes, it preserves public trust and confidence.  It can start to repair the damage done by erroneously, indeed vindictively, attempting to sanction an innocent business.").[15]  Indeed, the U.S. Attorney's Manual commands that prosecutors consider "collateral consequences, including whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable" when contemplating the prosecution of business organizations.  US Attorney's Manual 9-28.300 A.8, available at https://www.justice.gov/usam/usam-9-28000-principles-federal-prosecution-business-organizations#9-28.100.

These general principles reinforce Ganek's argument that the duty to intercede could apply to the case at hand.  The duty to intercede has been expressed broadly by the Second Circuit:  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official."  Anderson, 17 F.3d at 557.  Here, Ganek plausibly pleads that the Supervisor Defendants could have prevented a

---

[15] Notably, the SEC agreed to return $21.5 million to Level Global's former investors and management company.  See SEC v. Adondakis, 12-cv-409, ECF No. 139 (S.D.N.Y. Jan 25, 2016) (letter from the SEC noting that the SEC "does not oppose" Level Global's motion to vacate the judgment entered against it); Aruna Viswanatha, *SEC Expected to Give Unusual Refund for Insider-Trading Penalty*, WALL ST. J., Jan. 25, 2016, http://on.wsj.com/1WLnMfa ("The Securities and Exchange Commission is expected to refund a $21.5 million settlement that hedge fund Level Global entered into in 2013 to resolve allegations that it profited from trades on corporate secrets about Dell Inc. and other technology firms.  Experts said that the refund may be unprecedented.")

significant amount of the harm caused by the alleged Fourth Amendment violation if they had learned—prior to Level Global's closure—that the search of Ganek's office had been predicated on false evidence.

Defendants challenge Ganek's proposed remedy, arguing that there is no "clearly established constitutional right" to public exoneration and therefore Defendants are entitled to qualified immunity.  But as Ganek points out, courts have recognized a constitutional obligation to protect an individual when a "governmental entity itself has created or increased the danger to the individual."  Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993).  At the pleadings stage, it would be premature for this Court to address the manner in which government agents should have intervened.  And Defendants cite no authority to the contrary.  Whether the Supervisor Defendants are entitled to qualified immunity on such grounds is a better question for summary judgment.  Accordingly, the Supervisor Defendants' motion to dismiss the failure to intercede claim is denied.

      D.   Supervisor Defendants' Liability

"[A] federal tortfeasor's Bivens liability cannot be premised on vicarious liability. Thus, Plaintiffs must plausibly plead that each Defendant, through the official's own individual actions, violated Plaintiffs' constitutional rights.  In other words, Bivens relief is available only against federal officials who are personally liable for the alleged constitutional tort.  Iqbal precludes relying on a supervisor's mere knowledge of a subordinate's mental state (i.e., discriminatory or punitive intent) to infer that the supervisor shared that intent.  But that is not to say that where the supervisor condones or ratifies a subordinate's discriminatory or punitive actions the supervisor is free of Bivens's reach."  Turkmen, 789 F.3d at 233.  In short, Ganek

must plausibly plead that the Supervisor Defendants acted "deliberately or recklessly" with regard to the fabricated evidence against Ganek.

The Second Circuit's <u>Turkmen</u> decision offers some guidance.  In <u>Turkmen</u>, detainees incarcerated after the September 11, 2001 terrorist attacks brought <u>Bivens</u> claims against the former Attorney General and FBI Director.  Those defendants argued that they merely set policies within constitutional bounds, and had a right to presume that their policies would be lawfully implemented.  The Second Circuit agreed that "the DOJ Defendants had a right to presume that subordinates would carry . . . out [facially constitutional] policies in a constitutional manner." <u>Turkmen</u>, 789 F.3d at 238.  Nevertheless, the Second Circuit overturned the district judge's decision dismissing claims against those high-level supervisor defendants, and found that their receipt of reports regarding the alleged misconduct, discussions of concerns with other government officials, and widespread media attention "support[ed] the reasonable inference that not only w[ere defendants] aware of some of the conditions imposed, but affirmatively supported them." <u>Turkmen</u>, 789 F.3d at 239-40.[16]  And despite acknowledging a lack of certainty, the Second Circuit found that plausible allegations of "a steady stream of information" flowing from lower level agents to the high level supervisors sufficed at the pleading stage.  Similarly, the Second Circuit held that "[i]t seems quite plausible that [lower-level] DOJ officials would confer with the Attorney General and the Director of the FBI

---

[16] <u>See also</u> <u>Turkmen</u>, 789 F.3d at 239-40 ("At a minimum, a steady stream of information regarding the challenged conditions flowed between the [defendants unconstitutionally implementing policy] and senior DOJ officials. Given the . . . Plaintiffs' allegations, the media coverage of conditions . . . , and the DOJ Defendants' announced central roles . . . , it seems to us plausible that information concerning [unconstitutional] conditions . . . reached the DOJ Defendants.").

[regarding potentially unconstitutional and problematic issues] in contravention of Ashcroft's stated policy.  Indeed, it seems to us <u>implausible</u> they did not."  <u>Turkmen</u>, 789 F.3d at 241-42.[17]

Both sides argue that <u>Turkmen</u> is in accord with their positions.  For Defendants, <u>Turkmen</u> is a unique case that turned on the Second Circuit's consideration of a detailed internal report issued by the Office of the Inspector General (the "OIG Report").  And because the OIG Report was undoubtedly central to the Second Circuit's analysis,[18] Defendants argue that Ganek's inability to corroborate his claims against the Supervisor Defendants with equivalent evidence renders his allegations similar to those deemed insufficient by the Supreme Court in <u>Iqbal</u>.  Ganek counters that <u>Turkmen</u> bolsters his case, noting that in <u>Turkmen</u> the alleged constitutional violations involved heightened <u>mens rea</u> elements, requiring plaintiffs to plead that defendants had both personal knowledge of the allegedly unconstitutional practices <u>and</u> discriminatory intent.  According to Ganek, the fact that the Second Circuit found the <u>Turkmen</u> allegations sufficient—despite a lack of allegations establishing that the high-level defendants knew anything about the conditions of any particular plaintiff—serves to highlight the sufficiency of the allegations here, where Ganek alleges facts establishing the Supervisor Defendants' direct involvement.

---

[17] Unlike the plaintiffs in <u>Turkmen</u>, Ganek does not seek to extend the reach of <u>Bivens</u> liability into a new arena.  <u>See</u> <u>Turkmen</u>, 789 F.3d at 265 (Raggi, J., concurring in part in judgment and dissenting in part) ("Today, our court becomes the first to hold that a <u>Bivens</u> action can be maintained against the nation's two highest ranking law enforcement officials—the Attorney General of the United States and the Director of the Federal Bureau of Investigation[]—for policies propounded to safeguard the nation in the immediate aftermath of the infamous al Qaeda terrorist attacks of September 11, 2001.").  As Judge Raggi recognized, <u>Bivens</u> liability applies in Fourth Amendment actions such as this one, but has an extremely "[n]arrow [s]cope" outside of the contexts explicitly recognized by the Supreme Court.  <u>Turkmen</u>, 789 F.3d at 267.

[18] <u>See, e.g.</u>, <u>Turkmen</u>, 789 F.3d at 226 (acknowledging that "[t]he OIG reports . . . play[ed] a significant role" and "help[ed] orient [the court's] analysis of the Complaint.")

Certainly, the Supreme Court has been reluctant to permit claims against high-level government officials, and the Defendants deftly argue that <u>Turkmen</u> should be limited to its facts.  But the fundamental question before this Court is whether it is <u>plausible</u> (<u>i.e.</u>, more than just possible but less than probable) that the Supervisor Defendants were involved with the allegedly false or misleading information in the Affidavit before it was submitted to the magistrate.  And while Ganek does not have the benefit of <u>Turkmen</u>'s OIG Report to bolster his claims, there are obvious parallels in Ganek's allegations.  Namely, Ganek pleads that the Supervisor Defendants were kept abreast of developments, prioritized the prosecution of high-level executives, and tipped the *Wall Street Journal*.   Moreover, the Complaint contains thorough allegations establishing the high priority placed by the Supervisor Defendants on the insider trading investigation.  (<u>See, e.g.</u>, Compl. ¶¶ 52, 54, 62.)  These allegations include specific facts establishing the plausibility of the Supervisor Defendants' involvement prior to the raid, including admissions by certain defendants that the raid's consequences "had been carefully considered at the highest levels," and DOJ policy indicating that any decision to tip the press required supervisory approval.  (Compl. ¶¶ 97, 110.)  In short, given the high-profile nature of the investigation and involvement of the Supervisor Defendants, as alleged in great detail in the Complaint, it is plausible that some of the Supervisor Defendants would have learned details of the November 2, 2010 Meeting and, at the very least, "entertained serious doubts as to the truth

of [the allegations] in the Affidavit."  United States v. Rajaratnam, 719 F.3d 139, 154 (2d Cir. 2013) (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).[19]

As recognized by the Supreme Court, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  Twombly, 550 U.S. at 556.  That said, in a case alleging unconstitutional overreach, it would be ironic to permit Plaintiff to unnecessarily embroil each of the nine Supervisor Defendants in time-consuming discovery given the possibility (and perhaps probability) that not all of the Supervisor Defendants were directly involved with the allegedly false Affidavit.  Indeed, this concern is tacitly recognized by Ganek.[20]  The parties should account for that reality by formulating an equitable and proportional discovery plan consistent with the recent revisions to the Federal Rules of Civil Procedure.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Specifically, Defendants' motion is granted only with respect to Plaintiff's Fifth Amendment claim (Count 1) to the extent it relies on stigma-plus and substantive due process theories of liability, and Plaintiff's Fourth Amendment claim (Count II), to the extent it challenges the "reasonableness" of the manner in which the search was conducted.  All other aspects of Plaintiff's Fifth and Fourth Amendment claims survive.  Defendants' motion to

---

[19] Defendants assert that it is simply implausible that, if the non-Supervisor Defendants fabricated evidence in the Affidavit, they would confess that fabrication to their supervisors.  But it seems entirely plausible that those defendants would have run such a decision "up the ladder" in shaping the Affidavit.  In any event, this Court cannot credit Defendants' argument on a motion to dismiss, as it is a question of fact requiring discovery.

[20] See Opp'n at 45 ("Should discovery reveal that any particular Supervisor Defendants were not personally involved, Plaintiff will voluntarily dismiss any claims against them."); Supp. Auth. Ltr. (ECF No. 54) at 5 ("Should the evidence not support Plaintiff's allegations that each of the Supervisor Defendants were involved in the fabrication . . . Mr. Ganek will voluntarily dismiss those Defendants that were uninvolved.").

dismiss is denied with respect to Plaintiff's claims for failure to intercede (Count III) and supervisory liability (Count IV).

Discovery is now appropriate to ascertain whether this case is about a simple misunderstanding or whether something more troubling was afoot.  A status conference is scheduled for March 30, 2016 at 11:00 a.m. in Courtroom 20B.  The parties should meet and confer and submit a joint letter by March 25, 2016 outlining their respective positions on how discovery should proceed.

The Clerk of Court is directed to terminate the motion pending at ECF No. 43.

Dated: March 10, 2016
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Copies via ECF to all counsel of record.*